# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ALEX DEMOLLE,
Defendant and Appellant.

S159120

Alameda County Superior Court
140729

---

June 1, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Kruger, Groban, and Jenkins[*] concurred.

Justice Liu filed a concurring and dissenting opinion.

Justice Evans filed a concurring and dissenting opinion.

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. DEMOLLE

S159120

Opinion of the Court by Guerrero, C. J.

On July 23, 1999, 11-year-old Jaquita Mack went missing.[1] Her body was discovered the next day on a hillside in Oakland. Two weeks later, defendant Alex Demolle confessed to raping and strangling Jaquita. After hearing this confession and other evidence, a jury convicted defendant of first degree murder. (Pen. Code, § 187.)[2] The jury also found true two special circumstance allegations: murder during the commission of a rape (§ 190.2, subd. (a)(17)(C)) and murder during the commission of a lewd and lascivious act on a person under the age of 14 (*id.*, subd. (a)(17)(E)). The jury returned a sentence of death, which the trial court imposed. This automatic appeal follows.

We affirm the judgment.

## I. BACKGROUND

### A. Evidence at the Guilt Phase

The evidence introduced by the prosecution established that Jaquita lived with her aunt and court-appointed legal guardian, Verna White. However, in July 1999, she was visiting her biological parents, James Mack and Kenya White, staying

---

[1] Both parties refer to the victim by her first name. We do the same.

[2] All further unspecified statutory references are to the Penal Code.

1

with them at their house on East 29th Street in Oakland. James Mack and Kenya White were no longer in a romantic relationship, and James Mack's girlfriend, Chris Aubrey, was also residing at the house on East 29th Street.

Around 5:00 p.m. on Friday, July 23, 1999, Jaquita left the house to ride her bicycle to a nearby store. At some point, Aubrey realized Jaquita had been gone for a long time. Aubrey went to look for Jaquita. While doing so, she encountered defendant, who lived around the corner from East 29th Street in an apartment complex on Fruitvale Avenue. She asked if he had seen Jaquita, giving a description of both Jaquita and the bicycle she was riding. Defendant denied having seen Jaquita. Aubrey subsequently called the police to report Jaquita missing.

The police discovered Jaquita's body the next day on a hillside about a mile from her parents' house. Her body was wrapped in a sheet, her midriff was exposed, and her pants were low on her pelvis and irregularly laced.

Doctor Sharon Van Meter conducted an autopsy. She determined that Jaquita had died from "[a]sphyxia due to strangulation." Van Meter collected vaginal and rectal swabs from Jaquita's body. Sperm was detected from both swabs, and a DNA profile was created from the rectal swab.

On August 3, 1999, Oakland Police Sergeant Derwin Longmire, the lead detective on Jaquita's case, was conducting a neighborhood canvass around the area of East 29th Street and Fruitvale Avenue. Longmire explained that a canvass "is a door-to-door search where [police] officers . . . go to each residence . . . [¶] . . . knock on the door and talk to the residents." As part of this canvass, Longmire spoke to defendant briefly. Defendant

told Longmire that he had seen Jaquita "earlier in the day" before she was reported missing.

Three days later, on August 6, 1999, Longmire knocked on defendant's door to follow up on the conversation. Defendant answered the door and invited Longmire in. Defendant told Longmire that he "saw [Jaquita] late in the evening [of July 23], that she had fallen off her bike and that he helped her up, that just a few minutes after that . . . an aunt [Chris Aubrey], came around the corner looking for her, and that ultimately he had left the residence and went on to Lake Tahoe." Longmire asked defendant if he would be willing to accompany him to the police station to memorialize defendant's statement. Defendant agreed and brought along his three-year-old daughter. While at the police station, Longmire asked if defendant would consent to give a blood sample. Defendant initially refused but subsequently agreed. After audio taping defendant's interview, Longmire took defendant and his daughter to a hospital, where defendant had his blood drawn. Defendant and his daughter then returned home.

The DNA profile generated from defendant's blood sample matched that of the sperm recovered from Jaquita's body. An expert testified that "[t]he . . . profile of the semen of the rectal swab [collected from Jaquita's body] [wa]s indistinguishable within the match criteria of the laboratory from the . . . profile of Alex Demolle."

Based on the DNA match, the police arrested defendant on August 8, 1999. On the same day, defendant confessed to raping, strangling, and disposing of Jaquita's body. In two statements, one taken by Longmire and the other by a deputy

district attorney, defendant gave the following account of the day of Jaquita's death.

In July 1999, defendant was living in an apartment complex on Fruitvale Avenue with his wife and three-year-old daughter.  He was home alone on the afternoon of July 23, waiting to be picked up by two friends for a trip to Lake Tahoe.  At some point around 5:00 p.m. to 5:30 p.m., defendant was outside his apartment and saw Jaquita, whom he claimed to have never met before.  Defendant was feeling nauseous because of some food that he had consumed earlier and went back inside to take a nap.  Sometime between 6:30 p.m. and 8:00 p.m., defendant was outside again and saw Jaquita falling off her bicycle.  He helped pick up the bicycle, and Jaquita rode off.  Some minutes thereafter, a person defendant identified as Jaquita's aunt — but who was in fact Aubrey — came by and asked if defendant had seen "a little girl riding a pink . . . bike."  Defendant said yes and told Aubrey to look at a spot "around the corner" where the local children are known to congregate.  Aubrey left.  Defendant then sat down by his front door to play video games.  Shortly thereafter, Jaquita rode by on her bicycle.  Seeing defendant playing his video games, Jaquita stopped and asked if she could play.  Defendant said yes and invited her in.  She came into the apartment, bringing her bicycle with her.  Defendant closed the door behind her.

Once inside the apartment, Jaquita sat down on a mattress in the living room and began playing a video game.  Defendant sat next to her.  At some point, he touched her arm and legs.  She looked at him and went back to the video game.  He touched her again, this time either closer to her breasts or between her legs.  She got up to leave.  He pushed her down and pulled down her pants.  Then with her legs held up in the air,

defendant inserted his penis into Jaquita's vagina, moving in and out a few times. Jaquita was crying and making "little whimpering noises," with her hands up, "petrified" "[l]ike if a dog was coming up [and] she was trying to keep her hands from getting . . . bit." After about 20 seconds, defendant pulled his penis out of Jaquita's vagina and ejaculated in the process.

Defendant was nervous and scared. He thought "about [his] daughter and [his] life," "[his] family and how embarrassing this was," and he did not "want to go to jail." He "wrapped [his] hands around [Jaquita's] throat" and "squeez[ed] her whole neck." Jaquita was crying; she did not scream or fight back. Defendant continued strangling Jaquita for about 15 to 20 minutes. When defendant let go of her neck, Jaquita's eyes were wide open and she was dead.

Defendant wrapped Jaquita's body with a bedsheet. He lowered her body about five feet out of a window and dropped it onto the ground. He threw out her bicycle over his back fence. Defendant then went to his next-door neighbor, Delores Hill, and asked to borrow her car so he could visit an aunt. Hill lent him her car. Demolle took Jaquita's body to the car, placing it on the floorboard of the front passenger seat. Just as he was getting into the car, the two friends whom defendant had been waiting for arrived. Defendant told them he would be back shortly. Defendant drove away, stopping at a hillside that he recognized, and there he "swung" Jaquita's body "five feet to the grass."

After disposing of the body, defendant drove back to his apartment and left with his friends. He spent the night at their house with the intention of leaving for Lake Tahoe in the morning. In the middle of the night, one of defendant's two

friends took defendant back home because he was sick with a stomach flu. By the next morning, defendant was feeling better and left for his trip to Lake Tahoe as planned. Defendant returned to his Oakland apartment after the trip and was arrested two weeks later.

Other evidence corroborated defendant's account. Hill, defendant's next-door neighbor, testified that he had borrowed her car the day of Jaquita's disappearance. Hill also testified that the day before he was arrested, defendant told Hill he could not have killed Jaquita because choking somebody "takes a long time" and "he didn't have time to commit a crime like that." One of the friends who picked up defendant for the trip to Lake Tahoe likewise testified to a time frame of events consistent with defendant's account. Jaquita's bicycle was found in the backyard of a property abutting defendant's apartment complex, a location consistent with where defendant said he had discarded the bicycle.

The defense presented no evidence at the guilt phase.

## B. Evidence at the Penalty Phase

### 1. *Prosecution case*

The prosecution introduced victim impact evidence and testimony regarding two incidents of "criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence." (§ 190.3.) These two incidents consisted of an unadjudicated battery that defendant committed against Robert Barnes when defendant was a minor and an unadjudicated criminal threat defendant made against Jeff Samuel about a year before Jaquita's killing.

Jaquita's family members — Verna White, Jaquita's aunt and legal guardian; Jasmine White, Verna White's daughter and Jaquita's cousin; and Khena White, Jaquita's brother — gave victim impact evidence. They described what Jaquita was like, their close relationship with her, and the impact of her death on their family.

Jaquita's fifth-grade teacher — Christine Mohler — also testified about her relationship with Jaquita and how Jaquita's death impacted her. Mohler testified that in her first year as a teacher, she taught Jaquita's fifth-grade class. Mohler developed a "special bond" with Jaquita and "spent the most time with [her], just working with her academically and trying to find ways to motivate her." Mohler testified regarding how Jaquita's murder continued to affect her, stating that she saw the "effects of it in [her] parenting" and that Jaquita's death was "just something you don't leave behind in your life."

2. *Defense case*

A total of 29 witnesses testified on defendant's behalf, including his father, mother, paternal aunt, paternal uncle, maternal aunt, uncle-in-law, cousin, nephew, junior high school teacher, various clergy and church members, multiple friends, four deputy sheriffs working in the jails where defendant was housed, and a former prison warden.

Family members and friends painted the following picture of defendant. He was born in 1975 in New Orleans to Adam Marcell Encalade, Sr. and Mary Ann Demolle. When he was born, defendant suffered a staph infection that required him to stay in the hospital for a month. Encalade worked as a fisherman and was gone from the home most of the time. When defendant was two and a half years old, his mother left Encalade

and moved with her children to Oakland, California, where her family was. Defendant grew up in a big extended family. He was friendly and helpful, often helping to watch the children of family, friends, and fellow church members. Defendant was devoted to his daughter and served as her primary caregiver. Defendant loved fishing and frequently took his daughter fishing with him.

Witnesses testified that based on what they knew of defendant, they were shocked to learn that he had committed the crimes charged. They loved defendant and would miss him if he were executed.

The deputy sheriffs testified that during his time in custody, defendant was well behaved and was "never a disciplinary problem." One of the witnesses, Daniel Vasquez, testified to the conditions that a prisoner like defendant would experience if he were sentenced to life without the possibility of parole. Based on his experience, an interview with defendant, and his study of defendant's incarceration records, Vasquez opined that he had "no concerns" about defendant "being the type of prisoner who would typically lash out or do some harm to others."

The prosecution cross-examined some of the witnesses. The prosecution confronted Vasquez with the fact that defendant's record showed two rule violations and elicited the admission that "[f]uture human behavior of an individual can be difficult to predict." The prosecution also presented evidence that defendant had been arrested in Oakland for attempting to break into a minivan, and the incident occurred as he was leaving a church youth group meeting. The prosecution used the incident to impeach the testimony of a pastor who had

offered a favorable opinion of defendant based on his participation in the church youth group.

At the conclusion of the penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion to modify the verdict and sentenced defendant to death.

## II. DISCUSSION

### A. Guilt Phase Issues

1. *Denial of motion to suppress*

   a. *Background*

Defendant contends that he was unlawfully detained by law enforcement and his subsequent consent to a blood draw was tainted by this illegal conduct. According to defendant, all incriminating evidence obtained thereafter constituted "the fruits of his unlawful detention and thus should have been suppressed."

Defendant raised this argument prior to trial by filing a motion to suppress under section 1538.5. (See § 1538.5, subd. (a)(1)–(A) ["A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure [if]: [¶] . . . [t]he search or seizure without a warrant was unreasonable"].) The magistrate held a preliminary hearing at which Longmire and Bruce Brock, a police sergeant who was present during defendant's August 6 interview, testified to the circumstances surrounding defendant's consent to give blood.

According to Longmire, he first encountered defendant during a neighborhood canvass on August 3, 1999. Defendant told Longmire that he had seen Jaquita on the day of her disappearance. Three days later, Longmire was back

canvassing the area and knocked on defendant's door. As he had been on August 3, Longmire was wearing "dress shoes, slacks, shirt, tie" and possibly "a jacket" but not a formal police uniform. When defendant opened the door, Longmire asked if he could speak with him "a little bit more" about Jaquita's disappearance. Defendant "said yes, opened the door wide, and invited [Longmire] into his home."

After defendant and Longmire sat down at defendant's kitchen table, defendant volunteered that he had seen Jaquita "shortly before dark" on the day of her disappearance. Jaquita had fallen off her bicycle; defendant went to help her, lifting the bicycle and righting it, after which Jaquita rode off. Sometime into the conversation, Longmire asked defendant if he would be willing to come down to the police station because Longmire "wanted to memorialize the statement that [defendant] had just given" but did not "have a recording device" with him. Defendant agreed to go with Longmire but said he had his three-year-old daughter at home with him. Longmire said it was "all right" if defendant brought his daughter with him. Longmire informed defendant that "kids come down quite often when [they] interview people" and defendant's daughter "would either sit in with [them] or sit with somebody watching her and she would be okay." Defendant agreed to accompany Longmire to the police station.

Longmire, defendant, and defendant's daughter then walked to Longmire's police car, which was unmarked and had no "cage" or "locked area in the back." Defendant opened the right rear door to the vehicle, fastened his daughter into the seat with the seat belt, and then got into the front passenger seat. Longmire drove to the police station, which was about two miles away from defendant's residence. Upon arrival, defendant got

out of the car, helped his daughter out, and followed Longmire into the police station's homicide section. Longmire "unlocked the door to the homicide section," and the three entered.

Longmire then guided defendant to one of the interview rooms, Room 203. Room 203 was about eight feet wide by eight feet long. It had windows along two of its walls and a door that contains a "large glass plate." Inside Room 203 was "office-type furniture," including file cabinets, a table, and chairs. The door to Room 203 could be locked, and "if the door is locked from the outside you need a key to unlock it from the interior to get outside."

While defendant remained in the room, Longmire exited Room 203 and locked the door. Longmire explained that he did so because homicide investigators store their weapons in the unlocked drawers of their desks outside of Room 203. It was therefore "very important to be sure that you control the movement of all people coming into that office" and "you can't do that if you've got people walking in and out of rooms where weapons are being stored and unattended." Longmire further explained that his concern was not based on anything that defendant said or did, and he would have had this safety and security concern regardless of who was inside Room 203.

Longmire went to his desk, secured his firearm, and asked Sergeant Brock to assist in conducting the interview. The two officers then returned to Room 203. An interview log indicates that Longmire's initial arrival to Room 203 occurred at 10:55 a.m., and Longmire testified that he was gone from the room for "a minute" before returning with Brock.

Longmire and Brock began interviewing defendant. Longmire could not recall whether defendant's daughter was

also present in Room 203. "Two or three minutes" into the interview, around 10:59 a.m., Longmire read defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The form Longmire used informed defendant of "the right to remain silent," "the right to talk to a lawyer and have him present," and the right to an appointed attorney. Defendant waived his rights and initialed a waiver form confirming that he understood his rights and, "[h]aving these rights in mind," wished to talk to the investigators. Longmire testified that, although defendant was not a suspect, he provided the *Miranda* advisement "as a prophylactic measure in the event that [defendant] gave incriminating information."

Sometime between 11:15 a.m. and 11:35 a.m., Longmire asked defendant whether he would agree to give a blood sample. In the course of investigating Jaquita's murder, Longmire had previously obtained blood samples from other individuals. By soliciting a sample from defendant, Longmire believed he could "either secure a suspect" or "just as importantly . . . eliminate those people that could have potentially been the donor or the suspect" and thus "free [Longmire] to start . . . looking [in] other places." Defendant declined to provide blood, explaining that he was afraid of needles.

At 11:45 a.m., the investigators decided to take a short break. They left Room 203, and the door was locked while the investigators were gone. At this time, Longmire and Brock also decided to "put [defendant's] statement on tape."

Accordingly, at 11:54 a.m., the officers walked defendant to a different interview room, Room 201. Room 201 was roughly eight feet by six feet. It had no windows, and the door only had a small eyehole. The door to Room 201 also locked automatically

whenever it was closed. Despite the locking mechanism, Longmire testified that "there would be no indication to the person sitting in the room that the doors in fact locked" and "the only way [a person] would know is if [he or she] tried to open the door."

"Somewhere between moving from [Room] 203 to 201," Longmire told defendant that "it would be better if [they] left [defendant's daughter] outside of the interview" room. The police "were going to record [defendant's] statement on tape, and oftentimes children have a difficult time sitting through without making noises."

After placing defendant in Room 201, Longmire again left, and the door locked automatically behind him. The interview in Room 201 started at 12:10 p.m. However, "four or five minutes" before the formal interview began, defendant knocked on the door and Longmire answered.[3] While the two were standing

---

[3] More precisely, Longmire said, "There was a period probably four or five minutes before I returned to the room where Mr. Demolle knocked on the door and I came back to answer." Longmire's statement was given in the context of the following exchange:

"Q. And during that period of time [in between when Longmire left and 12:10 p.m. when the interview began] Mr. Demolle was locked in the room by himself?

"A. For the majority of that time, yes. [¶] . . . [¶]

"Q. During some period of that time he was not locked in the room[?]

"A. You asked if he was alone for that entire time and I said for the majority of the time, yes.

with the door open, defendant asked Longmire "how long it would be." Longmire responded that "it would be just a short while." Defendant also asked about his daughter, "want[ing] to know where she was, if she was okay." Longmire said she "was right there in the office with the secretary and she was fine." Defendant "seemed to be okay" with Longmire's response.

Although Longmire could not recall the exact sequence of events, he testified he thought that it was at this time — when defendant knocked on the door and the two men spoke at the doorway — that defendant "talked a little bit about having a party the next day and wanting to prepare for the party." Afterward, Brock walked up and the men entered the room.

Longmire again approached defendant about giving a blood sample. This time, defendant "said he would do it." At 12:13 p.m., defendant signed a "consent to search" form. The consent form reflects that defendant agreed to a search of his residence and "my blood sample being taken." The form also states, "I have been told that I have a right to refuse to allow the police to search my person or my property" and "I have given my consent voluntarily without threats or promises." Defendant signed the form, and it was witnessed by Longmire and Brock. Longmire stated that defendant did not appear to be under the

---

"Q. When during that period from 11:54 till 12:10 was he not alone?

"A. There was a period probably four or five minutes before I returned to the room where Mr. Demolle knocked on the door and I came back to answer. [¶] . . . [¶]

"Q. So that conversation [at the doorway] occurred very close to the end of that . . . 16-minute period between 11:54 and 12:10.

"A. Yes."

influence of alcohol, drugs, or any other substance when he provided his consent.

At 12:22 p.m., the tape recorder was turned on and the taped portion of the interview began. The prosecution played a portion of the recording during the preliminary hearing and entered a transcript of the recorded interview into evidence. The interview began with the officers obtaining biographical information from defendant. Longmire then stated, "Now, what we'd like to do is . . . go on tape here as we are, and chronicle the events leading um, up to the disappearance of . . . the young Jaquita Mack on [¶] . . . [¶] the 23rd of ah, July, okay?" After defendant responded, "Alright," Longmire continued, "Now if you will, I'm just gonna let you in your words um, tell us about that evening in respects to Jaquita." Defendant subsequently volunteered detailed, lengthy answers about his interaction with Jaquita and what he did in the hours thereafter. In response to defendant's answers, Longmire generally replied, "Okay" and asked follow-up questions.

Brock also participated in the questioning. The officer asked a series of questions that he directed defendant to answer "yes" or "no." Brock phrased his request as follows: "You know I got some questions and kind of, I have a weird way of asking questions if you don't, if you can bare [*sic*] with me for a second. [¶] . . . [¶] Can you, you do me a favor and if you could answer them like yes and no. 'Cause I just kind of wanna see how you respond to them? Fair enough?" Defendant responded, "Okay." Brock subsequently asked defendant some innocuous questions (e.g., "Is your name Alex . . . Demolle?") and requested that defendant "purposely lie to [him] if [he] can" on some of the queries (e.g., "is my shirt red?"). Brock also asked defendant questions directly related to Jaquita's death. Before the first of

these questions, Brock said, "Now some of these . . . I, you know, you have [to] understand the nature of this investigation." Brock then asked, "did you murder Jaquita Mack," to which defendant answered, "No." Brock asked these "yes" or "no" questions twice, the second time closer to the end of the interview. Defendant denied any involvement in Jaquita's killing.

Toward the end of the interview, Longmire orally confirmed that defendant was "willing to consent to giving [them] a sample of [his] blood." Defendant responded, "I don't have no problems. I mean if that's going just, you know, help out. . . . I have no problems." Defendant reiterated he had signed the consent form and had not "been forced to give" his statement.

The taped portion of the interview ended at 12:55 p.m. Following the interview, Longmire, Brock, defendant, and defendant's daughter drove to a hospital to have defendant's blood drawn. Defendant "appeared to be quite relaxed"; he "sat in the back seat, sang along with songs that were on the radio" and was "real lighthearted." Defendant had his blood taken shortly after arriving at the hospital. He and his daughter returned home after this August 6 blood draw. Two days later, when the DNA from defendant's blood was found to match with the DNA from the semen recovered from Jaquita's body, police officers arrested defendant at his residence.

Sergeant Brock gave a similar account of his interaction with defendant on August 6. Brock confirmed that shortly before the taped portion of the interview began, Longmire asked defendant if he would mind giving a blood sample; when

defendant agreed, Longmire filled out the consent form and defendant signed it.

After hearing the evidence, the magistrate denied the motion to suppress. In explaining its reasoning, the court noted that it had reviewed "cases that were on point on the custody issue." The court stated that in those cases "we do not have the benefit of a statement from the defendant" — presumably because the defendant did not testify at the preliminary hearing — "so we are left to surmise and speculate from the circumstances what the state of mind of the defendant is, and it seems to hinge upon whether or not the defendant thought he was in custody." The court next enumerated the bases it relied upon in denying the motion. First, it observed that the defense attempted to distinguish prior case law by relying on the fact defendant was given *Miranda* warnings. However, the court stated that it understood Longmire to have given such warnings merely as a "precaution[]." "Secondly," continued the court, "I did review the transcript and I did not find the interrogation to be particularly accusatory." "Thirdly," the court emphasized that when defendant and Longmire stood talking at the door of Room 201, "they talked about [defendant's] return to his home, the fact that he had a party to prepare for the next day. So to me that tells me that [defendant] is aware that he is returning to his home, he is not in a custody situation, and similarly, shortly thereafter Detective Longmire informs him that they are going to take him to the hospital and then take him home." Finally, "most important" to the magistrate was "the presence of the child" because the magistrate did "not think that a reasonable person, knowing the child was at the police station . . . that a reasonable person would believe himself to be in custody with no provision being made for the child."

Defendant contested the magistrate's ruling by filing a motion under section 995 before the superior court. (See § 995, subd. (a) ["the indictment or information shall be set aside by the court in which the defendant is arraigned, upon his or her motion . . . [¶] . . . [¶] [if] the defendant had been committed without reasonable or probable cause"].) After hearing arguments from the parties and taking into consideration "the totality of the circumstances," the superior court denied the motion.

b. *Analysis*

Defendant argues his "consent to provide a blood sample was obtained during his unlawful seizure and detention in violation of the Fourth Amendment," and thus "the results of the blood test and [his] subsequent incriminating statements" should have been suppressed. We reject defendant's claim.

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).) Defendant concedes that his initial decision to go to the police station was consensual.[4] The primary question we address here is whether subsequent circumstances transformed the

---

[4] "Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*Manuel G., supra,* 16 Cal.4th at p. 821.)

consensual encounter into an unlawful seizure or detention under the Fourth Amendment. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 341 (*Zamudio*) ["Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure"].)

A person has been seized or detained when a reasonable person would not feel free to leave or otherwise terminate the encounter. (*People v. Brown* (2015) 61 Cal.4th 968, 974, 979–980; accord, *United States v. Mendenhall* (1980) 446 U.S. 544, 554 (*Mendenhall*); *People v. Boyer* (1989) 48 Cal.3d 247, 267 (*Boyer*) ["[T]he test of detention under the Fourth Amendment is whether a reasonable person in the suspect's position would have felt free to leave"].)[5]

---

[5] We have previously described "the test for determining whether a person was seized under the Fourth Amendment or was in . . . custody [such that a *Miranda* advisement is required as being] *essentially the same*: whether a reasonable person would have felt he or she was at liberty to leave or to decline the officers' requests" for cooperation. (*People v. Kopatz* (2015) 61 Cal.4th 62, 80, italics added (*Kopatz*).) In light of this overlap, although defendant does not premise his claim on any alleged violation of *Miranda*, in addressing his argument we consider decisions that have addressed similar claims premised on the Fourth Amendment and alleged violations of a defendant's *Miranda* rights. We need not consider whether different analyses would be required under other circumstances not present here. (See *People v. Holloway* (1990) 50 Cal.3d 1098, 1114–1115 (*Holloway*) [applying the same analysis to reject a defendant's arguments that he was in custody both under the Fourth Amendment and for purposes of *Miranda*]; but see *Howes v. Fields* (2012) 565 U.S. 499, 509 ["Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. . . . '[T]he freedom-of-movement test identifies only a

Where, as here, a magistrate rules on a motion to suppress under section 1538.5 raised at a preliminary hearing, the magistrate "sits as the finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences." (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244.) The superior court ruling on a subsequent motion under section 995 sits as a reviewing court, drawing every legitimate inference in favor of the magistrate's determination; the superior court cannot substitute its judgment for that of the magistrate on issues of credibility or reweigh the evidence. (See *People v. Laiwa* (1983) 34 Cal.3d 711, 718.) On review of the superior court's ruling, we in effect disregard the ruling of the superior court and directly review the determination of the magistrate. (*Ibid.*; *People v. Hawkins* (2012) 211 Cal.App.4th 194, 200 ["When a motion to suppress evidence under section 1538.5 is denied at the preliminary hearing and reviewed by the trial court in a section 995 proceeding, even though the appeal is from the trial court, we, in effect, review the magistrate's decision directly, deferring to the magistrate's factual findings"].) We draw all presumptions in favor of the magistrate's express or implied factual determinations and must uphold them if they are supported by substantial evidence (*Laiwa*, at p. 718), but we exercise our independent judgment in determining the ultimate constitutional question of whether a

---

necessary and not a sufficient condition for *Miranda* custody' "]; *People v. Caro* (2019) 7 Cal.5th 463, 491 [similar]; *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1405 ["Whether an individual has been unreasonably seized for Fourth Amendment purposes and whether that individual is in custody for *Miranda* purposes are two different issues"].)

seizure occurred within the meaning of the Fourth Amendment. (*Zamudio*, *supra*, 43 Cal.4th at p. 342.)

Applying these standards, we conclude defendant was not unlawfully detained when he consented to a blood draw. Preliminarily, the fact that Longmire first encountered defendant during a neighborhood canvass, while not specifically looking for him, would have reasonably conveyed to defendant that he was not a suspect at the time. Moreover, the informal nature of this first meeting plausibly informed how defendant perceived Longmire on the day of the interview three days later.

We further agree with defendant's concession that his decision to accompany Longmire to the police station for questioning on August 6 was consensual. After defendant described an innocuous encounter with the victim, Longmire asked if defendant was willing to go to the station to memorialize the statement. The police officer was wearing plain clothes and displayed no overt sign of authority, e.g., flashing his badge or firearm. Defendant agreed, and along with his young daughter, walked freely to the officer's unmarked vehicle. Defendant rode in the front passenger seat of the vehicle and freely walked into the police station behind the police officer upon arrival. At no point was defendant patted down for weapons, handcuffed, or subjected to bodily restraints. (See *Kopatz*, *supra*, 61 Cal.4th at p. 80 [in determining whether a defendant was seized, noting as relevant the fact that "officers did not handcuff defendant or display any weapons," "[d]efendant walked unassisted to the patrol car," "[t]he officers did not frisk or search defendant before he entered the patrol car," and "[t]he drive to the station was only 10 minutes, and defendant did not voice any complaints or opposition"].) As in *Zamudio*, the evidence in the record here "supports the

conclusion that there was no threat or application of force, no intimidating movement, no brandishing of weapons, no blocking of exits, and no command associated with the officers' request that defendant come to the police station." (*Zamudio*, *supra*, 43 Cal.4th at p. 344; see *ibid.* [concluding a defendant was not detained for Fourth Amendment purposes].)

Nothing occurred at the police station to transform defendant's voluntary encounter into a coercive one in which a reasonable person in defendant's situation would not feel free to leave or otherwise terminate the interview.[6] Once at the station, defendant — as the magistrate found — was not subjected to "hostile, menacing, or accusatory" questioning. (*Zamudio*, *supra*, 43 Cal.4th at p. 345.) Substantial evidence supports the magistrate's finding that the questioning was not accusatory. The transcript of the recorded interview, which the magistrate reviewed, reveals that after obtaining some background information from defendant, Longmire began the questioning by asking defendant to "tell us" "in your words" "about that evening" that Jaquita disappeared. Defendant provided lengthy responses, in which he volunteered various

---

[6] We assume for present purposes that activity occurring after defendant's consent was first obtained is relevant to our analysis. (Compare *Kopatz*, *supra*, 61 Cal.4th at p. 79 ["the test for determining if a seizure occurred is whether, ' "in view of *all of the circumstances surrounding the incident*, a reasonable person would have believed that he was not free to leave" ' " (italics added)] with *People v. 48,715 United States Currency* (1997) 58 Cal.App.4th 1507, 1514 [concluding that a subsequent detention "did not terminate" a prior consent because "[e]ven if we were to find the detention here illegal, it did not produce or lead to the search"].) We conclude that there was no detention at any juncture here.

details, many of which were not directly elicited by the questions. Although the officers asked for clarification at times, they never contradicted defendant's statements or implied that they did not believe his account. The officers simply responded "Okay" or asked another question after defendant gave a response.

Although defendant claims "the magistrate overlooked the series of questions Brock asked" defendant, the record does not support this contention. The magistrate expressly noted having reviewed the transcript of the recorded interview, and we decline to speculate that the magistrate overlooked portions of that interview. And even considering these questions, we are convinced the magistrate was correct in concluding that the interview was not "particularly accusatory."[7] Brock prefaced his questions by asking defendant to "bare [*sic*] with" his "weird . . . way of asking questions," to "do [him] a favor and . . . answer them like yes and no." When Brock asked defendant about Jaquita's killing directly, he first asked defendant to "understand the nature of this investigation." In response to being asked if he killed Jaquita, defendant answered, "No," and Brock simply said, "Okay," before continuing with the next question. Defendant exhibited no difference in tone of voice or the speed at which he responded when answering questions about Jaquita's homicide than he did when responding to other questions. The bulk of the conversation consists of defendant's

---

[7]     To the extent defendant asserts that the police "had requested to tape-record *only*" Brock's "accusatory" or "adversarial" questioning of him, the record refutes his assertion. (Italics added.) Longmire's queries to defendant were also recorded, and Brock's questioning did not occur until 14 pages into the 19-page transcript of the recorded interview.

narrative of his interaction with the victim.  Brock briefly asked defendant twice if he murdered Jaquita; he was never subjected to extensive questioning, accusations, threats, or intimidation. (See *Zamudio*, *supra*, 43 Cal.4th at p. 345 ["Although the officers told defendant about the discrepancies between his statements and his wife's, they did not make accusations against him"]; *People v. Spears* (1991) 228 Cal.App.3d 1, 25–26 ["The tone of the officers throughout the interview was courteous and polite.  At no time did the officers attempt to threaten or intimidate appellant [citation], nor did they lead him to believe that he was a suspect in the murder, that they considered him to be guilty, or that they had the evidence to prove his guilt in court.  [Citation.]  In sum, although the questions were detailed, they were not accusatory in nature"]; *People v. Moore* (2011) 51 Cal.4th 386, 402 [similar].)

All told, the officers simply accepted defendant's answers, made no indication that they disbelieved him, and adopted a measured, polite tone, at one point phrasing their request for defendant's cooperation as "do[ing] [the officer] a favor" by answering yes-or-no questions.  Under these circumstances, a reasonable person in defendant's position would have felt free to leave or otherwise terminate the encounter.  (See, e.g., *Kopatz*, *supra*, 61 Cal.4th at p. 81; *Holloway*, *supra*, 50 Cal.3d at p. 1115; *Zamudio, supra*, 43 Cal.4th at p. 345; see also *People v. Stansbury* (1995) 9 Cal.4th 824, 832 (*Stansbury*) [a *Miranda* custody case in which we stated "the nature of the interview in this case, which was brief and not accusatory, would not convey to the reasonable person the impression that he or she was in custody"]; compare *Boyer*, *supra*, 48 Cal.3d at p. 268 [concluding that "the situation quickly ripened into a full-blown arrest inside the station house" when, among other things, the

defendant "was subjected to more than an hour of directly accusatory questioning, in which [the interrogating officer] repeatedly told him — falsely — that the police knew he was the killer, had all the necessary evidence, intended to charge him with the crimes, and would prove his guilt in court"]; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1163 ["Given the officers' repeated rejection of defendant's story, a reasonable person eventually would have realized that telling the 'truth' meant admitting the officers' information was correct and explaining how and why one was involved and that until this 'truth' came out, he or she could not leave"].)[8]

In addition, the record establishes that defendant understood he would be going home after his interaction with the police, as would a reasonable person in his situation. As the magistrate noted, during a conversation with Longmire at the doorway of Room 201, defendant asked how long the interview would take and said he was "having a party the next day and want[ed] to prepare for the party." The conversation indicates defendant expected to go home shortly after the interview, with time to prepare for a party that would take place the next day. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1401 (*Leonard*) ["defendant's comments [indicating that he felt ' "free to go" ']

---

[8] Defendant also contends the magistrate's findings should be rejected because the magistrate erroneously applied a subjective standard rather than an objective test examining whether a reasonable person would feel free to leave or end the questioning. In denying defendant's motion to suppress, however, the magistrate specifically stated that it did not think "a reasonable person would believe himself to be in custody" under the circumstances — indicating it was applying the correct, objective test.

reinforce our view that a reasonable person in his position would have felt free to leave"].)

A reasonable person in the same situation would have shared defendant's understanding that he was going home shortly. As the magistrate observed, the record supports a finding that "Detective Longmire inform[ed] [defendant] that they [were] going to take him to the hospital and then take him home." During his testimony at the preliminary hearing, Longmire stated he told defendant that "we were going to tape the statement and we'd step out and then we would take him home — to the hospital."

The parties dispute whether Longmire's testimony that they "would take him home" was a misstatement, i.e., whether Longmire had intended only to say that they "would take him . . . to the hospital" and immediately corrected himself after saying they "would take him home." The Attorney General argues that, regardless of any ambiguity in Longmire's statement, "*everyone* who was present in court during Longmire's preliminary examination testimony, *including defense counsel*, understood Longmire to have testified that he told [defendant] he would take him to the hospital and then home." In support, the Attorney General cites numerous references in defendant's own trial court briefing reflecting this understanding. Defendant responds that even if Longmire did tell defendant that he would take him home, the statement was made only after defendant's consent to give blood was obtained and "Longmire's statement that he would take him home . . . [was] conditioned on [defendant's] consent to make a taped statement and give a blood sample."

The record does not support the contention that Longmire suggested to defendant he would not take defendant home unless defendant agreed "to make a taped statement and give a blood sample." In fact, defendant orally confirmed toward the end of the recorded interview that he voluntarily consented and was not coerced. Defendant's contentions at most amount to an argument that Longmire gave ambiguous testimony regarding what he told defendant. But we defer to the magistrate's resolution of such facts when, as here, the record supports the magistrate's finding. (See *Zamudio*, *supra*, 43 Cal.4th at p. 342; see also *People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*) [on review of the denial of a motion to suppress evidence, " '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' "].) Furthermore, defendant did, in fact, return home after his trip to the police station and the hospital for a blood draw. The fact that the officers allowed defendant to go home after the interview, and remain at large for two days, tends to corroborate their account of the tenor of their interactions with defendant as being inconsistent with any detention. (See *Kopatz*, *supra*, 61 Cal.4th at pp. 81–82; *Leonard*, *supra*, 40 Cal.4th at p. 1401; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

The magistrate also found it significant that defendant voluntarily brought his young child to the police station with him. As the magistrate explained, a reasonable person, "knowing [a] child . . . had accompanied him to the police station," would not "believe himself to be in custody with no provision being made for the child." We agree. A reasonable person would understand that a police station is generally ill equipped to take care of a young child over an extended period of time, and the fact that a child was present while the sole

person responsible for her care was being questioned supports an inference that the questioning would not be prolonged and the person was free to leave and continue caring for the child.

Defendant disagrees, instead contending that "a person could reasonably have concluded the police were actually detaining him and planned to call a relative or even Child Protective Services to care for his daughter once they were at the station." But there was no discussion of any plan to call Child Protective Services or make any alternative arrangements for the care of defendant's child, and the magistrate was not required to draw the unsupported inference defendant advances.

Defendant also contends that a "confluence" of additional factors supports his argument that a reasonable person in his situation would not have felt free to leave. We disagree with defendant's assessment.

First, defendant focuses on his separation from his daughter during his interview. Defendant asserts "[h]e was not told he could join his daughter and she was not brought to him, but instead he was told she was being looked after until the police put his statement on tape." "Under those circumstances," defendant contends, a reasonable person would feel that "[i]f he refused to consent or to answer questions, the taping might never be over, the police would keep him separated from his daughter, and he would not be free to leave." But there is no evidence that the police ever implied defendant would only be reunited with his daughter if he consented to the blood draw. When defendant agreed to go to the police station with his daughter, he was told that she "would either sit in with [him and Longmire] or sit with somebody watching her." The fact that his

daughter ended up "sit[ting] with somebody watching her" at the police station could not have reasonably surprised defendant or caused a reasonable person in his situation to conclude the encounter was no longer voluntary and they were no longer free to leave or cease cooperating. In addition, when defendant asked about his daughter's whereabouts and was told that "she was right there in the office with the secretary and she was fine," defendant "seemed to be okay with that" and was not "upset" or "frustrated." And the police had previously provided a reasonable explanation why a three-year-old child would not be present during the recorded interview, i.e., the police "were going to record [defendant's] statement on tape, and oftentimes children have a difficult time sitting through without making noises." This record does not support defendant's assertion that a reasonable person in this situation would conclude they would only be reunited with their child if they consented to a blood draw.

Second, defendant contends that the provision of *Miranda* warnings shortly after he was brought to the station "would have sent a strong signal that he was being detained." Whether a subject was provided with *Miranda* advisements is one factor that we consider in analyzing whether the subject was in custody. (See *Boyer, supra*, 48 Cal.3d at p. 268 [treating the fact that the defendant "was informed of his *Miranda* rights" as a factor supporting the conclusion that he was under arrest]; *Zamudio, supra*, 43 Cal.4th at p. 344 [that the "[d]efendant was not given his *Miranda* rights" is a circumstance indicating that

he "was not detained within [the] meaning of the Fourth Amendment"].)[9] But it is not dispositive.

We consider on a case-by-case basis whether the giving of a *Miranda* warning that is not legally required contributes to a seizure finding under the Fourth Amendment. (*Caldwell v. State* (Fla. 2010) 41 So.3d 188, 202 (*Caldwell*).) Although "the reading of *Miranda* warnings during a consensual police encounter might add to the coercive nature of that encounter under at least some circumstances" (*ibid.*), in this case, Longmire's advisement did not transform defendant's interaction with law enforcement into a Fourth Amendment detention.

As discussed, defendant went to the police station voluntarily and was not detained during the car ride or the walk to the police station's homicide section. Defendant arrived at

---

[9] In *Stansbury*, we disapproved of *Boyer* to the extent its language — stating that a defendant "was informed of his *Miranda* rights, an indication that the officers themselves believed the situation might be tantamount to custody" (*Boyer*, *supra*, 48 Cal.3d at p. 268) — "may be read to suggest that an officer's subjective focus of suspicion is an independently relevant factor in establishing custody for the purposes of *Miranda*." (*Stansbury*, *supra*, 9 Cal.4th at p. 830, fn. 1.) We reiterated, however, that "evidence of the officer's subjective suspicions or beliefs is relevant . . . 'if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.'" (*Id.* at p. 830.) In other words, advising a defendant of his or her *Miranda* rights can be relevant in this context not because it goes to the police officer's subjective state of mind, but because it can have the effect of conveying to a reasonable listener, under a given set of circumstances, that he or she is not free to leave or otherwise end the encounter with law enforcement.

the police station around 10:55 a.m. and was read his *Miranda* rights approximately five minutes thereafter. Accordingly, a very short period of time elapsed between defendant's arrival at the police station and when he was given *Miranda* warnings. No substantive questioning took place in the interim.

A reasonable person would have felt free to leave or terminate the encounter after being *Mirandized* under the circumstances presented here. Longmire testified he advised defendant of his *Miranda* rights simply as a "prophylactic measure in the event that [defendant] gave incriminating information." Because Longmire did not inform defendant of his intention, we do not consider Longmire's " 'uncommunicated state of mind.' " (*Zamudio, supra*, 43 Cal.4th at p. 341; *ibid.* ["an 'officer's uncommunicated state of mind . . . [is] irrelevant' "].) However, Longmire's other actions — his polite requests, the tone of the interview he conducted, the nonconfrontational nature of the questioning, and the fact that he ultimately allowed defendant to return home — are consistent with his statement that defendant was not being detained. (See *Stansbury, supra*, 9 Cal.4th at p. 830 ["evidence of the officer's subjective suspicions or beliefs is relevant . . . 'if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave' "]; *Michigan v. Chesternut* (1988) 486 U.S. 567, 575, fn. 7; *Caldwell, supra*, 41 So.3d at p. 203 ["the circumstances of the encounter after the warnings indicate that the tenor of the conversation remained consensual. . . . [The defendant] was also aware, due to the *Miranda* warnings, that he had the right to remain silent"].)

Third, defendant contends he was "secured in locked rooms and his movement was thereby restrained." As previously noted, defendant was placed in two different interview rooms. One room was bigger, with a window and "office-type furniture." The other was smaller and had no window. Both rooms were capable of being locked.

The parties center their dispute on whether defendant knew the rooms were locked. (See *Green v. Superior Court* (1985) 40 Cal.3d 126, 134, 135 (*Green*) [in determining whether interviews were " 'custodial' " for *Miranda* purposes we noted that a factor favoring the conclusion that the defendant was in custody is "the interviews took place in a locked room," but we then observed that "[t]he record . . . does not reveal whether defendant realized the room was locked"].) The Attorney General maintains that the record does not demonstrate "whether [defendant] knew the interview room doors were locked." Defendant, on the other hand, states that his actions — including his knocking on the door of Room 201 — showed he did realize he was locked inside the interview rooms.

Even if defendant was aware that the rooms were locked, however, the fact that he was in a locked room is not enough in itself to establish that he was detained. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 403 [a *Miranda* custody case in which we stated "the fact that [the defendant] was questioned in the police station's polygraph examination room does not necessarily require a finding of custody, even if the room was in a secure area"]; *Stansbury*, *supra*, 9 Cal.4th at p. 834 ["although defendant had been admitted to the jail section of the police station through locked doors and would have needed assistance to leave the facility, these facts alone do not establish that he was in custody"]; *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 65

["While the interview was conducted in a section of the police station to which the public was not given free access, and respondent would have required the accompaniment of an officer to leave, this was insufficient to have led a reasonable person in respondent's position to understand that he was in custody [for *Miranda* purposes]"].)  Here, as in *Stansbury*, although defendant was in locked spaces and "would have needed assistance to leave the facility," "[t]here is no evidence to indicate that a reasonable person in his position would feel that [such] assistance . . . would not be forthcoming." (*Stansbury*, at p. 834.)

Furthermore, the fact that defendant was left alone in the rooms for brief periods does not mean he was unlawfully detained.  Although Longmire left the interview rooms more than once, he returned within minutes each time.  Even when he was not present in the room, Longmire was in close proximity and attentive to defendant, as indicated by the fact that he came back when defendant knocked.  Although defendant argues that he "could have been knocking for as long as *five minutes* before Longmire returned," the record does not support his argument.  Defendant bases his contention on Longmire's statement that "[t]here was a period probably four or five minutes before I returned to the room where Mr. Demolle knocked on the door and I came back to answer."  However, Longmire's statement was given in response to a question asking, "When during that period from 11:54 [a.m.] till 12:10 [p.m.] was he not alone?"  After Longmire answered as described above, counsel then followed up, "So that conversation [at the doorway] occurred very close to the end of that . . . 16-minute period between 11:54 [a.m.] and 12:10 [p.m.]," and Longmire replied, "Yes."  The statement defendant relies upon therefore referred to Longmire

returning to the room four or five minutes before 12:10 p.m., in response to defendant's knocking. We do not understand Longmire's statement to mean that defendant was knocking for four or five minutes before Longmire responded.

Moreover, there is no indication that Longmire "would not have let defendant leave during that period [that he was in a locked room alone] — even to go to the bathroom — without having first" obtained authorization from someone else. (*Green*, *supra*, 40 Cal.3d at p. 136.) Given the other circumstances associated with defendant's presence at the police station, a reasonable person would not have felt that "assistance in leaving the facility would not be forthcoming" simply because Longmire (and Brock) had momentarily left the interview rooms. (*Stansbury*, *supra*, 9 Cal.4th at p. 834.)

Fourth, defendant contends that he was never told "he could leave at any time, or that he had a right to refuse his consent." This argument does little to advance defendant's case. We do not understand defendant as arguing that his consent was actually involuntary. Instead, his claim remains that his consent was the product of an illegal detention. Insofar as the failure to inform defendant that he could leave or refuse the officers' requests is relevant to the Fourth Amendment inquiry, we conclude that in light of the other surrounding circumstances, the absence of such an advisement does not compel the conclusion that he was detained. (See *Zamudio*, *supra*, 43 Cal.4th at p. 346 [explaining that while the "defendant also notes that the officers never told him he did not have to talk or go with them, or that he was free to leave" the United States Supreme Court "has 'rejected . . . the suggestion that police officers must always inform citizens of their right to refuse' police requests" and "[n]o 'presumption of invalidity

attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate' "] see also *Mendenhall, supra,* 446 U.S. at p. 555 ["Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed"].)[10]

In sum, we conclude that defendant's encounter with the police on August 6 was consensual and he was not illegally detained when he consented to have his blood drawn. Accordingly, his motion to suppress was properly denied.

### 2. *Alleged juror bias*

#### a. *Background*

Defendant raises several claims relating to the alleged bias of Juror No. 7. During voir dire, the trial court impressed

---

[10]     Furthermore, the record supports the conclusion that defendant did, in fact, know that "he had a right to refuse his consent," as he exercised that right earlier in the interview. (See *United States v. Drayton* (2002) 536 U.S. 194, 206 [" 'knowledge of the right to refuse consent is one factor to be taken into account' " when assessing whether a suspicionless search was voluntary]; *People v. Ledesma* (2006) 39 Cal.4th 641, 704.) When Longmire first asked for defendant's consent to do a blood draw, defendant declined, and the interview proceeded in the same manner as before. When defendant subsequently agreed to a blood draw, he stated that although he did not like needles, he had "no problems [giving blood] if that's going [to] . . . help out." These circumstances support the conclusion that defendant knew he could refuse to give his consent without consequence, and that when he consented, he did so to "help out" rather than because he reasonably thought he would be detained until he agreed to the blood draw.

upon prospective jurors the need to be fair, and as part of its effort, gave an example of a case where the court recused itself after concluding it could not be fair in a particular case. The court told panels of the venire some version of the following: "I'm starting my 24th year now as a judge and I've tried hundreds of cases, all in the criminal area, and I've seen the worst of the worst. However, I'm also an animal lover. One of the first cases I was given had to do with a case that dealt with cruelty to animals. While we were putting on this hearing and I'm sitting there and I'm already figuring what I'm going to sentence this person to before anybody ever found him guilty. I realized that and so I called the lawyers together and I said, you know what? You need to try this before somebody else because I'm not going to be able to be fair. I recused myself and the case went somewhere. To this day, I will not take a case that deals with that. Now, I can handle a lot of other different types of cases, but that's just one based on the way I perceive things and how I feel about things that I know I can't be fair."

In her oral examination, Juror No. 7 confirmed her ability to be fair in the present case although it involved the rape and killing of an 11-year-old girl, and the juror taught kindergarten through eighth grade students. The juror said, "I feel that every human life is important. So to me, kid, child, adult, doesn't really matter." However, she continued, "If this was an animal case, I absolutely would have a problem with an animal. I volunteer at an animal shelter and I [don't] know whether it's right or wrong, it just would really bother me if it was . . . I don't think I could be impartial if it came to an animal." Defense counsel subsequently discussed this topic with Juror No. 7, asking, "You indicated . . . that you could be impartial in this case. But if it were an animal involved, you might not be

impartial." Juror No. 7 confirmed, "I just love animals. And they just have a different place in my heart than, I guess, people do. They don't always get . . . . I think it's hard for me because I work at a shelter that I feel bad for them." Juror No. 7 also stated that "growing up," she "always had several dogs," "[s]ometimes hamsters," and "[o]ne time chickens."

During the guilt phase, one of the witnesses, Delores Hill, testified to defendant's activities around the time Jaquita went missing. Hill stated defendant was "hanging out in front, playing with his BB gun or playing music." When the prosecutor followed up by inquiring, "You say playing with a BB gun, what do you mean about that," Hill responded that defendant "had a BB gun that he would play with. He would shoot at the fence or in the air, *shoot at birds*, things like that." (Italics added.) With the jury still present, defense counsel moved to strike the testimony about shooting at birds and stated defendant never "hit a bird." The trial court granted the motion. Upon cross-examination of Hill, defense counsel elicited from her that "during the entire time [Hill] knew [defendant]" she had not known him "to do physical harm to any living creature, animal, fish, person, anybody, anything," "[n]ot even an ant."

Out of the presence of the jury, defense counsel moved for a mistrial or "alternatively . . . taking Juror Number Seven off the panel [and] replacing her with an alternate." In support of his motion, counsel asserted that when the prosecutor "asked the question about shooting at the birds, [Juror No. 7] was crying after she heard that." The trial court disputed defense counsel's observation, stating "I've been observing this juror pretty closely and . . . I didn't see her crying and I didn't see her . . . stop taking notes [or] . . . do anything other than [what]

she's been doing.  She sits closest to me and I did not observe any unusual behavior on her part."

The prosecutor, too, stated he did not see Juror No. 7 display any unusual behavior.  The prosecutor also explained his purpose for eliciting Hill's testimony.  First, the prosecutor wanted to "establish that in the . . . hours leading up to the offense, that the defendant was his normal, happy self," engaging in "normal activities," "to counter any kind of claim later that something was wrong with him medically or physically that day because he was vomiting."  Second, the prosecutor intended to lay a foundation to rebut, as necessary, defendant's statement that he had never seen Jaquita before the day he raped and killed her.  According to the prosecutor, Jaquita had told one of her classmates about "this weird neighbor [who] would shoot at birds with his BB gun" and "that weird neighbor had tried to talk to her . . . and she . . . rebuffed him."  The prosecutor was uncertain that he would pursue the issue with the classmate but wanted to have the information "out there, depending upon what develops."  Ultimately, the prosecution did not introduce any further testimony involving defendant shooting at birds.

The trial court denied the motion for a mistrial and, implicitly, the motion to replace Juror No. 7.  In its ruling, the court emphasized that it had stricken the testimony, that jurors would be instructed "to treat [the stricken testimony] as [if] they haven't heard it," that defense counsel "got the same witness to testify she never saw [defendant] hurt anything," and the court did not observe any signs of emotional distress on the part of the juror.  Nonetheless, the court stated it "will consider any [special] instruction" on the issue that counsel wished to propose.  The court, however, cautioned the defense to "keep[] in

mind that counsel" acted "at their own risk draw[ing] attention to something that's not that big a deal probably in light of the crime that's been charged and the circumstances of the crime."

The subject of defendant shooting at birds was not mentioned again in front of the jury, and defense counsel did not propose any special instruction concerning the issue. At the end of both the guilt and penalty phases, the court included in its instructions CALJIC No. 1.02, which in relevant part states, "Do not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken by the court; treat it as though you had never heard of it." The court also instructed the jury with the standard instructions that directed jurors to "accept and follow the law," not to be influenced by prejudice, and to base their deliberations "solely upon the evidence properly admitted during the trial."

### b. *Analysis*

Defendant argues the trial court committed reversible error in (1) denying his motion for a mistrial, (2) refusing to discharge Juror No. 7, and (3) failing to conduct an adequate inquiry to determine whether Juror No. 7 should have been discharged.

### i. *Mistrial*

"[A] mistrial should be granted 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Burgener* (2003) 29 Cal.4th 833, 873 (*Burgener*).) In addition, " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion

in ruling on mistrial motions." ' " (*People v. Lucero* (2000) 23 Cal.4th 692, 713–714 (*Lucero*); accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 828 (*Jablonski*) ["Denial of a motion for a mistrial is reviewed for abuse of discretion"].)

We agree with the Attorney General that the trial court acted within its discretion in concluding that the challenged testimony here — that defendant used his BB gun to "shoot at birds" — did not irreparably damage defendant's ability to receive a fair trial (see *Burgener, supra*, 29 Cal.4th at p. 873) or result in incurable prejudice to defendant (see *Lucero, supra*, 23 Cal.4th at p. 714). The testimony was brief, and it was immediately stricken by the trial court. The court later instructed the jury to consider only evidence that was properly admitted, and not to let prejudice affect its decision. We presume the jury followed these instructions. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 634.) Under these circumstances, the trial court did not abuse its considerable discretion in denying defendant's mistrial motion. (See *People v. Johnson* (2015) 61 Cal.4th 734, 764–765 [defendant failed to show that testimony describing someone as his " 'henchman' " caused him incurable prejudice, where testimony was fleeting and stricken by the trial court]; *Burgener*, at p. 874 ["We do not agree the isolated references to an escape, immediately followed by an admonition to disregard them, mandated a mistrial"]; *id.* at pp. 875–876 [same, regarding evidence of an uncharged shooting]; *People v. Marshall* (1996) 13 Cal.4th 799, 839 [upholding the trial court's denial of a mistrial motion when the court inadvertently failed to strike a statement because "at no time during the subsequent progress of the trial was the jury's attention recalled to the statement, whether by an (undesired) admonishment, argument of counsel, or otherwise"; the

statement was "amply rebutted"; and "the jury was not told a damaging falsehood"]; *People v. Cooper* (1991) 53 Cal.3d 771, 838 [when the challenged evidence "was withdrawn, and the jury admonished to disregard it," the "danger of prejudice" is "reduc[ed]"].)

Defendant nonetheless contends that the testimony here had a prejudicial impact because of Juror No. 7's particular love of animals. He reasons that the testimony that was elicited "would trigger [this] specific juror's previously-declared bias and thus impede her ability to be impartial." We reject defendant's claim that Juror No. 7 was unable to be impartial in this case. After the trial court discussed a case involving animal cruelty, Juror No. 7 indicated that she "would have a problem" with an "animal case." But defendant's capital trial did not require the jury to determine any issues involving defendant's treatment of animals, and the court could have readily deemed this capital matter as not amounting to an "animal case." Far from evidencing bias, as the trial court and the prosecutor observed, Juror No. 7 appeared unaffected by the testimony that defendant shot at birds. (Cf. *People v. Ramirez* (2006) 39 Cal.4th 398, 461; *People v. Beeler* (1995) 9 Cal.4th 953, 989 (*Beeler*) [stating that "the trial court was in the best position to observe the juror's demeanor" in determining whether to discharge the juror].)

Contrary to defendant's assertion, the trial court did not abuse its discretion by considering Juror No. 7's reaction and noting that it did not observe Juror No. 7 crying or acting abnormally when Hill testified that defendant shot at birds. Defendant claims the trial court abused its discretion by "simply rel[ying] on its own observations of Juror [No.] 7's demeanor" and failing to consider "the state of mind of the juror and not the

judge" in ruling on the mistrial motion. But not only is it appropriate for the court to make such an observation (*People v. Ramirez, supra*, 39 Cal.4th at p. 461; *Beeler, supra*, 9 Cal.4th at p. 989), the court also made clear the information was relevant because defense counsel had made a contrary assertion. It was defense counsel who first contended that Juror No. 7 "was crying after she heard" Hill's testimony. The court disputed the accuracy of counsel's statement, remarking, "[Juror No. 7] sits closest to me and I did not observe any unusual behavior on her part." Although the court later "reiterat[ed]" its observation, it did not deny defendant's mistrial motion on that basis alone. Instead, the court emphasized that it had stricken the testimony and would inform jurors "that a motion to strike means to treat [the testimony] as [though] they haven't heard it."

Further, although stopping short of accusing the prosecutor of misconduct, defendant contends the prosecutor "intentionally elicited the prejudicial testimony." Defendant does not explain how this framing materially alters the analysis. We have found that even when "the prosecutor's questions elicited [the] defendant's [inappropriate] testimony" and "the prosecutor's questions were improper," that circumstance is not a ground in itself to find that a court "abuse[d] its discretion in denying [a] mistrial motion." (*People v. O'Malley* (2016) 62 Cal.4th 944, 998–999 (*O'Malley*).) Ultimately, defendant's contention that the prosecutor acted deliberately does not persuade us that the trial court erred in denying defendant's motion for mistrial.

Defendant further argues that the instruction to disregard the stricken testimony could not have cured the prejudice caused by Hill's testimony. (See *Lucero, supra*, 23 Cal.4th at p. 713 [" ' "A mistrial should be granted if the court is apprised

of prejudice that it judges incurable by admonition or instruction" ' "].) "There is a difference," defendant contends, "between instructing the jury generally that improperly admitted evidence should be ignored and attempting to cure an individual juror's personal biases with such an instruction." Defendant's argument presupposes that Juror No. 7 was personally biased against defendant because of Hill's testimony. As discussed, the trial court acted well within its discretion in rejecting defendant's argument. (See *People v. Chatman* (2006) 38 Cal.4th 344, 369–370 ["Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis" that "is entrusted [to the trial court's] broad discretion"].)

Defendant also observes that the trial court "cautioned [defense] counsel multiple times that . . . an instruction" directing the jury to disregard Hill's testimony "would only highlight [the] prejudicial testimony." According to defendant, the court's statement demonstrates that "the trial court itself had grave doubts as to whether the prejudice was curable by instruction." Defendant misreads the record. While the court told defense counsel that a special instruction would be "at [counsel's] own risk," the court reasoned the "risk" was that counsel may "draw[] attention to something that's not that big a deal." The court did not imply that the stricken testimony was prejudicial, or that the jury would be unable to comply with an instruction to disregard the testimony. (See *People v. Panah* (2005) 35 Cal.4th 395, 454 [presuming that the jury followed the trial court's admonition even when the admonition was "not to watch television" and "[d]efense counsel characterized [the idea that jurors followed the instruction] as 'wishful thinking' and moved for a mistrial"]; *O'Malley, supra,* 62 Cal.4th at p. 999 [the challenged testimony "was not so

necessarily prejudicial that we should set aside the normal presumption that the jury followed the court's admonition"].)

We conclude the isolated comment regarding defendant using his BB gun to shoot at birds did not mandate a mistrial. The challenged testimony was brief (consisting of three words in total); isolated (no other mention of defendant shooting at birds was made during the remainder of the trial); explained away (by the witness's statement she had never seen defendant hurt any animals); and stricken from the record (immediately after the testimony was offered and the defense objected); also, jurors were twice instructed to treat the testimony "as though [they] had never heard of it." (CALJIC No. 1.02.)

Because we conclude the trial court could reasonably find that defendant's chances of receiving a fair trial were not irreparably damaged by the testimony regarding his shooting at birds, we also conclude the court's denial of the mistrial motion did not violate defendant's right to due process and to a fair and reliable penalty determination. (See *People v. Bolden* (2002) 29 Cal.4th 515, 555 [finding no due process violation in a trial court's denial of a mistrial motion based on a brief reference to a defendant's parole status; the challenged testimony "was not significant in the context of the entire guilt trial, and the trial court did not abuse its discretion in ruling that defendant's chances of receiving a fair trial had not been irreparably damaged"].)

ii. *Discharge of juror*

Defendant argues that the trial court erred in failing to discharge Juror No. 7 pursuant to section 1089, which provides in relevant part, "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon other good

cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged . . . ."

" 'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence.' " (*Jablonski, supra,* 37 Cal.4th at p. 807.)

We conclude the trial court's decision to retain Juror No. 7 is supported by substantial evidence that the juror did not display actual bias against defendant and was able to be impartial in this case. As discussed, the testimony regarding defendant's shooting at birds did not turn this capital matter into an animal-related case. Juror No. 7 stated, "If this was an animal case, I absolutely would have a problem with an animal," after hearing the court discuss a case involving animal cruelty. Against that backdrop, the trial court could have reasonably understood the juror's inability to be impartial as triggered only when the matter at hand involved charges of animal mistreatment — not when, as here, there was a single remark about defendant shooting at birds with a BB gun. Moreover, in the context of a capital trial for the murder of an 11-year-old girl, it is hard to imagine that even a staunch animal lover would have been distracted by a brief, immediately struck, and promptly rebutted statement that defendant would "shoot at birds."

Because the trial court could have reasonably determined that Juror No. 7's inability to perform the functions of a juror was not shown to be a demonstrable reality, there was no error in failing to discharge her. (See *People v. Martinez* (2010) 47 Cal.4th 911, 943 [upholding the trial court's decision not to discharge a juror when "[t]he record before us does not show that [the juror's] interaction with [an investigator working for the District Attorney] caused her to learn more about defendant's juvenile record" and "[t]herefore, defendant fails to show that she was unable to fulfill her functions as a juror"]; *Jablonski*, *supra*, 37 Cal.4th at p. 807; *Beeler*, *supra*, 9 Cal.4th at p. 989.)

In maintaining that the trial court abused its discretion in failing to discharge Juror No. 7, defendant again argues that the court should have declared a mistrial and contends that "Juror 7's statements unequivocally demonstrate that she would have been subject to a challenge for cause [during jury selection] had the defense known that the prosecutor intended to present evidence showing [defendant] spent his days shooting at birds . . . and based on the record, such challenge would have been granted." But whether defense counsel would have challenged Juror No. 7 for cause is not dispositive of whether Juror No. 7 harbored bias. It does not affect our substantial evidence analysis nor alter our conclusion that the evidence supports the trial court's decision to retain the juror.

### iii. *Failure to conduct further inquiry*

While maintaining that the record "clearly indicates" Juror No. 7 was subject to dismissal, defendant argues in the alternative that if we find "the record is insufficient to establish that Juror 7 was actually biased," then we should conclude "the trial court committed reversible error" "in failing to conduct any

46

inquiry into the juror's state of mind before denying the motion for her discharge." Because "no trial court action by the defense [is] required to preserve [a] claim" that "the trial court erred by failing, sua sponte, to conduct an adequate inquiry" in this respect, we review defendant's contention despite his failure to request an inquiry at trial. (*People v. Cowan* (2010) 50 Cal.4th 401, 506–507 (*Cowan*).)

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct . . . rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*).)

We conclude that defendant has not pointed to any information possessed by the trial court that, "if proven to be true," would establish that Juror No. 7 was biased against him. (*Ray*, *supra*, 13 Cal.4th at p. 343.) Defendant simply relies on the juror's voir dire answers and Hill's testimony that defendant shot at birds to assert "the trial court was aware that Juror 7 might not be able to remain fair and impartial." The court heard Juror No. 7's voir dire responses and Hill's challenged statement, and it observed Juror No. 7's demeanor after hearing Hill's testimony. Based on this evidence, the court struck Hill's statement but declined to declare a mistrial or discharge Juror No. 7.

This record fails to establish the trial court abused its discretion by not inquiring further into Juror No. 7's ability to deliberate fairly. This case is analogous to others in which we have upheld a trial court's decision not to conduct such inquiries. In *Cowan*, for example, the court had information that a juror was sitting " 'right next' " to two of the defendant's family members who were also witnesses and who were talking with one another. (*Cowan*, *supra*, 50 Cal.4th at p. 504; see *id.* at p. 507.) The defendant there argued the trial court should have "conduct[ed] an investigation adequate to determine if Juror No. 045829 had been speaking with defendant's family members or had overheard anything connected with the trial." (*Id.* at p. 505.) We found no merit to the claim, reasoning that "[a]t best, the trial court possessed ambiguous information suggesting that Juror No. 045829 may or may not have been talking to defendant's relatives who also were witnesses at the penalty phase." (*Id.* at p. 507.) Given such "ambiguous information," "the court reasonably could have concluded that there were no grounds for believing good cause to excuse Juror No. 045829 might exist." (*Id.* at pp. 507, 508.)

Similarly, in *People v. Osband* (1996) 13 Cal.4th 622, 675, jurors may have been exposed to statements extraneous to the record, as "two police officers were discussing material contained in their police reports . . . in the hallway where jurors could overhear them." The defendant complained, and the court admonished the jury " 'not to consider anything that's said outside the courtroom.' " (*Ibid.*) On appeal, the defendant contended the court should have gone further and investigated because jurors "might have heard a discussion so prejudicial that no admonition could cure it." (*Ibid.*) We rejected the claim. We found the court did not have any information that would

obligate it to inquire further, and "any prejudice that may have arisen [from the jurors overhearing the officers] was cured by events immediately following defendant's complaint to the court, which strictly admonished the jurors not to consider anything they might hear beyond the witness stand." (*Id.* at p. 676; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1349 (*Bradford*) [concluding it was "apparent the trial court reasonably determined that a further interruption in the proceedings to address the matter [of a juror sleeping during two days of trial] was not justified by the conduct thus far exhibited by the juror" and that "the trial court did not abuse its discretion by not conducting an inquiry"]; *Ray*, *supra*, 13 Cal.4th at p. 344 [affirming a trial court's decision not to conduct a further inquiry when the court learned that one of the jurors worked at the same high school attended by a victim's daughter].)

We thus conclude the court did not err by failing to conduct a sua sponte inquiry regarding Juror No. 7's ability to remain impartial after Hill's brief and isolated testimony.

### 3. *Admission of testimony regarding extramarital affair*

#### a. *Background*

Defendant argues the trial court prejudicially erred by allowing Hill, defendant's neighbor, to testify that she had an extramarital relationship with him. As previously explained, Hill testified that she had lent defendant her car, which he then used to transport and dump Jaquita's body. After providing his recorded statement to the police, defendant told Hill he could not have killed Jaquita because "he didn't have time to commit a crime like that." According to Hill, defendant explained that strangling someone "takes a long time," "30, 45 minutes,

sometimes up to an hour." Hill did not report this statement to law enforcement until September 2006, shortly before defendant's trial began, even though she reported defendant's borrowing of her car as soon as the police arrested him in August 1999.[11]

The prosecution filed a pretrial motion seeking permission to introduce at trial the fact that Hill and defendant, who was married, had sexual relations. The prosecution argued the sexual relationship was relevant to explain (1) why defendant told Hill he could not have killed Jaquita, and (2) why Hill did not immediately report the information to the police. The defense objected, stating that the evidence was irrelevant and unduly prejudicial. The defense characterized the "affair" as "very minor," noting Hill and defendant "two times . . . had some intimacy, but . . . they were very quick and not very meaningful." According to the defense, because the jury was going to learn that Hill was "a neighbor" and "a good friend," it did not need to know other details of her relationship with defendant.

After considering the parties' respective arguments, the court ruled it would not permit the prosecution to introduce the fact that defendant had extramarital affairs with multiple women. However, the court stated it would allow Hill to testify about her affair with defendant. The court found defendant's "relationship with Ms. Hill [to be] probative as to her motive for

_____

[11]    Defendant states that Hill disclosed the information eight years after his arrest. The record shows that a period of about seven years and one month had elapsed in between defendant's arrest and when Hill related to law enforcement the substance of her conversation with defendant.

why she said what she said and when she said it." Regarding prejudice, the court referenced former president Bill Clinton and stated that in its view, "in this day and time a short-term extramarital affair is not going to cast somebody in such a negative light that it's going to inflame or impassion the jury against the defendant." The court thus found that "the probative value [of Hill's relationship with defendant] outweighs the prejudicial effect insofar as it goes to her interest, bias or motive for telling the police [officer] what she told him and when she told him." The court indicated that it "would be open to a limiting instruction to be given to the jury" concerning the proper purposes for which jurors could consider Hill's testimony.

At trial, the prosecution elicited from Hill details concerning defendant's activities on the day that Jaquita went missing and shortly thereafter. Hill testified that she was defendant's next-door neighbor, that she was home on the day of Jaquita's disappearance, and that as it got dark that day, she heard music from defendant's apartment being turned up in volume and put on repeat play. Around this time, Hill also heard a "very loud" noise from defendant's apartment "that woke [her] up," but when she went to check, defendant told her he did not hear any noise and she should "go back to sleep." A short time later, defendant came to Hill's apartment, "hyper," "in a rush," and asked to borrow her car so that he could visit a sick aunt. Hill lent defendant her car, and he left and came back in about 20 minutes, at which point "[h]e was calm like everything was okay." Hill further testified that she talked to the police the day that defendant was arrested and told officers about lending defendant her car and hearing the loud noise.

Hill also provided an account of events that occurred after Jaquita was killed. Hill testified that the day before he was

arrested, defendant told her about his trip to the police station to give a memorialized statement. During this conversation, defendant denied his involvement in Jaquita's killing, stating, "[I]t couldn't have been him, because he didn't have time to commit a crime like that." Defendant asked Hill if she knew "how long it takes to actually choke somebody." When Hill said she did not, defendant explained "that it's a lot longer than what they think it is on T.V. It's not just a couple minutes." As defendant related to Hill, "you have to choke them and then they pass out first. And then after that, their heart is still beating so you have to keep choking them until their heart stop[s]. . . . [I]t takes a long time . . . 30, 45 minutes, sometimes up to an hour to do it." Hill testified she told a friend what defendant said to her.

The prosecutor elicited from Hill that when she talked to the police after defendant's arrest, she did not disclose what defendant said about the time that it takes to choke someone, and in fact, withheld the information for seven years. When asked why she did not come forward with the information earlier, Hill responded, "I didn't want to really be tied into it like that. I didn't want to be, you know, like — like I had something to do with it or [was] involved or knew something more . . . because I had contacts, sexual contact, with [defendant], I didn't want that out there. So I just didn't say anything at that time." The prosecutor clarified that Hill was "worried" that, because of her sexual relationship with defendant, "somebody might think [¶] . . . [¶] that [she] had involvement in this [crime]."

Regarding the "sexual contact" between Hill and defendant, Hill had earlier testified that she had two sexual encounters with defendant "a few months prior" to Jaquita's disappearance. The sexual nature of the relationship evidently

ceased after the second incident, and Hill was "okay . . . talking with [defendant] and interacting with him" afterward.

After Hill's testimony concluded, the defense explained it did not want a limiting instruction because it "felt [an instruction] would unduly emphasize the fact that [defendant] cheated on his wife and therefore, it would be better just to let it go." Accordingly, no instruction was given on this subject.

b. *Analysis*

Defendant contends the trial court erred in not finding evidence of his extramarital relationship inadmissible either because it was irrelevant or because it should have been excluded under Evidence Code section 352. We review the trial court's decision to admit Hill's testimony for abuse of discretion. (See, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 491.)

As the trial court noted, the fact that defendant and Hill had a sexual relationship was relevant to Hill's credibility on the stand, including her testimony that defendant told her it takes "30, 45 minutes, sometimes up to an hour" to fatally choke someone.[12] In particular, defendant's and Hill's intimate relationship could have bolstered Hill's credibility by explaining

---

[12] The time it takes to manually strangle someone is, in turn, relevant to establish the elements of premeditation and intent to kill. (See, e.g., *People v. Lucero* (1988) 44 Cal.3d 1006, 1020 ["While ligature strangulation may not always evidence a premeditated murder [citation], the jury could have viewed the strangulation as a deliberate manner of killing sufficient to indicate a 'preconceived design' "].) Because defendant pleaded not guilty at trial, the People were "obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with which [he] was charged." (*Florida v. Nixon* (2004) 543 U.S. 175, 188.)

why defendant "would say these things" to her and why she did not disclose the information to the police for seven years. Although defendant maintains he and Hill were friends, thus explaining why he would have this conversation with her, one could reasonably conclude that friends who had a sexual relationship were more likely to confide in each other. Their relationship was also relevant to explain why Hill refrained from telling the police about defendant's statements. Hill testified she was concerned that if people knew what defendant had told her and knew that she and defendant had a sexual relationship, they would think she was involved in the crime.

The trial court therefore did not err in concluding that Hill's sexual contact with defendant was relevant. (See Evid. Code, §§ 210 [" 'Relevant evidence' means evidence, including evidence *relevant to the credibility of a witnes*s or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (italics added)]; 780 [identifying a nonexhaustive list of factors "the court or jury may consider in determining the credibility of a witness," including "[t]he existence or nonexistence of a bias, interest, or other motive"]; *People v. Harris* (2005) 37 Cal.4th 310, 337 ["In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to: . . . the existence or nonexistence of a bias, interest, or other motive; . . . and his admission of untruthfulness"]; *People v. Sweeney* (1960) 55 Cal.2d 27, 41 (*Sweeney*) ["The challenged evidence was properly admissible as bearing on the interest and bias of [a witness] and was not rendered improper because it disclosed defendant's extramarital relationship. The state of

mind of a witness as to bias, prejudice, interest involved, friendship or hostility toward a party are all proper subjects for investigation in the trial of a case"].)

Moreover, the trial court did not abuse its discretion in finding that the probative value of the evidence was not substantially outweighed by the possibility of undue prejudice. (See Evid. Code, § 352.) Section 352 of the Evidence Code "authorizes the exclusion of evidence by the trial court when its probative value is 'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' The 'undue prejudice' that Evidence Code section 352 is concerned with ' "is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " ' " (*People v. Pineda* (2022) 13 Cal.5th 186, 222 (*Pineda*).) Hill's testimony on the subject of the sexual relationship was brief, amounting to about two pages of transcript in testimony that spanned over 30 pages. The affair itself was of limited duration. In concluding that evidence of such "a short-term extramarital affair" was not so unduly prejudicial as to require its exclusion, the court expressly stated it had weighed the probative value of the evidence against any prejudicial effect, indicated it would consider a limiting instruction, and excluded evidence of defendant's other extramarital affairs. In sum, the court conscientiously considered the issue and acted within its discretion in admitting Hill's testimony. (See *Sweeney*, *supra*, 55 Cal.2d at pp. 41–42 [" '[The] admission of . . . evidence [bearing on the interest and bias of a witness] is error only where it bears no materiality to the issues involved in the case' "].)

Defendant fails to advance a persuasive basis to conclude the trial court erred in admitting the challenged testimony. Defendant asserts that *People v. Houston* (2005) 130 Cal.App.4th 279, a case the prosecution cited to the trial court, is distinguishable from the circumstances of his case. In *Houston*, we affirmed the trial court's decision to permit two witnesses to each testify "at trial that she had had an affair with [the defendant] during [the defendant's] marriage to [his wife]," whom he was charged with having murdered. (*Id.* at p. 285; see *id.* at p. 283.) We concluded that the trial court did not abuse its discretion "pursuant to [Evidence Code] section 352 in admitting any of the extramarital affairs evidence." (*Id.* at p. 308.) We do not need to resolve whether *Houston* is instructive in the matter before us. Regardless of whether *Houston* is on all fours with this case, the trial court did not rely on *Houston* in making its ruling, and neither do we.

Defendant also contends that the reliability of Hill's testimony could have been corroborated in other ways, including by calling to the stand Hill's friend with whom she shared the conversation she had with defendant. But the possibility that other testimony might have served a similar purpose does not establish that the trial court abused its discretion in admitting evidence of Hill's and defendant's relationship. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1138 ["where, as here, the prosecution must convince the fact finder, beyond reasonable doubt, of charges and allegations the defendant has not conceded, it need not sanitize its case by presenting only enough evidence to meet bare legal sufficiency"].)

Finally, defendant asserts the trial court misjudged the potential for prejudice. To support his assertion, defendant cites a Gallup poll purportedly demonstrating that "adultery was

morally unacceptable for an overwhelming majority of the American public." But even if we were to assume that adultery is commonly regarded as morally unacceptable, that would not be determinative of whether under the particular facts presented here, the probative value of Hill's testimony on this subject was substantially outweighed by the threat of undue prejudice occasioned by its introduction. (See, e.g., *People v. Jones* (2017) 3 Cal.5th 583, 609 (*Jones*).)

Defendant also stresses that because he was "defending against capital charges" and "sex crimes," evidence concerning any "sexual misbehavior . . . has an enormous potential for prejudice." The trial court, however, could have reasonably concluded that evidence of a consensual sexual relationship with an adult is distinct from the rape of an 11-year-old girl, such that any potential of undue prejudice was not so great as to require exclusion of the former simply because defendant was accused of the latter. Within the context of this case, evidence of Hill's and defendant's relationship was not the sort of evidence that " ' " ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " ' " (*Pineda, supra*, 13 Cal.5th at p. 222.)

## B. Penalty Phase Issues

### 1. *Admission of victim impact evidence*

#### a. *Background*

The prosecution offered victim impact evidence at the penalty phase by introducing testimony from three of Jaquita's family members and her fifth-grade teacher, Christine Mohler.

Because whether and how Mohler would testify was a contested issue below, the prosecution made an extensive offer of proof. According to the prosecution, Mohler would testify that

she had "a very special relationship with Jaquita" and "Jaquita was her favorite student." To illustrate the "importance of Jaquita in [Mohler's] life," Mohler would relate that she talked to her husband about Jaquita. As another example of the impact Jaquita had on Mohler's life, Mohler would testify that in an end-of-year presentation to colleagues, she used journal entries written by Jaquita "to talk about the importance of not giving up and labeling kids." The prosecution made a similar argument regarding a report card that Mohler had prepared for Jaquita. More generally, the prosecution argued that Mohler's testimony would demonstrate for the jury the impact that Jaquita's death had on the communities that were most important to her: "her family and . . . her school."

The defense sought to exclude Mohler's testimony on the ground that Mohler was "not really family or close enough." Alternatively, the defense argued Mohler's testimony should be kept "narrow" and neither the journal entries nor the report card should be introduced.

After considering the parties' arguments, the court ruled it would allow Mohler to testify along the lines of the proffer. The court explained that the subjects covered by Mohler's testimony were "directly related to [defendant's] moral culpability." Given that "elementary school is [one] area of [a child's] community" and teachers develop "a close affinity" with their students, the court discerned "nothing inflammatory or outrageous about having a [fifth] grader's elementary school teacher come and talk about what she meant to her as a teacher, what she meant to the class and allow her to comment on the impact of having her taken from her classmates and from her teacher, particularly in light of the fact [that] if you look at the

victim's writings it's apparent that there was a closeness between [Jaquita and Mohler]."

Mohler testified consistently with the offer of proof. At the beginning of her testimony, Mohler provided some biographical details, telling the jury where she lived and that she was married and had children. Mohler volunteered that she was a teacher, at which point the prosecution asked for her educational background "for her to be able to be a teacher." The defense objected; the trial court overruled the objection, and Mohler informed the jury she "went to college and got a college degree . . . [and] had to take teaching classes and do student teaching."

Regarding her relationship with Jaquita, Mohler testified that during her first year as a teacher, she taught Jaquita's fifth grade class. Mohler told the jury that Jaquita "was living with her aunt . . . [because] her parents weren't able to take care of her," that she "struggled" academically as "[s]chool did not come easy for her," but that she was "bubbly and just really personable" and "she really was motivated and worked hard and tried to get through some of the things she struggled with."

Mohler also described her relationship with Jaquita, stating she "spent the most time with Jaquita" during the school year, "working with her . . . and trying to find ways to motivate her." Mohler admitted she was "a very idealistic first-year teacher" and she "saw so much potential in [Jaquita]." Mohler "invested . . . time" "discussing [Jaquita] with other teachers, . . . [and] trying to come up with strategies to help her succeed." Mohler's mother, who was also a teacher, came to Mohler's classroom and "worked one on one" with the students, including Jaquita. Mohler's interest in Jaquita carried "beyond

the classroom," as she would discuss Jaquita with her husband, both when Jaquita was "funny" and "bubbly" but also when she was "really sad and down" and Mohler "felt like [she] couldn't get through to her." Mohler explained she felt "a special bond" with Jaquita.

At the end of her first year of teaching, Mohler made a presentation to her fellow teachers; Jaquita was Mohler's "main motivation" for the presentation because Mohler "learned so much through the year through working with her." As part of this presentation, Mohler used two journal entries Jaquita had written in class. Over unsuccessful objections by the defense, Mohler read the journal entries to the jury. In the first entry, Jaquita wrote that her "secret dream is to be a president for the United States." She wrote that although "people call [her] stupid," she thought she was "smart enough to be a president . . . if [she] do[es] [her] hardest and . . . keep[s] on trying." The second journal entry Jaquita wrote was directly addressed to Mohler and expressed her appreciation for Mohler's efforts to "make [her] learn more and let [her] write neater, plus help [her] know how to read." With permission from the court and over a defense objection, the prosecution also showed an image of a report card that Mohler had prepared for Jaquita. Mohler read a comment she had written on the report card noting Jaquita had made "noticeable improvements."

Turning to the events surrounding Jaquita's death, Mohler testified that it was "devastating" to hear Jaquita had been killed. Mohler was teaching summer school when she got the news, and she talked to students who knew Jaquita. Mohler told the jury that she remembered the students "holding back their tears" and "consoling them during that time." Mohler explained that she was "grateful" to move away from the

community after Jaquita's death because she "couldn't handle the pain and it was hard to see the kids" who were Jaquita's friends. When asked how Jaquita's death has affected her, Mohler revealed that it affected both her teaching and her parenting. Mohler concluded her testimony by stating that Jaquita's killing was "something you never forget" and "something you don't leave behind in your life."

b. *Analysis*

Defendant makes two broad claims concerning the admission of Mohler's testimony as victim impact evidence.

First, defendant contends that the standard California courts apply in evaluating the admissibility of victim impact evidence falls short of what is demanded under the federal Constitution. He asserts that to correct this misalignment, we should repudiate our precedents and "limit victim impact testimony to surviving victims of the crime itself, family members or to those who have a strictly familial-type relationship with the victim."

These contentions lack merit. The United States Supreme Court has held that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 (*Payne*).) Accordingly, unless "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair" (*ibid*.), a state may "choose[] to permit the admission of victim impact evidence" (*id*. at p. 827). In other words, "victim impact evidence is only barred by the federal Constitution if it is so

unduly prejudicial that it renders the trial fundamentally unfair." (*People v. Simon* (2016) 1 Cal.5th 98, 138 (*Simon*).)

In addition to this federal constitutional requirement, "California law provides . . . that victim impact evidence is admissible under section 190.3, factor (a) as a 'circumstance of the crime.' [Citation.] Pursuant to factor (a), trial courts may allow emotional though relevant evidence, but not irrelevant information or inflammatory rhetoric that elicits purely emotional or irrational responses from the jury." (*Simon*, *supra*, 1 Cal.5th at p. 138.) We have said the federal constitutional and state statutory standards under which victim impact evidence may be admitted are "consistent" with one another. (E.g., *People v. Dykes* (2009) 46 Cal.4th 731, 781 (*Dykes*); *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056 (*Lewis and Oliver*) ["The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' [Citation.] State law is consistent with these principles"].)

While acknowledging our precedent on this point, defendant nonetheless claims that the two standards materially differ. According to defendant, "There is a distinction between evidence so minimal in probative value that it is not worth the risk of prejudice that its introduction might engender and thus is 'unduly' prejudicial, and evidence that is both so unrelated to the defendant's culpability and so enormously prejudicial that a juror's reaction to it in the context of a given case would be 'purely irrational.'" He further contends that "this Court, in practice," has applied only the purportedly lower "purely irrational" requirement imposed by state law in considering challenges to the introduction of victim impact evidence.

Contrary to defendant's assertion, we have expressly stated that we assess the admission of victim impact evidence under both the federal and state standards. (See, e.g., *People v. Romero and Self* (2015) 62 Cal.4th 1, 45 (*Romero and Self*) ["We conclude neither the federal nor the state standard was violated here"]; *People v. Verdugo* (2010) 50 Cal.4th 263, 298 (*Verdugo*) [same]; *People v. Ervine* (2009) 47 Cal.4th 745, 792 [same]; *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1057 ["The victim impact evidence presented here satisfied *Payne* and did not surpass constitutional limits. Nor was such evidence excessive, inflammatory, or otherwise prejudicial under state law"]; see also *Simon*, *supra*, 1 Cal.5th at p. 141 ["The victim impact evidence was not unduly prejudicial because the testimony did not invite the jury to form an ' "irrational, purely subjective response" ' "]; *People v. Taylor* (2010) 48 Cal.4th 574, 646 (*Taylor*) ["Here, the victim impact evidence was neither unduly prejudicial nor so inflammatory that it invited the jury to make its penalty determination on a purely irrational basis"].) And despite his contentions, defendant has identified no case in which the admitted victim impact evidence should have been excluded in accordance with federal constitutional demands even though it passed muster under the state standard.

Because defendant fails to show that our jurisprudence on victim impact testimony is constitutionally infirm, we decline "to reconsider and/or limit [our] reading of *Payne* to hold that victim impact evidence by individuals other than surviving victims or family members is inadmissible." "At core, the holding in *Payne* rests on the premise that victim impact evidence is permissible because the evidence is 'designed to show . . . *each* victim's "uniqueness as an individual human being" ' and, in so doing, demonstrate 'the specific harm caused

by the crime in question.' [Citation.] Given this rationale, it is difficult to discern why, under *Payne*, a victim's ' "uniqueness as an individual human being" ' may be attested to only by family members, and not . . . by a victim's colleagues and close friends," or here, a teacher with a close connection to the victim. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1025 (*Ramirez*); see also *Dykes*, *supra*, 46 Cal.4th at p. 783 [rejecting the defendant's claim that we must "limit[] victim-impact evidence to evidence . . . given by a family member who was at the scene of the crime or immediately thereafter" and finding no error in the admission of the testimony of a victim's teacher]; see *id.* at p. 782.)

In short, we have " 'repeatedly rejected' " invitations to limit victim impact evidence to testimony by a victim's family members or those who were present at the crime scene (*Ramirez*, *supra*, 10 Cal.5th at p. 1024; see *ibid.* [collecting cases]), and we reach the same conclusion here. (See also *People v. Trinh* (2014) 59 Cal.4th 216, 246 (*Trinh*) ["Neither the United States Supreme Court nor this court has ever identified a constitutional or statutory basis for so constraining the permissible scope of victim impact testimony"].)

Defendant contends that by refusing to impose such limits, we are "so widely open[ing] the door" that "any and all forms of evidence purporting to show any and all 'devastating effects of a capital crime' on anyone considered to be a part of the victim's 'community,' or on the general community as a whole, is admissible." We disagree. As discussed, the trial court here carefully considered the scope of Mohler's proposed testimony. It permitted her to testify upon finding (1) that the testimony was not "inflammatory or outrageous," and (2) that Mohler and the victim shared a special "closeness." In short,

Mohler was not just "anyone" in Jaquita's community, and her testimony does not amount to "any and all forms of evidence." Nor is it evidence so "unduly prejudicial that it renders the trial fundamentally unfair" (*Payne*, *supra*, 501 U.S. at p. 825).

Second, in the alternative, defendant asks us to find that Mohler's testimony "was inadmissible in whole or in part" because it "went far beyond the reasonably foreseeable and immediate impact of Jaquita's murder." The argument that victim impact evidence must be limited to facts known or reasonably foreseeable to a defendant "has not been accepted by this court and is not now the law." (*People v. Thomas* (2012) 54 Cal.4th 908, 941; see also *Simon*, *supra*, 1 Cal.5th at p. 141 ["we have rejected these arguments — and we have done so repeatedly"]; *Romero and Self*, *supra*, 62 Cal.4th at p. 48; *Trinh*, *supra*, 59 Cal.4th at p. 246 ["[The defendant] contends victim impact testimony should have been confined to effects that were known or reasonably should have been known by [the defendant] at the time of the crimes or were part of the proof of the underlying charges. We have repeatedly rejected this limit as neither constitutionally nor statutorily warranted"]; *People v. Myles* (2012) 53 Cal.4th 1181, 1219; *Verdugo*, *supra*, 50 Cal.4th at p. 299; *Taylor*, *supra*, 48 Cal.4th at p. 647; *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1057.) Our position on this issue is consonant with that of the United States Supreme Court, which has rejected the argument that "[t]o the extent that victim impact evidence presents 'factors about which the defendant was unaware, and that were irrelevant to the decision to kill,' . . . it has nothing to do with the 'blameworthiness of a particular defendant.'" (*Payne*, *supra*, 501 U.S. at p. 818; see *ibid*. [overruling *Booth v. Maryland* (1987) 482 U.S. 496].)

In any event, although the precise contours of Mohler's testimony reflected her personal relationship with Jaquita and Jaquita's " 'uniqueness as an individual human being' " (*Payne, supra,* 501 U.S. at p. 823), at heart this testimony was " 'traditional victim impact evidence.' " (*Ramirez, supra,* 10 Cal.5th at p. 1027.) Overall, Mohler " 'extoll[ed]' " Jaquita's virtues and demonstrated Mohler " 'missed [her].' " (*Ibid.*) " 'As in other cases, the witness[] here described the "immediate effects" of the murder[], as well as [its] "residual and lasting impact." ' " (*Ibid.*) We conclude that although defendant "may not have known the exact details of the harm he was causing," the fact "that the harm would be of the type [Mohler] described was quite foreseeable." (*People v. Weaver* (2012) 53 Cal.4th 1056, 1085; see also *Payne,* at p. 838 (conc. opn. of Souter, J.) ["The fact that the defendant may not know the details of a victim's life and characteristics, or the exact identities and needs of those who may survive, should not in any way obscure the further facts that death is always to a 'unique' individual, and harm to some group of survivors is a consequence of a successful homicidal act so foreseeable as to be virtually inevitable"].)

Finally, defendant focuses on a number of details in Mohler's testimony and contends that "much" of it should have been excluded because these details "had nothing to do with the impact of the crime on the community . . . and went far beyond the immediate harm caused by [defendant's] actions." Defendant specifically identifies the following as evidence that, in his view, constitutes improper victim impact evidence: "Mohler's testimony regarding her educational history, her own goals and frustrations as an idealistic young teacher, her mother's role in the classroom, her conversations with her husband, her presentation at the end of the school year, her

decision to move, and Jaquita's written expressions about Mohler as a teacher . . . ."

We review the admission of victim impact evidence for abuse of discretion. (*Simon, supra*, 1 Cal.5th at p. 138.) We find no abuse of discretion in allowing these details to be introduced. Some of this information involved passing references or explanations that served to place Mohler's other testimony in context. For instance, "Mohler's testimony regarding her own educational history" consisted of a single sentence informing the jury Mohler had completed college and undertaken other teaching-specific training to become a teacher. Given that Mohler gave victim impact testimony as the victim's teacher and a part of her school community, the evidence was not irrelevant or otherwise improperly admitted.

Other parts of Mohler's testimony that defendant challenges involve evidence of Jaquita's " 'uniqueness as an individual human being.' " (*Payne, supra*, 501 U.S. at p. 823.) For example, although Mohler testified that she was "a very idealistic first-year teacher," it was things about Jaquita herself — her "bubbly" personality, her difficult home environment, the fact that she "really was motivated and worked hard," that she had "so much potential," et cetera — that "drew [Mohler] in" and led Mohler to spend more time with her than any other student. Likewise, that Mohler's mother was involved with Jaquita and Mohler had conversations with her husband about Jaquita helped to establish the "special bond" that Jaquita and Mohler shared. Similarly, Mohler's year-end presentation was motivated by Jaquita because "Jaquita was so much a part of" Mohler's year of teaching. The fact that Mohler moved away was also tied to the impact of Jaquita's death, as

Mohler was "grateful" for the move due to the emotional difficulties she faced after Jaquita was killed.

Regarding the journal entries that Jaquita wrote, we have permitted creative expressions by the victims themselves to be admitted as victim impact evidence. (See, e.g., *Ramirez, supra,* 10 Cal.5th at pp. 1027–1029 [finding no error in a witness reading for the jury a short story written by her murdered husband]; *People v. Mendez* (2019) 7 Cal.5th 680, 713–714 (*Mendez*) [upholding a mother's reading of her slain daughter's poem]; *Verdugo, supra,* 50 Cal.4th at pp. 298–299 [cassette tape of the victim's singing played for jurors].) We reasoned that "it was through" the expression the victim created "that the jury heard directly from the victim" as opposed to "hearing *about*" the victim. (*Ramirez,* at p. 1028.) That reasoning applies here: Jaquita's journal entries allowed the jury to hear directly from the victim herself. Through the journal entry in which Jaquita thanked Mohler, a jury could reasonably learn that Jaquita was a person who showed gratitude and someone who made others feel appreciated for having been in her life.

In sum, these details were "evidence about the victim" or evidence "about the impact" of the victim's murder on her community that is "relevant to the jury's decision as to whether or not the death penalty should be imposed." (*Payne, supra,* 501 U.S. at p. 827.) Nothing about these specific facets of Mohler's testimony or her testimony as a whole exceeded "what we have allowed in the past" where "the witnesses testified 'about their relationship with' the victim[], 'how they learned about' the victim['s] death[], and how the murder[] 'affected their lives.'" (*Mendez, supra,* 7 Cal.5th at p. 712.) As we have done in the past, "[w]e conclude neither the federal nor the state

standard was violated" by the admission of the victim impact evidence here.  (*Romero and Self, supra,* 62 Cal.4th at p. 45.)

### 2.  *Admission of unadjudicated other crimes*

Under section 190.3, factor (b), the jury "[i]n determining the penalty . . . shall take into account" "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."  Pursuant to this factor, the prosecution introduced evidence of two unadjudicated crimes that defendant allegedly committed:  a battery against Robert Barnes and a criminal threat made against Jeff Samuel.  Defendant challenges the admission of evidence concerning both offenses.

### a.  *Evidence of battery of Robert Barnes*

#### i.  *Background*

As part of its penalty phase presentation, the prosecution introduced evidence that in 1990, defendant, then 15 years old, assaulted and fractured the arm of a 13-year-old, Robert Barnes.  Evidence concerning the battery was presented through the testimony of Barnes; Russ Kunzler, an individual who broke up the fight; and Dale Burnell, a police officer who investigated the incident and took statements from Barnes and Kunzler.

Before the prosecution introduced the evidence, the court had a discussion with the parties regarding the anticipated testimony.  The defense informed the court that Barnes's attorney had indicated that Barnes "will not be able to identify" defendant in court and that "any identification made with the police [in 1990] . . . was just tentative" and suspect.  The defense therefore requested a hearing "before the jury hears about any identification made by Barnes to a police officer."  The

prosecutor acknowledged that Barnes was not "going to be identifying anybody in court because of the time that has passed." The prosecutor explained that identification of defendant as Barnes's assailant would be established through Burnell's testimony "by past recollection recorded." The prosecutor elaborated that Barnes "remembers being shown photographs" as part of the investigation in 1990 but "he d[oes] not recall now 17 years later the specifics of . . . who he pointed out and what role they played, but what he . . . will testify to is that when he was meeting with the investigator he was truthful in whatever identification he made and that it was fresh in his mind then, and that lays the foundation for the past recollection recorded for Officer Burnell coming in and be able to establish the photo that was identified" as defendant. After hearing further argument, the court denied defendant's motion for a "preliminary-type hearing" under Evidence Code section 402.

When Barnes took the stand, he testified as follows. In 1990, Barnes was 13 years old and attended school in Oakland. While riding the school bus on May 7 of that year, Barnes "had some words" with a fellow student he knew from school, Myisha Green. When Barnes and Green got off the bus, they got into a "[s]cuffle" in which they were "[p]ulling" and "[s]winging" at each other. After the physical altercation with Green ended, "like . . . five or six guys" approached Barnes. One of them hit Barnes, who fought back but at some point fell. While Barnes was on the ground in a "[f]etal position" to protect himself, the assailants kicked him "[h]ard." They only stopped when "[s]ome tall white dude r[an] over" and intervened. Afterward, Barnes's mother took him to the emergency room where he was treated for bruises and a fractured arm.

To lay the foundation for Burnell's testimony, the prosecution elicited the following information from Barnes. Shortly after the fight happened, a police investigator came to talk to Barnes about the incident. Barnes recalled that he gave the investigator a general description of the individuals involved in the fight. The investigator later returned with a set of photographs, which he showed Barnes, and Barnes made an identification.

Kunzler, the witness who broke up the fight, testified next. At the relevant time, Kunzler was working as an automobile technician across the street from where the altercation with Barnes took place. On the day of the incident, Kunzler heard a commotion, looked across the street, and saw three people "beating up" one person. He saw the victim fall to the ground. The other people in the fight then kicked him. Seeing that the victim was on the ground and not "fighting back," Kunzler "felt enough was enough" and decided to intervene. He ran across the street and physically pushed a couple of individuals away. However, "there was still one guy on top of the victim," "still kicking him and beating the kid up." Kunzler stopped the person by "grabb[ing] the upper torso and basically just pulled him off." After he did so, the person whom he pulled off "turned around and faced [Kunzler] and just [said], I'm going to come back, white boy, come and shoot you. You're dead."

The police contacted Kunzler after the incident. An investigator came to Kunzler's place of work, showed him photographs, and Kunzler made an identification. Kunzler testified he believed the person he identified was "the last guy that [Kunzler] pulled off" the victim.

Burnell then took the stand. Burnell had no independent recollection of the Barnes investigation and testified based on a police report that he had prepared in 1990. Burnell testified that he "develop[ed] the names of some suspects that may have been involved in the assault on Robert Barnes" after speaking with Green and Barnes. The suspects included defendant (whom Green knew). Burnell then spoke to defendant and took a photograph of him. Using this photograph, Burnell conducted a photo lineup with Barnes and Kunzler.

Burnell testified that when he showed Barnes three photo lineups consisting of 18 photographs, including a photograph of defendant, Barnes "selected the photograph with [defendant's] picture on it." Barnes stated the photograph he selected was of "the person who had kicked him in the arm when he was on the ground."

Likewise, when Burnell showed Kunzler the photo lineups, Kunzler "selected the photo that had [defendant's] photo in it." Kunzler identified the photograph "[a]s the person [he] pulled off of Barnes," (i.e., the one Kunzler testified was "still kicking . . . and beating the kid up").

The defense cross-examined Barnes, Kunzler, and Burnell. The defense elicited from Barnes that when Barnes "pick[ed] out [defendant's] picture," he was indicating that defendant "was just there" and not saying "that's the guy who broke [his] arm." Barnes stated that "even back at the time" of the incident, he did not know who broke his arm. Similarly, Burnell stated during cross-examination that he does not recall Kunzler saying he "was threatened with being shot." If Burnell had been told of a threat, that would be "the kind of thing [he]

72

would have written in [his] report," but the report contained no such information.

The defense also called Green, the individual involved in the initial confrontation with Barnes. Green generally testified that Barnes was the aggressor, both in her scuffle with him and in the interaction with her friends who came to her rescue. Green, however, "didn't stay [until] the end" of the fight and did not witness anyone kick Barnes.

### ii. *Constitutionality of use of juvenile criminal behavior*

Defendant broadly challenges the admission of evidence concerning his alleged battery on Barnes, arguing that because he was a juvenile when the incident occurred, admission of evidence regarding the incident pursuant to section 190.3, factor (b), violated his federal constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.

Defendant asks us to address his claim despite the fact that he did not raise it at trial. According to defendant, the argument he now makes is "based on legal developments in the courts that occurred years after [his] trial" and thus "any objection on this specific ground at the time of trial would have been futile." Yet, the main authority defendant relies on is *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), a case decided in 2005. Defendant's penalty phase trial took place in 2007. It therefore cannot be said that because of this timing, "any objection [in reliance on *Roper*] at the time of trial would have been futile." Defendant thus forfeited this challenge.

Defendant's claim also fails on the merits. We have "repeatedly rejected" the claim that the death penalty statute is unconstitutional "because it allows the consideration of juvenile criminal conduct in aggravation." (*People v. Powell* (2018)

73

6 Cal.5th 136, 193.)  As we have "long held," "prior violent conduct committed while a defendant was a juvenile may be admitted as evidence of criminal activity that involved the use or attempted use of force or violence."  (*People v. Bivert* (2011) 52 Cal.4th 96, 122 (*Bivert*).)  "[T]he admission of such evidence passes constitutional muster."  (*People v. Lee* (2011) 51 Cal.4th 620, 649; see also *People v. Tran* (2022) 13 Cal.5th 1169, 1223–1224 [reaffirming these principles].)

Defendant asks us to reconsider these holdings, contending that evidence of violent juvenile criminal activity should not be considered at the penalty phase because "juvenile acts are not reliable evidence of either character or future dangerousness."  In so arguing, defendant relies on *Roper*, *supra*, 543 U.S. 551.  As we have explained, however, reliance on *Roper* in this context is "badly misplaced."  (*People v. Bramit* (2009) 46 Cal.4th 1221, 1239.)  *Roper* "holds that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments.  It says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile."  (*Ibid.*; see also *Bivert*, *supra*, 52 Cal.4th at p. 122 ["*Roper* . . . spoke only to the question of punishment for juvenile offenses, while defendant's challenge 'is to the admissibility of evidence, not the imposition of punishment' "].)  *Roper* thus " 'does not compel exclusion of . . . evidence' " of violent juvenile conduct.  (*People v. Rivera* (2019) 7 Cal.5th 306, 342.)

"The same reasoning applies to" *Miller v. Alabama* (2012) 567 U.S. 460 and *Graham v. Florida* (2010) 560 U.S. 48, two cases defendant cites in passing.  (*People v. Rices* (2017) 4 Cal.5th 49, 87 (*Rices*).)  These cases "do not address the

question of whether evidence of juvenile misconduct can be considered on the question of what punishment a defendant may receive for crimes committed as an adult." (*Ibid.*) Thus, "[e]ven if defendant is correct that *Roper* and *Miller* treat juvenile misconduct as less blameworthy than adult misconduct, evidence of forceful or violent conduct is nevertheless relevant to penalty phase questions about character and future dangerousness. [Citation.] Arguments about the offender's youth and immaturity go to the weight of the evidence, not its admissibility." (*People v. Winbush* (2017) 2 Cal.5th 402, 473 (*Winbush*).) As the Attorney General explains, "While a juvenile's character may not be as well formed as that of an adult, and their personality traits may be more 'transitory' [*Roper*, *supra*, 543 U.S. at p. 570], this general difference between juveniles and adults does not support [defendant's] suggestion that juvenile acts of violence by a defendant who has gone on to commit a death eligible offense as an adult are not reliable evidence of that defendant's character or future dangerousness."

In short, "[t]he high court has never suggested that evidence of juvenile misconduct may not be admitted in deciding the proper punishment for crimes an adult commits" (*Rices*, *supra*, 4 Cal.5th at p. 87), and defendant's arguments provide no basis for us to revisit our precedents allowing for the introduction of such evidence.

### iii. *Sufficiency of the evidence*

Defendant contends the trial court abused its discretion by refusing to hold an adequate hearing before permitting Barnes, Kunzler, and Burnell to testify about the alleged battery. In making this argument, defendant relies on *People v.*

*Phillips* (1985) 41 Cal.3d 29 (*Phillips*), where the plurality opinion "suggest[ed]" that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." (*Id.* at p. 72, fn. 25 (plur. opn. of Reynoso, J.).) Defendant faults the trial court for purportedly failing to comply with *Phillips* by not making a sufficient "inquiry and ruling as to the sufficiency of the evidence . . . before allowing the evidence to be introduced."

We have made clear that a preliminary inquiry of the sort discussed in *Phillips* is not *required* as a condition of admission of other crimes evidence pursuant to section 190.3, factor (b). (See, e.g., *People v. Boyer* (2006) 38 Cal.4th 412, 477, fn. 51; *People v. Young* (2005) 34 Cal.4th 1149, 1209 (*Young*); *People v. Clair* (1992) 2 Cal.4th 629, 677–678 (*Clair*) [stating that "*Phillips* did not impose . . . a requirement" to conduct a preliminary inquiry to ascertain whether evidence of an uncharged crime was substantial and, indeed, "*Phillips* could not impose any such requirement" because "[t]he pertinent language did not command the support of a majority of the court, and was clearly dictum"]; *People v. Jennings* (1991) 53 Cal.3d 334, 389 ["We did not [in *Phillips*] require such a hearing nor predicate admission of . . . evidence [of other criminal activity] on the holding of a hearing"].) We have also said a preliminary inquiry "if held, need not be an *evidentiary* hearing. If the court does elect, in its discretion, to conduct such an inquiry it may be based on an offer of proof." (*People v. Jones* (2011) 51 Cal.4th 346, 380; accord, *Boyer*, at p. 477, fn. 51.)

Here, the court "read the moving papers and the prosecutor's summary of the evidence, which was in effect an

offer of proof, and heard arguments from both sides regarding the strength of the evidence." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 636 (*Rodriguez*).) "[T]he trial court [thus] did conduct a preliminary inquiry." (*Ibid.*; see also *Clair*, *supra*, 2 Cal.4th at pp. 673–675, 677.)

Insofar as defendant contends that the evidence was insufficient to establish that he battered Barnes, that argument also fails. " ' "[A] trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." ' " (*Tully*, *supra*, 54 Cal.4th at p. 1027; see also *Rodriguez*, *supra*, 58 Cal.4th at p. 636 ["no abuse of discretion in admitting evidence of other crimes will be found if, in fact, the evidence was legally sufficient"].)

Review of the sufficiency of the evidence "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, *supra*, 34 Cal.4th at p. 1181.)

The evidence here was sufficient. Burnell testified, based on his police report, that Barnes identified defendant as "the person who had kicked him in the arm when he was on the ground."[13]  Burnell also testified that Kunzler identified defendant "[a]s the person [he] pulled off of Barnes," the same person Kunzler said was "kicking [Barnes] and beating [him] up" when Barnes had fallen. A rational jury crediting this testimony could readily conclude beyond a reasonable doubt that defendant committed a battery against Barnes.

In arguing otherwise, defendant points to Barnes's and Kunzler's testimony as elicited through cross-examination. Defendant emphasizes that upon cross-examination, "Barnes stated he was only asked if he recognized any of the people in the pictures, and that he had only identified [defendant] as someone who was there." A reasonable jury, however, was free to credit Barnes's statement to Burnell over testimony at trial. (See *People v. Boyer*, *supra*, 38 Cal.4th at p. 480 ["a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court. [Citations.] Indeed, 'an out-of-court identification generally has *greater* probative value than an in-court identification, even when the

---

[13]  Defendant also challenges the admission of Burnell's testimony in a subsequent claim. Because " '[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1120), we may consider Burnell's testimony in assessing the sufficiency of the evidence presented to the jury regardless of the merits of defendant's latter claim. (See also *People v. Navarro* (2021) 12 Cal.5th 285, 311; *People v. Story* (2009) 45 Cal.4th 1282, 1296.)

identifying witness does not confirm the out-of-court identification' "].)

Defendant's attack on Kunzler's testimony fares no better.[14]  Defendant contends that Kunzler "admitted on cross-examination that [defendant] was standing over Barnes when he arrived on the scene and did not testify that [defendant] was striking or kicking Barnes."  Contrary to defendant's contention, however, Kunzler did testify that the person he pulled off Barnes was "kicking [Barnes] and beating the kid up."  Although Kunzler stated during cross-examination that when he got to the scene of the fight, defendant was "[s]tanding" "over [Barnes]," Kunzler did not retract his testimony that he saw defendant kicking Barnes while Barnes was on the ground.  In fact, defense counsel's questions to Kunzler demonstrate counsel's own similar understanding of this testimony.  For example, counsel asked, "And then this one [individual] that was standing over [Barnes], hitting him or kicking him, whatever he was doing, you pulled him away?"  Moreover, as the Attorney General points out, whatever conflicts appeared in Kunzler's testimony "were for the jury to resolve," and the mere fact that there were conflicts or inconsistent statements "do[es] not support a conclusion that the evidence of the battery was legally insufficient."  (See *Young, supra,* 34 Cal.4th at p. 1181

---

[14]    Because "testimony of a single witness is sufficient to support a conviction" (*Young, supra,* 34 Cal.4th at p. 1181), a reasonable jury need not have relied on both Barnes's and Kunzler's identifications to find that defendant committed the alleged offense against Barnes.  We nonetheless address defendant's contentions regarding both of these witnesses' testimony for the sake of completeness.

["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"].)

> iv. *Issues relating to Evidence Code section 1237*

Defendant also argues that neither Barnes's nor Kunzler's testimony established the necessary foundation for Burnell to testify to the contents of his police report as a past recollection recorded under Evidence Code section 1237.[15]

Evidence Code section 1237 provides an exception to the hearsay rule, specifying that "[e]vidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying," provided certain conditions are

---

[15] At trial, the parties discussed admissibility of the prior statements as coming within the hearsay exception for past recollections recorded without specifically referring to the applicable Evidence Code section. The section of the Evidence Code that pertains to past recollections recorded is section 1237, and the prosecutor cited for the court's consideration *People v. Cummings* (1993) 4 Cal.4th 1233, which discussed the admissibility of a statement as a past recollection recorded under that section. (See *Cummings*, at pp. 1292–1294.) Neither the parties nor the trial court specifically referred to Evidence Code section 1238, which recognizes an exception for a prior statement of a witness identifying a party or another as a person who participated in a crime. (See Evid. Code, § 1238 ["Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and: [¶] (a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence"].)

Consistent with the record below, the parties before us confine their arguments to whether the statements at issue here were admissible under Evidence Code section 1237. We do the same.

met.  (Evid. Code, § 1237, subd. (a).)  The conditions include: (1) "the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately," and (2) "the statement is contained in a writing which," among other requirements, "[i]s offered after the witness testifies that the statement he made was a true statement of such fact." (*Ibid*.)  We review a trial court's decision to admit testimony pursuant to Evidence Code section 1237 for an abuse of discretion.  (See, e.g., *People v. Sanchez* (2019) 7 Cal.5th 14, 39 (*Sanchez*).)

Defendant claims the trial court "abused its discretion in allowing Burnell to testify about . . . Kunzler's identification" because "the prosecutor failed to establish that Kunzler did not have sufficient memory of his statement to Burnell."  According to defendant, Kunzler's testimony failed to satisfy the statutory requirement that a past recorded recollection concerns "a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately" (Evid. Code, § 1237, subd. (a)) because Kunzler never testified he did not recall "selecting [defendant's] photograph from the photograph display as the one who he pulled off of Barnes."

On the subject of his recollection, Kunzler testified that he remembered identifying a photograph for Burnell.  Kunzler explained, however, that he had only a "vague" memory of the "specifics" of the identification.  In particular, the prosecutor asked, "Your memory, if you will, about the specifics of these photographs, what you saw, how many photographs you saw, the role that the guy played [that] you may have selected, how is that memory of all those specifics as you sit here today?"  Kunzler answered, "Very vague."  Kunzler also confirmed that "[t]oo much time" had passed since he made his identification

and, at the time of his testimony, he was not "in any kind of position now to be making [an] identification [of defendant as] one of the guys who was there fighting."

During cross-examination, Kunzler reiterated that he did not have "any recollection" of any physical characteristics of the participants in the fight. Kunzler could say that all three of the individuals who were involved in the fight with Barnes were Black teenagers, but he did not recall any detail regarding their "height or weight" or "build or nothing." Defense counsel then asked Kunzler what the person that Kunzler identified "was doing." Kunzler replied, "I believe he was the gentleman that I pulled, the last guy that I pulled off." Upon further probing by defense counsel, Kunzler elaborated that he was "80 percent sure that's the guy. The only guy I actually looked in the face."

As noted, Evidence Code section 1237 requires that for a statement to be admitted as past recollection recorded, the statement must "concern[] a matter as to which the witness has insufficient present recollection to enable him to testify *fully and accurately*." (Evid. Code, § 1237, subd. (a), italics added.) Here, it is clear that Kunzler had "insufficient present recollection to enable him to testify fully and accurately" concerning the circumstances of his identification of defendant. (*Ibid*.) Kunzler did not recall which officer he talked to, how many photographs the officer showed him, or any physical characteristics of the three individuals who assaulted Barnes, other than that they were all Black teenagers. Although Kunzler was relatively certain that the person he identified was the person he pulled off Barnes, this was because this person was "[t]he only guy [Kunzler] actually looked in the face," and not because Kunzler recalled any individualized characteristics of the person. Kunzler also testified that he had only a "[v]ery

vague" memory of the "specifics of these photographs" from the lineup. Given this testimony, defendant's contention that "[h]ad he been shown the photo array displayed to him by Burnell, Kunzler may well have been able to recall which photo he had selected" is unpersuasive speculation.

Thus, even assuming defendant has preserved the argument, we conclude the trial court did not abuse its discretion by allowing the challenged testimony regarding Kunzler's identification. (See *Sanchez, supra*, 7 Cal.5th at pp. 25, 41 [concluding that a witness "certainly had 'insufficient present recollection to enable him to testify fully and accurately' about the matter" when, at trial, the witness "testified that he remembered little about the events of August 4 [the day of the murders]"]; *Cowan, supra*, 50 Cal.4th at p. 465 [explaining that a witness "had insufficient independent recollection to testify 'fully and accurately' about the events" when the witness testified he could not remember many of the details of the underlying incidents or what he told police officers]; *People v. Freeman* (1994) 8 Cal.4th 450, 498–499, fn. 6 ["Defendant's assertion that [the victim] [lacked] 'insufficient present recollection' (Evid. Code, § 1237, subd. (a)) is belied by the record. [The victim] testified that when he made the statement at the time of the lineup, he was 'in complete control of all of my facilities'; 'But as far as me remembering it today, no, I don't' "]; compare *People v. Alexander* (2010) 49 Cal.4th 846, 909–910 ["Because [the witness] never was asked about her November call to [the detective] . . . it was not established that [the witness] had 'insufficient present recollection to enable [her] to testify fully and accurately' about that statement" made during the November call].)

Regarding Barnes, defendant argues that Barnes "did not testify that he had truthfully identified [defendant] as someone who assaulted him." Defendant contends that, without this key piece of evidence, Barnes's testimony fails to satisfy the requirement of Evidence Code section 1237 that before a prior statement may be admitted as past recollection recorded, the witness must "testif[y] that the statement he made was a true statement of such fact." (Evid. Code, § 1237, subd. (a)(3).) On this basis, defendant asserts the trial court should have precluded Burnell from informing the jury that Barnes had identified defendant as the person who kicked Barnes in the arm.

We will assume the trial court erred in admitting Barnes's statement to Burnell, but we conclude that any such error was harmless. In addition to testifying that Barnes selected defendant's picture as the person who kicked him, Burnell also testified that Kunzler identified defendant as the person he pulled off Barnes, the same person whom Kunzler observed "kicking [Barnes] and beating" him. As such, even absent Barnes's testimony and Burnell's statement regarding Barnes's identification, there was evidence before the jury sufficient to prove that defendant committed a battery against Barnes. (See *Young*, *supra*, 34 Cal.4th at p. 1181.)

Moreover, it is not reasonably possible that the jury, hearing of Kunzler's identification through Burnell's police report, but without any corroborating evidence from Barnes or *his* statements to police, would not have voted for death. Barnes's trial testimony was equivocal and not particularly helpful to the prosecution. For example, on cross-examination, Barnes testified that "even back at the time" of the incident, he did not know "who broke [his] arm." He did not know "if Alex

84

Demolle or any particular one of those boys was kicking [him] or hitting [him] or even participating at that point." Regarding Barnes's statements to the police, Barnes testified that when he was "picking out [defendant's] picture," he was saying that defendant "was just there." Moreover, at the time of his testimony, Barnes was in custody, a fact that was "obvious[]" to the jury. The jury also knew about Barnes's multiple "felony convictions" and that he was currently on "felony probation."

Barnes's background and the nature of his testimony stand in contrast to Kunzler's. Unlike Barnes, there was no evidence that Kunzler had a similar criminal history. Moreover, Kunzler's testimony was consistent and supportive of his identification (to Burnell) that defendant was the person who Kunzler saw kicking Barnes.

Finally, the prosecutor acknowledged that the aggravating evidence in terms of "criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence" (§ 190.3) "doesn't deserve a lot of weight" in this case. As the prosecutor reasoned, "Quite frankly, the Factor B evidence in this case when you put it on a moral scale, on the aggravating side, it doesn't deserve a lot of weight. It's not a big thing in this case. . . . [These incidents involving the assault on Barnes and the threat made against Samuel] pale in comparison with what [defendant] did on July 23, 1999 [when he raped and killed Jaquita], and I don't really argue with that." After explaining that he introduced the evidence to show "as complete of a picture [of defendant] as [he was] allowed to," the prosecutor summarized the facts surrounding the incident with Barnes and concluded by stating, "on the moral scale, it's not why I'm here addressing you today."

In sum, the admission of Barnes's identification (through Burnell's testimony) does not amount to prejudicial error. (See *Pineda, supra*, 13 Cal.5th at p. 245.)

v. *Admission of threatening statement*

As mentioned, Kunzler testified that the person he pulled off Barnes had threatened him. After establishing that Kunzler pulled off an individual who was "kicking" and "beating . . . up" Barnes, the prosecutor asked, "[w]hat happens then?" Kunzler responded, "The guy that I pulled off threatened me, to come back and shoot and kill me." When asked to explain, Kunzler elaborated, "I pulled the guy off and he turned around and faced me and just [said], I'm going to come back, white boy, come and shoot you. You're dead. That was basically it . . . ." The prosecutor then asked, "What level of certainty do you have that the guy who says this is the guy you end up pulling off [Barnes]?" Kunzler said he was "[p]retty sure. About 80 percent and higher. Pretty sure that was him." Kunzler testified the statement was "pretty shocking" and "scared [him] pretty good."

Later, out of the presence of the jury, defendant sought to strike Kunzler's testimony "regarding the alleged threat made by [defendant] that he's going to shoot him and the white race reference." Defendant complained that he did not receive notice the prosecutor would elicit testimony concerning defendant's remark to Kunzler. "And secondly," said defense counsel, "it's just hearsay — not hearsay, but irrelevant to any issue in this case and it could be highly inflammatory and prejudicial."

In response, the prosecution informed the court it had disclosed "Mr. Kunzler heard this threat to shoot him" and included the detail in its "190.3 notice." The prosecutor acknowledged Kunzler had not previously revealed the "part of

the comment that related to him being white" and as such, that specific detail was not included in any prior disclosure. However, "the gist [that] he threatened to shoot him, that was disclosed earlier." The trial court denied the motion to strike.

On appeal, defendant contends the trial court erred when it refused to strike Kunzler's testimony that defendant made a threatening statement and called Kunzler a "white boy." Defendant asserts three separate grounds upon which the court should have granted the motion to strike. We find each argument unconvincing.

Defendant first renews the argument that the testimony should have been excluded because he did not receive proper notice of the alleged threat. Section 190.3 provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." Here, the prosecution disclosed the alleged threat in a memorandum of points and authorities that it submitted in support of its motion to admit aggravating evidence under section 190.3. The memorandum stated, "Kunzler exchanged some words with the assailants. One of the assailants said, 'I'm gonna come back and shoot and kill you.' Kunzler likely could not remember today whether defendant is the assailant who made this threat." In addition, the record contains an inspector's report that was prepared based on a telephone conversation between the prosecution and Kunzler in which the inspector wrote, "Kunzler exchanged some words with the assailants. One kid said, 'I'm gonna come back and shoot and kill you.' "

Defendant does not contend the prosecution failed to provide him with the section 190.3 notice, the accompanying memorandum, or the inspector's report in a timely manner. He nonetheless argues that the content of the materials did not give him "adequate notice of the evidence [the prosecution] planned to present in aggravation at the penalty phase."

"To be sufficient as to content, the notice must afford the defendant ' "a reasonable opportunity" to prepare a defense to the allegations.' [Citation.] Actual notice may be provided not only by the statutory notice, but by supplemental information such as police reports." (*Bradford, supra*, 15 Cal.4th at p. 1359; see also *People v. Pride* (1992) 3 Cal.4th 195, 258–259 (*Pride*).) The threatening statement as described in the section 190.3 notice and "related discovery materials" meets this standard. (*Pride*, at p. 258.)

Defendant resists this conclusion, arguing that the notice "did not indicate the threat would be introduced, or that it was linked to [defendant]." Defendant further stresses that "[t]he threat, as reported in the memorandum, contained no racial comment." But "the prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein." (*Pride, supra*, 3 Cal.4th at p. 258.) As noted, a "notice is sufficient if it gives defendant 'a reasonable opportunity' to prepare a defense to the allegations." (*Ibid*.) Here, the prosecution provided notice of the threatening remark pursuant to the statutory requirement that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given." (§ 190.3.) The materials provided under this provision necessarily gave defendant notice that the evidence described therein "may be

presented by the prosecution." (*Ibid.*) Although the notice also stated, "Kunzler likely could not remember today whether defendant is the assailant who made this threat," this is not inconsistent with Kunzler's testimony. Before the jury, Kunzler testified the person he pulled off Barnes was the person who threatened him. He also testified he could not identify *defendant* as the person he pulled off Barnes; *that* identification rested on Burnell's police report. Accordingly, defendant's claim that he was not afforded proper notice lacks merit.

Defendant further argues that the threatening remark did not rise to the level of a criminal threat prohibited by section 422. Even assuming this is correct, "Under section 190.3, factor (b), the prosecution may introduce evidence to show not only the conduct establishing the criminal violation, but also evidence of any relevant surrounding circumstances." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1133–1134 (*Kipp*).) Consistent with this principle, we have permitted the prosecution to introduce evidence that a "defendant threatened to kill a sheriff's sergeant who assisted in subduing him after his attempted escape from the . . . [c]ounty jail" because the "threats against the sheriff's sergeant were relevant to an understanding of the violent potential of defendant's attempted escape," notwithstanding that the threat in itself may not have violated any law. (*Id.* at pp. 1133, 1134.) Likewise, we found no error in the admission of evidence that a defendant, after assaulting a sheriff's deputy, "stated that he would kill one of [the assaulted deputy's] fellow deputies, or have him killed, 'and he would have the rest of [them] taken care of as well.' " (*People v. Welch* (1999) 20 Cal.4th 701, 759 (*Welch*).) As we explained, " '[v]iolent "criminal activity" presented in aggravation may be shown in context, so that the jury has full opportunity, in

deciding the appropriate penalty, to determine its seriousness.' " (*Ibid*.) The defendant's remarks thus were admissible because they were "relevant to the context in which . . . assault [on the sheriff's deputy] occurred." (*Ibid*.; see also *Winbush, supra*, 2 Cal.5th at p. 474; *People v. Watkins* (2012) 55 Cal.4th 999, 1032–1033; *People v. Wallace* (2008) 44 Cal.4th 1032, 1081; *Bradford, supra*, 15 Cal.4th at pp. 1377–1378; *People v. Montiel* (1993) 5 Cal.4th 877, 916–917 (*Montiel*) ["Even if defendant's threats were not themselves crimes, they occurred in the course of a violent, criminal resistance to arrest [citation], and they were thus admissible under factor (b) to demonstrate the aggravated nature of defendant's unlawful conduct"].) In line with our precedent, we discern no error in the admission of the threatening statement simply because defendant's remark in itself may not have risen to the level of a crime.

Defendant next contends that evidence relating to the threatening remark should have been excluded because it was inadmissible hearsay. The Attorney General counters that the argument has been forfeited because defendant did not raise it before the trial court. Defendant points to his trial counsel's statement "it's just hearsay — not hearsay, but irrelevant to any issue in this case" as evidence that he did preserve the issue. According to defendant, counsel's complaint that Kunzler's testimony was "just hearsay — not hearsay, but irrelevant" should be understood as raising " 'not [just a] hearsay' objection but also an objection pursuant to Evidence Code section 352."

The ambiguity in counsel's statement — coupled with the lack of any follow-up argument that the challenged testimony amounted to hearsay — casts doubt on whether defendant " 'fairly inform[ed] the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party

believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*Zamudio*, *supra*, 43 Cal.4th at p. 354; see also Evid. Code, § 353, subd. (a).) Nonetheless, because defendant's hearsay argument overlaps with his contention that Kunzler's testimony was irrelevant, we address both of these assertions.

Defendant asserts the threat was inadmissible on hearsay and relevance grounds because "Kunzler did not testify that [defendant] had made the threatening statement."[16] Defendant contends Kunzler testified that "[h]e was 80 percent sure that he had identified the person he pulled off of Barnes . . . and 80 percent sure that the person he pulled off Barnes made the threatening remarks." Defendant multiplies the two probabilities together and asserts that this means "Kunzler was only 64 percent sure that [defendant] made the [threat]." It seems unlikely, however, that Kunzler intended such mathematical precision with his testimony. He rather used "80 percent" to convey that he was relatively, but not completely, confident in his identifications. Moreover, defendant's calculation misrepresents Kunzler's testimony. Kunzler did not testify that he was "80 percent sure that the person he pulled off Barnes made the threatening remarks." Kunzler was asked, "What level of certainty do you have that the guy who says this [threat] is the guy you end up pulling off [Barnes]?" Kunzler responded, "Pretty sure. About 80 percent and higher. Pretty sure that was him." Even if we take at face value Kunzler's numerical estimate of his certainty, Kunzler

---

[16] If defendant made the statement, it would be admissible as a party admission under Evidence Code section 1220.

said that he had "80 percent *and higher*" certainty that the person he pulled off Barnes was the same person who threatened him. (Italics added.) In light of the above, the trial court did not abuse its discretion in finding Kunzler effectively testified that defendant made the threat.

Defendant also asserts that the threat was irrelevant as part of his broader argument that the statement was "more prejudicial than probative, and thus it should have been excluded pursuant to Evidence Code section 352." " 'A trial court has "considerable discretion" in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Jones*, *supra*, 3 Cal.5th at p. 609.)

According to defendant, the threat should have been excluded because it "did not provide any context regarding the assault against Barnes." Defendant reasons that the threat was not "made during the course of the assault against Barnes, but after it was over." But the assault against Barnes stopped only because Kunzler stopped it, and the threat was made immediately after Kunzler stopped defendant. The situation is thus indistinguishable from cases in which we have upheld the introduction of evidence that defendants uttered threats after their unlawful violent conduct was foiled. (See, e.g., *Kipp*,

*supra*, 26 Cal.4th at pp. 1133–1134; *Welch*, *supra*, 20 Cal.4th at p. 759 ["The prosecution introduced as evidence in aggravation . . . defendant's assault on [a sheriff's deputy] . . . . [The assaulted deputy] testified that immediately after this incident, defendant stated that he would kill one of [his] fellow deputies, or have him killed . . . . Defendant now objects to the admission of that statement . . . [contending it] is insufficiently connected with the [deputy's] assault to warrant admission. . . . We disagree. . . . Here, defendant's remarks were clearly relevant to the context in which [the deputy's] assault occurred"].)

Defendant's further contentions that the threat was irrelevant because "Kunzler was not a law enforcement officer" and "neither Kunzler nor Barnes was particularly vulnerable" are not well taken. Although some of our prior cases have involved law enforcement personnel (e.g., *Welch*, *supra*, 20 Cal.4th at p. 759) or vulnerable victims (e.g., *People v. Melton* (1988) 44 Cal.3d 713, 756–757), we have never indicated that admissibility rested on such circumstances. Rather, we have said " '[v]iolent "criminal activity" presented in aggravation may be shown in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness.' " (*Welch*, at p. 759.) We agree with the Attorney General that Kunzler's testimony satisfies this standard because "the challenged evidence that [defendant] threatened Kunzler was relevant not only to aid the jury in understanding the nature of the assault on Barnes, but also to help explain Kunzler's confidence in his identification because Kunzler testified that the person he had pulled off of Barnes looked him 'in the face' when he threatened him."

Finally, defendant focuses specifically on the term "white boy" and argues that the trial court should have stricken Kunzler's testimony because the use of those words was "particularly prejudicial." The Attorney General again contends that defendant has "forfeited his claim that the racial portion of the statement was especially prejudicial." Defendant insists otherwise, claiming that his argument before the trial court that the statement was inflammatory preserves the issue because the prejudicial nature of the remark "could only have been based on the 'white boy' comment, as the remainder of the statement was not inflammatory in any way." Defendant's claim, even if not forfeited, lacks merit.

Although defendant characterizes the introduction of the term "white boy" as "creating the false impression that [he] was a racist or would commit a violent act based, even in part, on the fact that someone was a 'white boy,'" no such argument was made at trial and we decline to hold that the brief reference was so prejudicial as to require exclusion under the deferential abuse of discretion standard of Evidence Code section 352. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 628.) And given our conclusion that the evidence was not unduly prejudicial, we further conclude its admission did not violate defendant's right to due process. (*Id.* at pp. 628–629.)

b. *Evidence of criminal threat against Jeff Samuel*

i. *Background*

During jury selection, the prosecution indicated that it sought to introduce evidence of four incidents of criminal activity under section 190.3, factor (b). In addition to the battery against Barnes, these incidents included arson of an office, endangerment of a police officer, and a criminal threat made

against Jeff Samuel. The court ruled that evidence of the endangerment was not admissible, the Barnes incident was admissible, and the alleged arson and threat "would be admissible . . . subject to a[n Evidence Code section] 402 type of hearing." The court indicated that "[a]ll [it] want[s] out of" such a hearing is to confirm "that somebody is going to come in and testify" to "the things that are in the papers" submitted by the prosecution in seeking to introduce the incidents. The prosecutor responded that he believed the Barnes and Samuel incidents will "come in just fine."

Before the penalty phase began, the defense again requested a hearing pursuant to Evidence Code section 402 regarding the Barnes incident. The court denied the defense motion. The parties did not further discuss the issue of a hearing regarding the threat made against Samuel, and the court did not hold such a hearing.

During the penalty phase, Samuel testified that in September 1998, or less than a year before Jaquita was killed, he had an encounter with a person who the parties stipulated was defendant. According to Samuel, he was working for a plumbing and paving company on September 4, 1998, and on that morning, he and his colleagues had just finished repaving a section of a parking lot in Hayward. As the asphalt on the newly paved section had yet to dry, Samuel and his colleagues "[s]et up barricades and created a new route for people to drive around" to avoid the fresh asphalt. Samuel explained that a car driving on the fresh asphalt "will ruin the asphalt," "cav[ing] it in," and require Samuel and his coworkers to fix it for free.

As traffic was "backing up in the parking lot because of [the] barricade," "one car decided to drive through the barricade

on the fresh paved asphalt." One of Samuel's coworkers went to talk to the driver of the car (defendant), but defendant did not move. Samuel then approached defendant.

Samuel testified he asked defendant to move his car in order not to damage the asphalt. Defendant was "[c]ocky and didn't want to move." So Samuel repeated, "Look, you have to remove your car," making the statement in a "firm" manner. Defendant responded by telling Samuel, "If you yell at me one more time, I'll shoot your ass." Samuel testified that defendant made the statement "[i]n a threatening manner." Samuel was afraid and "backed off" because he did not "want to be shot."

After Samuel backed away from defendant's vehicle, defendant "eventually . . . g[o]t his car off the asphalt" and parked at a facility within sight of the parking lot. Samuel and his supervisor called the police.

Based on her police report, Officer Heidi Galvez testified that when she responded to the call, she located defendant, brought him back outside, patted him down, and searched his car. Galvez did not find a gun and so did not arrest defendant.

### ii. *Analysis*

Defendant contends the trial court reversibly erred by failing to hold a foundational hearing on the alleged criminal threat before permitting evidence on the incident to be presented to the jury. (See Evid. Code, § 402, subd. (b).) He again relies on *Phillips* to support his contention. (*Phillips*, *supra*, 41 Cal.3d at pp. 72–73, fn. 25 (plur. opn. of Reynoso, J.).) As explained above, the argument amounts to a claim that the evidence adduced at trial was insufficient to establish that defendant committed a criminal threat.

Assuming defendant has preserved the claim for appellate review,[17] his contention lacks merit. Section 422 provides that "[a]ny person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and

---

[17] The Attorney General contends defendant has forfeited the issue because "defense counsel not only failed to renew his request for a hearing on or before . . . Samuel testified at the penalty phase [citation], he never raised the claim he now makes regarding whether the evidence supported a finding that [defendant's] threat to Samuel was sufficiently unequivocal." (See, e.g., *Montiel, supra,* 5 Cal.4th at p. 928, fn. 23 ["Even if defendant need do nothing at trial to preserve an appellate claim that evidence supporting his *conviction* is legally insufficient, a different rule is appropriate for evidence presented at the penalty phase of a capital trial. There the ultimate issue is the appropriate punishment for the capital crime, and evidence on that issue may *include* one or more other discrete criminal incidents. (§ 190.3, factors (b), (c).) If the accused thinks evidence on any such discrete crime is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground"]; *People v. Livingston* (2012) 53 Cal.4th 1145, 1175 ["defendant forfeited the claim the evidence should not have been admitted on the ground that it was insufficient"].)

Defendant responds that he is not obligated to renew his request given the court's early statement that it *would* conduct a hearing, and that his motion for a hearing pursuant to Evidence Code section 402 was sufficient to preserve the issue. We address the merits of defendant's claim without deciding whether the claim was forfeited.

specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment."  (§ 422, subd. (a).)

We hold that the evidence is sufficient here.  A reasonable juror could have found the elements of a criminal threat had been proved beyond a reasonable doubt through Samuel's testimony.  Samuel testified that defendant told him, "If you yell at me one more time, I'll shoot your ass" and conveyed the message in a "threatening manner."  Samuel was afraid upon hearing defendant's statement and broke off contact with defendant because he did not "want to be shot."  Samuel then had his supervisor call the police to report the incident.

A rational jury could conclude the testimony demonstrated defendant made a criminal threat against Samuel — i.e., that (1) defendant " 'willfully threatened' " to shoot Samuel, an act that would "result in death or great bodily injury"; (2) defendant made the threat with the intent that his statement would be " 'taken as a threat, even if [defendant had] no intent of actually carrying it out' "; (3) defendant's threat "was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat' "; (4) the threat caused Samuel to be in " 'sustained fear' " for his safety; and (5) Samuel's fear was " 'reasonabl[e]' under the circumstances."  (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*); *id.* at p. 227 [articulating the above as the "five constituent elements that must be established to find that a

defendant has committed th[e] offense" of making a criminal threat].)

Defendant resists this conclusion. He argues that the testimony at trial was insufficient to establish that his statement to Samuel was " 'so unequivocal' " and " 'unconditional' " as to satisfy section 422 (*Toledo*, *supra*, 26 Cal.4th at p. 228) because the alleged threat was prefaced with the conditional phrase, "*If* you yell at me one more time" (italics added).

Contrary to defendant's argument, we have held that "prosecution under section 422 does not require an unconditional threat of death or great bodily injury." (*People v. Bolin* (1998) 18 Cal.4th 297, 338 (*Bolin*).) Rather, as we explained, " 'Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat.' " (*Id.* at p. 340.) " 'A conditional threat can be punished as an assault, when the condition imposed must be performed immediately, the defendant has no right to impose the condition, the intent is to immediately enforce performance by violence and defendant places himself in a position to do so and proceeds as far as is then necessary.' " (*Id.* at p. 339.)

Defendant's arguments fail under these principles. It is true defendant phrased his threat to Samuel as a conditional " '*If* you yell at me one more time, I'll shoot your ass.' " (Italics added.) However, defendant " 'ha[d] no right to impose the condition' " that Samuel stop yelling in his attempt to direct traffic or else be shot. (*Bolin*, *supra*, 18 Cal.4th at p. 339.) Moreover, as the Attorney General points out, there is no evidence that Samuel had been "yell[ing]" at defendant. Samuel

testified only that he had been "firm" with defendant which does not equate to raising one's voice. As such, " 'given the reality of the circumstances surrounding the threat,' " a rational fact finder could have concluded that the condition defendant attached to his *not* shooting Samuel was " 'illusory,' " and could not " 'save [defendant] from conviction' " of making a criminal threat. (*Id.* at p. 340.)

Defendant emphasizes a number of facts that, in his view, defeat "any intent to cause serious or grave fear in Samuel." He stresses he "did not brandish a gun," and "once Samuel complied with [his] condition, [defendant] ceased any threatening behavior and immediately did what Samuel had requested him to do," i.e., he "moved his car . . . [and] continue[d] with his intended business."

The record does not fully support defendant's characterization of the facts. The prosecution had asked Samuel, "When you backed off, *eventually* does the driver get his car off the asphalt?" (Italics added.) Samuel responded affirmatively. The exchange reflects that defendant "eventually" moved his car, but not that defendant "immediately" did so "once Samuel complied with [his] condition" to "stop yelling."

In any event, the jury did not have to credit the circumstances defendant emphasizes. At the moment the threat was made, Samuel had no means to verify that defendant, in fact, did not have a firearm. Samuel reasonably could have been afraid of being shot even though defendant did not brandish such a weapon. Likewise, that defendant "continue[d] with his intended business" after making the threat gave no reassurance to Samuel that defendant would not have shot him had Samuel

not backed away. (See, e.g., *People v. Wilson* (2010) 186 Cal.App.4th 789, 807 [" 'threats often have by their very nature some aspect of conditionality: A threat is made to convince the victim to do something "or else" ' "]; *Toledo, supra,* 26 Cal.4th at p. 228 [stating that an element of the offense is "the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out' "].)[18]

### c. *Constitutionality of use of unadjudicated criminal activity*

To preserve arguments for federal habeas corpus review, defendant asks us to reconsider our decisions that have allowed for the introduction of unadjudicated crimes under section 190.3, factor (b). We decline to do so.

In *People v. Balderas* (1985) 41 Cal.3d 144, 204, we held the constitutional right to due process "permits a jury which has already decided defendant's guilt to consider, on the issue of penalty, other violent crimes on which defendant was neither charged nor convicted." (See also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1182 [affirming this principle].) We have also said that a defendant is not "denied [the] constitutional right to an impartial fact finder and reliable penalty determination

---

[18] Defendant also contends that the introduction of the evidence surrounding the Samuel incident violated the Eighth and Fourteenth Amendments. According to defendant, because "the evidence was insufficient to prove that [defendant's] statement to Samuel was a criminal threat," "the finding of the aggravating factor [was] invalid" and the admission of the evidence "invite[d] an irrational, purely subjective response." We disagree with defendant's characterization of the evidence as insufficient and therefore reject his constitutional claims as well.

because the same jury that decided his guilt" evaluates evidence of uncharged violent offenses at the penalty phase. (*Bolin*, *supra*, 18 Cal.4th at p. 335; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 590 ["the use of unadjudicated criminal activity during the penalty phase [of a capital trial] is permissible"].)

Along the same lines, "[j]ury unanimity is not required on findings of unadjudicated criminal conduct." (*Young*, *supra*, 34 Cal.4th at p. 1208.) Decisions by the United States Supreme Court, specifically *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. 92 do not alter this conclusion. (*People v. Ramirez*, *supra*, 13 Cal.5th at p. 1161.)

Because defendant has not asserted any new ground to revisit our holdings on these issues, we continue to adhere to them.

### 3. *Alleged violation of the Racial Justice Act*
#### a. *Background*

In supplemental briefing, defendant alleges that the prosecutor's penalty phase closing argument violated the Racial Justice Act of 2020 (RJA) (Pen. Code, § 745). Specifically, defendant argues that "the prosecutor's use of coded rhetoric, and in particular the comparisons of [defendant] to a wolf and a predator, appealed to racial stereotypes and violated the RJA." Based on this asserted violation of the RJA, defendant requests that we declare him "no longer eligible for the death penalty" and remand the matter to the trial court for resentencing.

The penalty phase of defendant's trial began on April 16, 2007. The presentation of evidence lasted five days, concluding on April 23, 2007. The jury heard testimony from 37 individuals, including eight witnesses who testified on behalf

of the prosecution and 29 witnesses who were called by the defense. At the end of the testimony, the prosecutor gave his closing argument.

The prosecutor began his penalty phase closing argument by telling the jury that "there is only one question for you to answer": "What punishment does the defendant deserve?" The prosecutor proceeded to discuss the law governing the jury's penalty decision, including the statutory mitigating and aggravating factors. (See § 190.3.)[19]

---

[19] Section 190.3 directs the trier of fact to "take into account any of the following factors if relevant:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired

In discussing the mitigating factors, the prosecutor maintained that none of the circumstances described in section 190.3, factor (d) through (j) "mitigate[s] this crime in any way." According to the prosecutor, factor (d) is inapplicable to the jury's decision because "[t]here's been no evidence that the defendant suffered from any kind of mental or emotional disturbance" during the time of the crimes; factor (e), "whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal conduct," "really has nothing to do with this case at all"; factor (f) "relates to a scenario far from what we have" because "[t]here . . . is no element of any kind of moral justification of what the defendant did to Jaquita Mack";[20] factor (g), "whether or not the defendant was operating under extreme duress or under the substantial domination of another person," has "nothing to do with this case"; factor (h) is irrelevant because there was "nothing at all relating to anything affecting [defendant's] capacity, being

---

as a result of mental disease or defect, or the affects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

[20] In explaining factor (f), the prosecutor stated, "This is a kind of case where, for example, you have, say, a mother who finds out that her son was molested and brutalized and she goes and finds the person that did this to her son and she takes him and she tortures him to death. . . . In that case, that mother may have believed to have a moral justification for what she did . . . ."

impaired by mental disease or defect or the effects of intoxication"; factor (i), defendant's age, "does not mitigate this crime" as defendant "was old enough to know right from wrong"; and finally, factor (j), "whether or not [defendant was] an accomplice or his participation was minor," was "[n]ot really at issue here."

Regarding section 190.3, factor (k), the "catch-all" mitigating factor, the prosecutor stated that the jury can expect to hear "an awful lot about Factor (k)" because "in some sense Factor (k) is all [defendant has] got." The prosecutor acknowledged that "[t]here have been a lot of witnesses that testified for the defense about the defendant's background, his life, things he did, that sort of thing." The prosecutor nonetheless maintained that the extent to which the witnesses' testimony "illuminate[d] something good or mitigating about [defendant's] character" is limited.

The prosecutor further said that "to some people" — including defense witnesses who testified during the penalty phase — defendant "shows his best side," but he cautioned jurors that "certainly there's the other side." The prosecutor emphasized that this was "a theme . . . with these defense witnesses" who saw only "a façade" of defendant's character. The prosecutor repeatedly asked jurors to "judge [defendant] by how he really acts," e.g., when his "teachers and ministers and family" are "not looking to see if he's on his best behavior."

The prosecutor then turned to the aggravating factors. Although the prosecutor mentioned section 190.3, factor (b) and (c) and summarized the victim impact evidence, he focused most on factor (a), "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the

existence of any special circumstances found to be true." (§ 190.3, factor (a).) In discussing the events immediately surrounding defendant's rape and murder of Jaquita, the prosecutor reminded the jury of "the evidence that came in in the guilt phase that relates to how this attack developed." The prosecutor theorized that defendant formed ill intentions early in his interactions with Jaquita. As the prosecutor stated, defendant "basically set a trap for [Jaquita]. He was the predator, captured and he killed her."

To develop his theory of the crimes, the prosecutor urged the jury to listen to the tapes of defendant's confessions and to focus on various inconsistencies in his accounts. Specifically, the prosecutor emphasized that defendant said in his confession that he told Chris Aubrey that he had seen Jaquita when Aubrey approached him, but Aubrey herself testified that defendant told her he had *not* seen Jaquita. The prosecutor explained that defendant lied in his confession because "he realized that if he had seen [Jaquita] and he doesn't tell Chris Aubrey . . . it means that the trap is set from the get-go, that if he lies to Chris Aubrey about having seen this little girl, it shows the true predator he is and he doesn't want the police . . . to realize what the true predator that he is."

The prosecutor similarly called the jury's attention to the varying accounts defendant gave in relating how Jaquita came into his apartment to play video games. The prosecutor highlighted that in his confession, defendant first said that he was "outside" when Jaquita saw him with his PlayStation but later changed his story to say that he was inside "right there by the door." The prosecutor explained the shifting narrative by positing that defendant understood "it's not good to be outside, to be the predator out there who sees the missing girl and

106

wave[s] her in, suggest to her come on down because that's predatory behavior and shows you how evil this really was." Likewise, the prosecutor noted that defendant initially said that it was Jaquita who asked to come in to play video games but then "slipp[ed] up [and] . . . said that" it was defendant who "asked [Jaquita] if she can come in and play the game." The prosecutor asked the jury to consider whether "the idea of coming to that apartment that night [is] going to generate from [Jaquita] or does it generate from a predator who uses his Play Station as a rape station, who uses it to entice an 11-year-old girl to be trapped inside his apartment?"

The prosecutor also stressed what defendant did *not* do when Jaquita appeared at his apartment. The prosecutor said, "think about . . . what would any good, decent human being who is not a predator do in that scenario. . . . The good, decent non-predator would say, Hey, little girl, you know what, I just saw your aunt. She's looking for you. . . . You need to go home right away." But defendant "doesn't say that." Moreover, he could not explain why he failed to do so when asked "because the answer is I'm a predator."

The prosecutor then focused on what happened once Jaquita came into defendant's apartment. "Now he's got her in there . . . . What's the next thing he's got to do? Shut the door." The prosecutor described the closing of the door as "predatory behavior" on the part of defendant, and not as "an unthinking act" as defendant tried to portray it.

Toward the end of his argument, the prosecutor stated that defendant saw Jaquita as "easy prey" who was "like a wounded lamb that has been separated from the flock." The prosecutor said, "Quite frankly, ladies and gentlemen, the

defendant in this case is the wolf in sheep's clothing. Jaquita is the wounded lamb. She's out looking for some escape here and he's this inviting, looking like a sheep, come on in. . . . And he shuts the door and the s[h]eep's clothing comes off and he is a wolf." In describing how defendant raped Jaquita, the prosecutor said, "he gets over her and then her legs get lifted up and he's got them up. And then he's on her like the wolf." The prosecutor also described the aftermath of the killing, stating that after strangling Jaquita, "The predator is thinking about covering his tracks now. The wolf doesn't want to be caught."

Throughout his argument, the prosecutor urged the jurors to see the events through Jaquita's eyes and asked them to imagine the suffering she must have experienced. For example, the prosecutor said, "The sensation [of having] an adult male grabbing her pants and her panties and pulling them down to her ankles. Imagine what she's thinking. And she's looking and he gets to a point where she's going to see him start fumbling with his own pants, to pull them down or pull it out, as he says. And she sees that. She is old enough to know that what's coming is just going to be terrible." The prosecutor told the jury that Jaquita "died traumatized, alone and in fear."

The prosecutor concluded this part of his remarks by stating "when . . . you put over here Factor A, what happened to this girl . . . [and] you . . . [compare that] to the mitigation . . . I don't have an arm long enough to show you how much imbalance there is." The prosecutor next turned to circumstances that he expected the defense to highlight and sought to minimize their importance. For example, the prosecutor urged the jury to find that "there is no true remorse in this case" because what defendant was "really sorry about" is the fact that "he got caught" and "his life, as he knows it, is basically over." The

prosecutor ended his closing statement by asking the jury for a verdict that "will do justice for Jaquita and her family."

The prosecutor's argument in its entirety took almost three hours. When transcribed, his argument spanned 82 pages in the record.

The jury retired for deliberations on April 26, 2007. It deliberated for almost 17 hours over the course of five days. During this time, the jury requested various exhibits, including recordings of defendant's confessions and letters he wrote apologizing to his and Jaquita's families. The jury also requested to have testimony of witnesses read back to them. The requested testimony included that of Aubrey, Hill, and several defense witnesses. At the end of the deliberation period, the jury returned a verdict of death.

The defense subsequently made a motion for the trial court to modify the sentence to life without the possibility of parole. In considering the motion, the court stated that it understood its role was to "make an independent determination whether the imposition of the death penalty upon the defendant is appropriate in light of the relevant evidence and applicable law." It further explained that its "findings are based solely on the evidence which was presented to the jury during the trial" and are not "in any way based on any information, any evidence, or [any] exhibits known to the Court but which was not placed before the jury."

In denying the motion, the trial court explained it had "independently [found] the jury's assessment that the evidence in aggravation substantially outweighs the evidence in mitigation so as to support the selection of the death penalty as the appropriate penalty . . . is overwhelmingly supported by the

weight of the evidence." The court also put in strong words the revulsion it felt in considering defendant's conduct in raping and killing Jaquita. For example, the court stated, "While it is difficult to choose words that can fairly describe the murder of Jaquita Mack, the Court has independently reviewed the evidence and independently finds beyond a reasonable doubt that the evidence of the murder was cruel, shows a cruel, senseless, depraved, evil and vicious act and this evidence is overwhelming. [¶] . . . [T]he rape of and the murder of Jaquita Mack by the Defendant Alex Demolle is shocking and callous beyond any civilized norms." The court ultimately denied the motion to modify the death judgment.

b. *Analysis*

"The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' (Stats. 2020, ch. 317, § 2, subd. (i).) To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin." (*People v. Wilson* (2024) 16 Cal.5th 874, 944–945.)

"The central provision of the RJA is Penal Code section 745 . . . which provides that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.' (§ 745, subd. (a).)" (*People v. Bankston* (June 1, 2026, S044739) __ Cal.5th ___ [slip opn. at p. 84] (*Bankston*).) Defendant's "claims in this case invoke the prohibition in section 745, subdivision (a)(2), which provides that a defendant may

establish a violation by proving by a preponderance of the evidence that, '[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language . . . or otherwise exhibited [racial] bias or animus towards the defendant . . . , whether or not purposeful.' The statute defines the term '[r]acially discriminatory language' to mean 'language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory.' (*Id.*, subd. (h)(4).) The prohibition on racially discriminatory language 'does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect.' (*Id.*, subd. (a)(2).)" (*Id.* at p. ___ [slip opn. at pp. 84–85].)

"The RJA's prohibition on the uses of racially discriminatory language covers explicit appeals to bias as well as facially neutral language that implicitly appeals to racial bias. (§ 745, subd. (h)(4).) To identify language that falls in the latter category, in particular, requires a nuanced inquiry that is sensitive to context." (*Bankston, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 86]; *People v. Barrera* (June 1, 2026, S103358) ___ Cal.5th ___ [slip opn. at pp. 77–78] (*Barrera*) [same]; *People*

*v. Chhuon and Pan* (June 1, 2026, S105403) ___ Cal.5th ___ [slip opn. at p. 81] (*Chhuon and Pan*).)

"As noted, the RJA prohibits the use of racially discriminatory language or 'language that, to an objective observer, explicitly or implicitly appeals to racial bias, including . . . *language that compares the defendant to an animal.*' (§ 745, subd. (h)(4), italics added; see *id.*, subd. (a)(2).)" (*Bankston, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 100].) Yet, "[a]lthough the RJA explicitly prohibits some 'language that compares the defendant to an animal' (§ 745, subd. (h)(4)), we are unpersuaded that the RJA categorically forbids *all* such language. . . . The legally operative provision of the RJA is the provision prohibiting the use of 'racially discriminatory language,' which it defined as language that 'to an objective observer, explicitly or implicitly appeals to racial bias.' (§ 745, subds. (a)(2), (h)(4).) . . . [N]ot all uses of animal imagery raise concerns about explicit or implicit appeals to racial bias. The RJA is most naturally understood to prohibit those uses of animal imagery that are objectively understood as appealing to racial bias; it does not categorically prohibit other uses of animal imagery that do not raise the serious racial fairness concerns to which the RJA is directed. As with the analysis of other types of potentially discriminatory language, we must carefully consider context when determining whether particular statements violate the RJA." (*Id.* at p. ___ [slip opn. at pp. 101–102]; see also *Barrera, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 83] [same].)

Defendant objects to the prosecutor's references to him as a predator and a wolf, contending that the use of such language violated section 745, subdivision (a)(2). We conclude that on this record, defendant has not established a violation of the RJA

based on the prosecutor's use of the term "predator" and versions of that word, or in the prosecutor's reference to defendant as being a "wolf in sheep's clothing." We do not decide whether the prosecutor employed racially discriminatory language in using the word "wolf" two to three additional times because, assuming that the prosecutor's use of this language violated the RJA, harmless error analysis applies, and any assumed error was harmless beyond a reasonable doubt.[21]

The prosecutor used the word "predator" and variants of that term in describing defendant's account of his interactions with Jaquita before she entered his apartment. "While the term 'predator' can refer to animal behavior, it also can refer to human behavior." (*Chhuon and Pan*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 108].) As we have recently observed, "California law includes a statutory scheme expressly concerning '[s]exually [v]iolent [*p*]*redators*.' (Stats. 1995, ch. 763, § 3, italics added.) That code provision pertains to

---

[21]  As previously noted and explained below, the prosecutor used the phrase "wolf in sheep's clothing" to convey his theme that defendant was pretending to be someone he was not. In addition, the prosecutor used "wolf" once after saying the "s[h]eep's clothing [came] off," and two additional times without repeating the word "sheep" or the term "wolf in sheep's clothing" in the same sentence.

One of the concurring and dissenting opinions criticizes our analysis for "isolat[ing]" the instances in which the challenged language (predator, or predatory, wolf in sheep's clothing, and wolf) was used. (See conc. & dis. opn. of Evans, J., *post*, at p. 3.) However, we are merely identifying the terms used in the context of how they were presented to the jury. This appropriately focuses on an objective observer's understanding of the statements as a whole, in the context in which they were presented. (See § 745, subd. (h)(4).)

human, not animal, behavior, and defines terms such as '[p]redatory' to mean 'an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization.'" (*Id.* at p. ___ [slip opn. at p. 108].)

It is apparent that the prosecutor attached similar meaning to predator and its variants here. The prosecutor used that language in connection with *human* actions attributed to defendant. For instance, the prosecutor said that defendant lied to the police about what he said to Aubrey because, had he told the truth, the police would have realized what a "true predator" he was. Similarly, the prosecutor implied that defendant engaged in "predatory behavior" by "wav[ing] [Jaquita] in" and "suggest[ing] to her come on down" when he saw her and knew that she was "the missing girl" whom Aubrey had been looking for. The prosecutor also said that defendant behaved as a "predator" by "us[ing] his Play Station as a rape station . . . to entice an 11-year-old girl to . . . his apartment." In addition, defendant did not tell Jaquita that Aubrey was looking for her and she should go home because that was what a "good, decent non-predator would say," but defendant was a "predator." Likewise, defendant's act of closing the door to his apartment once Jaquita was inside was "predatory behavior."

Based on this context, we conclude the prosecutor was not employing the term "predator" in a manner that "to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).) Although we

agree that the word "predator" *can be* employed in a manner that dehumanizes a defendant, leading to an RJA violation (Stats. 2025, ch. 721, § 1, subd. (c)), the context here portrayed the defendant in a different manner. All of the actions described by the prosecutor — lying, waving in a missing girl, using a video game to entice the victim to enter the apartment, failing to communicate to the victim that she should go home, and closing a door — are "refer[ences] to human behavior." (*Chhuon and Pan*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 108].) We therefore conclude that "[e]ven if the use of the term ['predator'] in some contexts has a [dehumanizing effect], [defendant] fails to explain how, in this context, the prosecutor's comment constituted an implicit 'appeal[]' to racial bias." (*Bankston*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 97].)

Likewise, we are not persuaded that defendant has shown by a preponderance of the evidence that the prosecutor's use of the term "wolf in sheep's clothing" amounts to "language that . . . appeals to racial bias." (§ 745, subd. (h)(4).) The term "wolf in sheep's clothing" is a common, facially neutral saying that has long been used in myriad circumstances in which someone or something poses or has been presented as something it is not. (See, e.g., *Barr v. American Association of Political Consultants, Inc.* (2020) 591 U.S. 610, 635 [describing an alternative approach to a legal issue as "a wolf in sheep's clothing"]; de Meziriac, Aesop's Fables (1897) p. 125 [retelling the ancient fable of the wolf in sheep's clothing].) Moreover, the challenged remarks were consistent with the theme — unrelated to race — which the prosecutor developed early in his argument. The prosecutor's theory was that defendant behaved differently in front of family and friends than "when no one is watching." (Accord, *Bankston*, *supra*, ___ Cal.5th at p. ___ [slip

opn. at pp. 105–106] ["We do not deny that the moral of the prosecutor's story was a permissible one:  that a defendant exhibiting appropriate . . . [behavior in some contexts] might have behaved differently at the time of the capital crimes"].) The prosecutor's point was that defendant presented a friendly, helpful, "inviting" persona in public, but the persona was nothing more than "clothing [that] comes off" once he was alone with the victim, at which time he revealed his true character by raping and killing her.  The fact that the challenged language "fell within the prosecutor's broader [legitimate] argument" supports the conclusion that it does not reflect bias or animus toward defendant because of his race, and that it would not trigger implicit bias by an objective observer against defendant. (*Chhuon and Pan, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 110].)[22]

---

[22]    In a cursory fashion, defendant contends the prosecution, by using phrasing such as "brute force" and "brutalize," "used language evoking the brute caricature," which he asserts "is an extension of animal imagery."  Defendant also stresses his jury "did not include even one Black juror" and "[t]he prosecutor exercised a peremptory challenge to the only Black prospective juror."

Defendant, however, does not raise a challenge concerning the selection of his jury.  He also has not persuasively argued how an objective observer would have understood the complained-of language (which does not include the prosecutor calling defendant a "brute") any differently had the jury contained Black jurors.  And as above, we conclude that the prosecutor's use of this language does not amount to "language that, to an objective observer, explicitly or implicitly appeals to racial bias" in the context of this case.  (§ 745, subd. (h)(4).) Furthermore, the prosecutor also described a hypothetical victim as having been "brutalized."  No mention of race was

Twice, the prosecutor used the word "wolf" without directly repeating the story of a "wolf in sheep's clothing" in the same sentence. The first stand-alone "wolf" reference appears two pages in the reporter's transcript after the prosecutor mentioned the "wolf in sheep's clothing." In short succession, in describing defendant's conduct after Jaquita entered his apartment, the prosecutor stated, "[H]e's on her like the wolf." Less than three pages later, the prosecutor said, "The wolf doesn't want to be caught."

In enacting the RJA, the Legislature showed a special concern regarding the use of animal imagery. As the Legislature stated in its uncodified findings and declarations, "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system . . . ." (Stats. 2020, ch. 317, § 2, subd. (e).) Nonetheless, defendant has not offered any evidence to suggest that the manner in which the prosecutor used the term "wolf," singly or in combination with other descriptions, is "used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin." (§ 745, subd. (h)(4).) He likewise has not demonstrated how the term wolf is "historically associated with racism." (Stats. 2020, ch. 317, § 2, subd. (e).)

Ultimately, however, we need not resolve whether these additional references to a "wolf" in the prosecutor's closing —

---

made in reference to this victim's assailant. As we have done elsewhere, we conclude that the prosecutor's use of the terms "brute force" and "brutalize" "does not stand out considering the use" of the similar phrasing in another context. (*Chhuon and Pan, supra*, ___ Cal.5th at p. ___ [slip opn. at p. 81].)

"he shuts the door and the s[h]eep's clothing comes off and he is a wolf"; "he's on her like the wolf"; and "[t]he wolf doesn't want to be caught" — violated the RJA. As we explain below, even assuming that they did, there is no reasonable possibility that they contributed to the jury's death verdict.[23]

In finding any assumed error to be harmless, we reject as a threshold matter defendant's contention that the RJA "does not require proof of prejudice for claims raised on direct appeal" and therefore he is immediately entitled to vacation of the death sentence. As we have held, in cases where the judgment was entered before the effective date of the RJA "the harmless beyond a reasonable doubt standard applies on appeal to review

---

[23] One of the concurring and dissenting opinions maintains that "[t]his is far from the first time a Black man . . . has been described as a 'wolf' as a means of dehumanizing [him]." (Conc. & dis. opn. of Evans, J., *post*, at p. 4.) The opinion points to "newspapers in New York and around the country, and even elected officials, [that] called the ultimately exonerated Black and Latino teenagers known as the Central Park Five a ' "wolf pack." ' " (*Ibid.*) While it is true that the prosecutor here did not use other innocuous metaphors like " 'an "eager beaver," "happy as a clam," "free as a bird," or "quiet as a mouse" ' " (*ibid.*, quoting *Bankston*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 101]), the prosecutor did rely on another innocuous fable, explaining how the facts of this case and defendant's conduct aligned with that commonly understood tale. The prosecutor did not present his argument in the same type of context as the Central Park Five case. (See *Chhuon and Pan*, *supra*, ___ Cal.5th at p. ___ [slip opn. at pp. 110–111] [rejecting the defendant's RJA argument made in reliance on alleged "fear of non-White teenage superpredators [as] spread through media crime stories and . . . [how] the superpredator myth affected the way that law enforcement, courts, and the public saw youth of color," noting that "the prosecutor never used the term 'superpredator' "].)

of RJA claims asserting the use of racially discriminatory language." (*Bankston, supra,* ___ Cal.5th at p. ___ [slip opn. at pp. 123–124]; see also *Barrera, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 71] [same]; *Chhuon and Pan, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 85] [same].)  We likewise follow our recent decisions interpreting the RJA in rejecting defendant's position that under section 745, subdivision (*l*), a finding of an RJA violation, by itself, precludes imposition of the death penalty. (See *Bankston,* at p. ___ [slip opn. at pp. 134–135]; *Barrera,* at p. ___ [slip opn. at pp. 102–103].)

In assessing the potential prejudicial effect of the prosecutor's use of the term "wolf," we consider the context of the challenged language, the evidence introduced at the penalty phase in support of aggravating and mitigating factors, the subsequent deliberations, and surrounding events.[24]

Here, the prosecutor's closing argument must be considered as a whole and in context.  From the start, the prosecutor emphasized that defendant was posing as someone

---

[24]  One of the concurring and dissenting opinions says that "[i]t is not enough to analyze the aggravating and mitigating evidence." (Conc. & dis. opn. of Evans, J., p. 7.)  As indicated by our analysis, we do not reach the conclusion that any violation was harmless beyond a reasonable doubt based on the aggravating and mitigating evidence alone.  Nonetheless, the aggravating and mitigating evidence offered at trial can play a significant role in an analysis of whether a found or assumed RJA violation at the penalty phase was harmless, just as this evidence may be material to whether other kinds of trial errors prejudiced a defendant.  (See *Barrera, supra,* ___ Cal.5th at p. ___ [slip opn. at p. 96] [in holding that an assumed RJA violation was harmless beyond a reasonable doubt, observing that "[t]he prosecution's case in aggravation was strong" and the defendant's "case in mitigation was, by contrast, weak"].)

he was not in order to manipulate a vulnerable child.  To convey this message in simple terms, the prosecutor chose to rely on the well-known "wolf in sheep's clothing" fable.  The prosecutor described defendant's deceptive human actions, including how he lured a child into his apartment and attempted to evade detection before raping, strangling, and killing his 11-year-old victim.  Relying on the same fable, the prosecutor at one point said the sheep's "clothing comes off and he is a wolf."  Although the prosecutor did not again directly couple the word "wolf" with a "sheep" shortly thereafter — when saying "he's on her like the wolf" and the "wolf doesn't want to be caught" — an objective observer would still recall the earlier context of the fable and the focus on defendant's human conduct.  And notably, these references constituted only a brief portion of a lengthy closing argument.  As mentioned, the prosecutor spoke for three hours in delivering his closing remarks.  (Accord, *Barrera, supra*, ___ Cal.5th at p. ___ [slip opn. at p. 95] [concluding that the challenged comments were harmless beyond a reasonable doubt when, among other things, they "were made only briefly and in passing"].)  During his argument, the prosecutor focused primarily on actions that defendant undertook.  It was only in describing defendant's "egregious harmful behavior" in raping and killing a child that the prosecutor employed the term "wolf." (*Bankston, supra*, ___ Cal.5th at p. ___ [slip opn. at p. 119] [in discussing prejudice from RJA violations, stating that "there [are] appreciable differences between an argument that overtly and flagrantly appeals to racial bias . . . and the fleeting use of dehumanizing language in an effort to describe egregious harmful behavior"].)

The prosecutor also acknowledged defendant's humanity in various parts of his closing argument.  For instance, he

conceded before the jury that defendant had friends and family who cared about him, that he had a "passion" for fishing, that he did "a good deed" in helping his nephew and "good things" by participating in "church activities and church relationships," and that he was "a good father" and "good with kids generally." Although the prosecutor opined that these characteristics were overwhelmed by defendant's rape and murder of an 11-year-old girl, he never denied that defendant was a uniquely individual human being.

In sum, the argument as a whole was extensive and fair, while the challenged remarks were brief, contained, and "part of an evident effort to comment on matters fairly presented to the jury for its consideration." (*Barrera*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 95].)

Regarding the aggravating evidence, we agree with the trial court that the rape and murder that defendant perpetrated was "shocking and callous beyond any civilized norms."[25] (Accord, *Barrera*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 96] [stating that the weight of the aggravating evidence was "reflected in the trial court's statement in denying the automatic motion to reduce the penalty"].) Defendant lured a vulnerable child into his home. Once inside, he overpowered, raped, and killed her. The strangulation itself took 15 to 20 minutes. In

---

[25] One of the concurring and dissenting opinions notes that death penalty cases sometimes may "tax even the ability of judges to set aside the horror and apply the law faithfully and fairly." (Conc. & dis. opn. of Evans, J., *post*, at p. 15.) We do not disagree that death penalty cases may present horrific facts. But like the trial court, we believe that a court can acknowledge the senselessness of the crimes and at the same time apply the law faithfully.

short, "though other aggravating evidence was not overwhelming, the capital crime[] . . . [was] exceptionally brutal. . . . [M]itigating evidence . . . was unlikely to carry persuasive weight against such a callous and calculated murder." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1185.)

As for the mitigating evidence, we recognize that a number of people testified on defendant's behalf at the penalty phase, that defendant did not have any prior felony convictions, and that the prosecutor conceded that the other criminal activity offered at the penalty phase was limited. But the quantity of witnesses does not necessarily mean the nature of their testimony provided the jury any meaningful mitigation evidence to balance in its consideration of a proper penalty. As the prosecutor emphasized, the proffered factor (k) mitigation evidence regarding a "good deed" by defendant, his love of fishing, and the support of his family, would do very little to extenuate the gravity of his crimes. The same is true of the purportedly mitigating evidence cited in one of the concurring and dissenting opinions. (See conc. & dis. opn. of Evans, J., *post*, at p. 12 [recounting how defendant helped by "string[ing] Christmas lights and decorations"]; *id.* at p. 16 [asserting that defendant "was remorseful" based on letters of apology he wrote after he killed the victim]; *ibid.* [explaining that defendant "loved and was loved" and "behaved well in jail"].)

As summarized by the trial court itself, "[T]here is no sympathetic or other aspect of the defendant's character or record that the defendant has offered for a sentence less than death." (Accord, *Barrera*, *supra*, ___ Cal.5th at p. ___ [slip opn. at pp. 96, 97] [describing the mitigating evidence as "weak" when it "consisted of testimony from [the defendant's] parents, his aunt and his uncle, and the testimony of [another

individual]" and the defendant's family members "were not aware of the facts of the [capital] case"].)

After receiving this evidence, the jury deliberated for several days. Defendant asserts that the length of the jury's deliberations demonstrates that "the jury struggled with its decision." "[W]e reject defendant's assumption the length of penalty deliberations in this case indicates the jury had 'difficulty' with the penalty decision." (*People v. Avena* (1996) 13 Cal.4th 394, 436.) The penalty trial here lasted more than a week and involved the testimony of numerous witnesses, some of whom testified for the defense while others spoke on behalf of the People. Against such a backdrop, the length of deliberations is consistent with the hypothesis that "the jury may simply have sifted the evidence with special care in light of the capital [sentence]." (*People v. Brown* (1985) 40 Cal.3d 512, 535.)[26]

---

[26] According to one of the concurring and dissenting opinions, our reliance on *People v. Brown* is "misplaced" because that case "analyzed *guilt* phase deliberations under a considerably more forgiving standard of prejudice." (Conc. & dis. opn. of Evans, J., *post*, at p. 14.) But a jury's careful consideration of evidence may result in lengthy deliberations regardless of whether the deliberations occur at the guilt or the penalty phase. (See *People v. Jurado* (2006) 38 Cal.4th 72, 134 ["the jury deliberated on penalty for five days before reaching its verdict. The length of their deliberations rather strongly implies that, rather than rushing to judgment under the influence of unbridled passion, the jurors arrived at their death verdict only after a full and careful review of the relevant evidence and of the legitimate arguments for and against the death penalty"]; *Ramirez, supra,* 10 Cal.5th at p. 1029 & fn. 11 [citing *Jurado* and adding in a footnote "[o]f course, the length of deliberations *may also* indicate that 'the question of penalty [was] a close and difficult one' " (italics added)].)

Indeed, the fact that the jury carefully considered the evidence tends to refute defendant's claim that the prosecutor's language triggered the jury's implicit racial bias, leading it to show "a lack of empathy for the defendant and [a] disregard for mitigating evidence." The record shows that the jury conscientiously examined the mitigating evidence, as most clearly indicated by the fact that it asked to have defendant's apology letters and various defense witnesses' testimony read back.[27] Even if implicit racial bias, as defendant claims, commonly has an "effect on how facts are perceived, remembered and understood by decisionmakers," in this case, the facts surrounding the capital crimes were uncontroverted, having been established by defendant's own recorded confessions. Furthermore, the jury was urged by the prosecutor to listen to the taped confessions and indeed asked to have them during deliberations. These facts bolster our assessment that the jury's grasp of the facts in the case was informed by the evidence and not tainted by any alleged racially discriminatory language or any triggering of implicit bias against defendant. Contrary to what defendant asserts, there is no indication on this record that the prosecutor's purported animal imagery operated to "increase[] emotional power, decrease[] conscious scrutiny, and increase[] certainty of belief" on the part of this jury so as to lead it to impose the death penalty.

For these reasons, we conclude the prosecutor's use of the word "wolf" during closing argument was harmless beyond a

---

[27] The prosecutor also told jurors that they should "evaluate [mitigating evidence] when [they] deliberate and [they] should consider [such evidence]." As the prosecutor stated, "I'm never going to tell you not to consider anything presented to you for mitigation."

reasonable doubt. In the context of a trial in which defendant confessed to raping and strangling an 11-year-old girl and has offered no justification — legal, moral, or anything approaching understandable — for his behavior, we agree with the jury and the trial court that the aggravating evidence was overwhelming. We therefore see no reasonable possibility that the prosecutor's reliance on the "wolf in sheep's clothing" story, or limited uses of the word "wolf," affected the death sentence.

Finally, we respond to the concurring and dissenting opinions' reliance on *Bankston*. One of the dissents writes that "[t]oday's decisions in this case and *Bankston* together hold, bizarrely, that the RJA is violated when a Black defendant is compared to a violent, predatory tiger but not when compared to a violent, predatory wolf." (Conc. & dis. opn. of Liu, J., *post*, at p. 2.) There is nothing "bizarre[]" about our holding today when viewed together with our decision in *Bankston*. (*Ibid*.) There, we reversed the judgment of death after the prosecutor likened the defendant to "an 'enormous' Bengal tiger with his 'muscles all flexed out,' 'claws out,' 'fangs' visible, and growling, and placed the tiger deep in the 'jungle[],'" as well as "repeatedly called him a 'thug'" in a way that was "tossed off, in the manner of epithets." (*Bankston*, *supra*, ___ Cal.5th at p. ___ [slip opn. at pp. 125, 108].) We explained in *Bankston* that although we found error under the RJA, we were not deciding "whether past tellings of the Bengal tiger story, without more, always give rise to an RJA violation." (*Bankston*, at p. ___ [slip opn. at p. 105].) We emphasized that "Bankston's claim of penalty phase error does not rest merely on the telling of the Bengal tiger story, without more" but "also rests on the manner in which the story was told." (*Id*. at p. ___ [slip opn. at p. 105].) It was all of these circumstances, in combination, that

persuaded us to "agree with both parties that an objective observer would find that the prosecutor's language constituted an implicit appeal to bias." (*Id.* at p. ___ [slip opn. at p. 108].)

Here, in contrast, the prosecutor's "wolf in sheep's clothing" reference drew upon a well-known fable in which a wolf is used to illustrate human behavior. Although the prosecutor at times used the word "wolf" alone instead of again saying "wolf in sheep's clothing," we do not perceive reversible error in his argument when considering the entire context and other relevant considerations outlined above. This fact-specific assessment of how an animal reference has been used is consistent with the analysis in *Bankston*, in which, as previously explained, we stressed that "we must carefully consider context when determining whether particular statements violate the RJA." (*Bankston*, *supra*, ___ Cal.5th at p. ___ [slip opn. at p. 102].)

The other concurring and dissenting opinion characterizes defendant's mitigating evidence as "much more robust" than that offered in *Bankston*, although it does not go further and weigh that evidence against the aggravating evidence presented in this case. (Conc. & dis. opn. of Evans, J., *post*, at p. 12.) Here again, the comparison to *Bankston* is inapt. In *Bankston*, the manner in which the prosecutor compared the defendant to a tiger and related aspects of his closing argument made it unnecessary for us to further address the mitigating evidence offered at trial in explaining that the error was not harmless. (See *Bankston*, *supra*, ___ Cal.5th at p. ___ [slip opn. at pp. 124–125].) In this case, though, even assuming there was error in the prosecutor's references to defendant as a "wolf" on the heels of referring to him as a "wolf in sheep's clothing," that assumed error nonetheless was of a nature that requires consideration of

matters such as mitigating evidence when assessing prejudice. As we have explained, upon consideration of that evidence, together with all other relevant circumstances, we do not perceive a reasonable possibility that the prosecutor's limited use of the word "wolf" affected the verdict.

The challenged references used in *Bankston* and in this matter have been considered in their respective contexts and both cases have been decided upon their respective facts, as are all cases raising claims under the RJA. We find the more categorical perspective advanced by the concurring and dissenting opinions to be unpersuasive, and decline to adopt it.

### 4. *Constitutionality of California death penalty law*

Defendant raises a series of challenges to California's death penalty scheme that he acknowledges we have "consistently rejected." Because defendant has not given us any persuasive basis to reconsider our prior decisions, we continue to hold as follows.

" '[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court.' [Citation.] Penal Code section 190.3, factor (a), which permits a jury to consider the circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution." (*People v. Rhoades* (2019) 8 Cal.5th 393, 455 (*Rhoades*).)

To the extent defendant complains about evidence introduced or arguments made in this case pursuant to section 190.3, factor (a) — e.g., that the prosecutor "repeatedly reminded the jury [that defendant] assaulted and killed an

innocent 11-year old girl," "contrasted [defendant's age] with the victim's vulnerability," "argued extensively about the impact of the crime on [Jaquita's] family and the community," and so forth — we discern no constitutional infirmity with such presentation.

Moreover, "The death penalty statute 'is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt.' " (*People v. Helzer* (2024) 15 Cal.5th 622, 678 (*Helzer*); see also *People v. McDaniel* (2021) 12 Cal.5th 97, 142–148 (*McDaniel*).) " 'Nothing in *Hurst v. Florida* (2016) 577 U.S. 92, . . . *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* [(2002)] 536 U.S. 584, or *Apprendi v. New Jersey* [(2000)] 530 U.S. 466 . . . , affects our conclusions in this regard.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 326.)

"Neither the federal Constitution nor state law requires the jury be instructed that the prosecution bears some burden of proof as to the truth of the aggravating factors (other than factor (b) or (c) evidence) or the appropriateness of a death verdict. Nor is the court required to explicitly tell the jury that neither party bears the burden of proof." (*People v. Schultz* (2020) 10 Cal.5th 623, 683 (*Schultz*); see also *Helzer*, *supra*, 15 Cal.5th at p. 676 ["We have consistently held that CALJIC Nos. 8.85 and 8.88 ' "adequately and properly instruct on the jury's determination of sentence" ' "].)

"The trial court need not instruct the jury that (1) it must impose a sentence of life without the possibility of parole if it

determines that mitigating factors outweigh aggravating factors [citations]; (2) its findings regarding mitigating circumstances do not need to be unanimous [citation]; (3) it should presume life imprisonment without the possibility of parole is the appropriate sentence [citation]; or (4) statutory mitigating factors are relevant solely in mitigation." (*People v. Scully* (2021) 11 Cal.5th 542, 611 (*Scully*).)

"The capital sentencing scheme does not violate equal protection by denying certain procedural protections to capital defendants that are available to noncapital defendants." (*Scully*, *supra*, 11 Cal.5th at p. 612.)

" 'The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) [citation], [and] jury unanimity regarding such conduct is not required . . . .' " (*Rhoades*, *supra*, 8 Cal.5th at p. 455.)

" 'By advising that a death verdict should be returned only if aggravation is "so substantial in comparison with" mitigation that death is "warranted," ' CALJIC No. 8.88 'clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty.' [Citation.] 'The phrase " 'so substantial' " in CALJIC No. 8.88 is not unconstitutionally vague . . . .' " (*McDaniel*, *supra*, 12 Cal.5th at p. 156.)

"There is no requirement that the jurors be instructed that a defendant bears no burden of proving the facts in mitigation, or that mitigating circumstances did not have to be found unanimously." (*Schultz*, *supra*, 10 Cal.5th at p. 684.)

"The penalty phase jury is not required to make written findings regarding its penalty choice, and the absence of such

written findings does not preclude meaningful appellate review." (*Schultz, supra,* 10 Cal.5th at p. 684.)

" 'The adjectives "extreme" and "substantial" in statutory mitigating factors (d) and (g) of section 190.3 do not prevent the jury from considering mitigating evidence.' " (*Helzer, supra,* 15 Cal.5th at p. 678.)

"The trial court need not delete factually inapplicable sentencing factors from its instructions." (*Scully, supra,* 11 Cal.5th at p. 612.)

"Nor must a court . . . identify which factors are aggravating and which are mitigating. [Citation.] Directing the jury to consider ' "whether or not" ' certain mitigating factors were present does not invite the jury to use the absence of such factors as a factor in aggravation." (*Schultz, supra,* 10 Cal.5th at p. 684.)

" 'Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required.' " (*Scully, supra,* 11 Cal.5th at p. 612.)

"California's death penalty does not violate international law or international norms of decency." (*Helzer, supra,* 15 Cal.5th at p. 678.)

### 5. *Cumulative error*

Defendant contends that even if "none of the errors asserted . . . individually requires reversal," reversal of his convictions and death judgment "is required based on the cumulative effect of guilt and penalty phase errors." We have found no error occurring at the guilt phase and have assumed two errors with respect to the penalty phase — the introduction of Barnes's identification and the use of animal imagery in the

prosecutor's closing argument. The assumed errors are not individually or cumulatively prejudicial.

## III. DISPOSITION

We affirm the judgment in its entirety.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**[*]

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. DEMOLLE

S159120


Concurring and Dissenting Opinion by Justice Liu


I join the portions of today's opinion affirming the judgment of guilt.  But I agree with Justice Evans, for the reasons stated in parts I, III, and IV of her opinion (conc. & dis. opn. of Evans, J., *post*, at pp. 1–6, 7–17), that the prosecutor's comparison of defendant Alex Demolle to a predatory wolf in sheep's clothing during the penalty phase violated the Racial Justice Act of 2020 (RJA) and that the violation requires reversal of the death judgment.  (Pen. Code, § 745; all statutory references are to this code.)

In enacting the RJA, the Legislature could not have been clearer:  "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system."  (Stats. 2020, ch. 317, § 2, subd. (e); see § 745, subds. (a)(2), (h)(4).)  The court today applies this prohibition to retire the oft-told Bengal tiger story because it poses "an unacceptable risk of appealing to racial bias."  (*People v. Bankston* (2026) __ Cal.5th __, __ (*Bankston*).)  Comparisons of Black defendants to Bengal tigers and other vicious animals are a "disturbingly common trope" that "risks activating an all-too-familiar form of implicit bias against Black people."  (*Id.* at p. __ (conc. opn. of Liu, J.).)  "There is no reason to permit prosecutors to continue running the risk of appealing to biases that undermine the very foundation of a system of equal justice,

1

simply to make an unremarkable point about a defendant's behavior." (*Id.* at p. __ (maj. opn.).)

But the court is unwilling to reach the same conclusion about the prosecutor's comparison of Demolle, who is Black, to a predatory wolf. It is true that the phrase "wolf in sheep's clothing" has many possible non-racial usages. But the "wolf" in the prosecutor's usage is not merely a metaphorical deceiver; even in Aesop's fable, it is a predator whose animal instinct is to kill and eat unsuspecting prey. Tracking this usage, the prosecutor likened Demolle to a "predator" who violently attacks a "wounded lamb" who is "easy prey" (i.e., "he's on her like the wolf"). To be sure, the prosecutor used the phrase to describe Demolle's "deceptive human actions." (Maj. opn., *ante*, at p. 120.) But it is unmistakable that the prosecutor also used it to convey that Demolle acted with animalistic savagery. (See *People v. Chhuon and Pan* (2026) __ Cal.5th __, __ (conc. & dis. opn. of Liu, J.) ["Both things can be true."]; *People v. Barrera* (2026) __ Cal.5th __, __ (conc. opn. of Liu, J.) ["why can't both be true?"]; *id.* at p. __ (conc. opn. of Liu, J.) ["In today's cases, the court uses 'either-or' reasoning when 'both-and' is called for."].) That squarely violates the RJA. (§ 745, subds. (a)(2), (h)(4).)

Today's decisions in this case and *Bankston* together hold, bizarrely, that the RJA is violated when a Black defendant is compared to a violent, predatory tiger but not when compared to a violent, predatory wolf. The court says the unlawfulness of the Bengal tiger story in *Bankston* turned on " 'the manner in which the story was told.' " (Maj. opn., *ante*, at p. 125; see *id.* at pp. 125–126 ["It was all of these circumstances, in combination, that persuaded us" in *Bankston* to find the story in violation of the RJA].) But the Legislature did not intend that courts "narrow the RJA's prohibition on animal comparisons" with

2

such "qualifiers." (*Bankston, supra*, __ Cal.5th at p. __ (conc. opn. of Liu, J.).) Comparing a Black defendant to a violent, predatory animal, of whatever species and in whatever manner, "carries significant risks of dehumanization, moral exclusion, and unfairly harsh punishment." (*Id.* at p. __ (conc. opn. of Liu, J.); accord, *id.* at pp. __–__ (conc. opn. of Evans, J.).)

In the penalty phase of a capital case, the use of such dehumanizing language, whether purposeful or not, calls for sentencing the defendant to death with the same degree of moral concern as, say, a rancher killing a wolf who has attacked his flock of sheep. Indeed, the deceitful wolf in Aesop's fable is summarily killed by the shepherd; in one telling, "the Shepherd discovered [the wolf], and cunningly watched the opportunity of slipping a noose about his neck, and immediately hung him up on the branch of a tree," as other shepherds "expressed themselves pleased at [the Shepherd's] dexterity, and applauded the justice of the execution." (Bewick, The Fables of Aesop (1818) p. 245.) Needless to say, no version of the fable includes careful, individualized consideration of aggravating and mitigating circumstances in accordance with law.

"Because the operation of implicit bias can shift the entire frame through which jurors evaluate the evidence, it is 'extraordinarily difficult' for a reviewing court to conclude beyond a reasonable doubt that such bias did not prejudice a capital jury's normative penalty determination." (*Bankston, supra*, __ Cal.5th at p. __ (conc. opn. of Liu, J.); accord, conc. & dis. opn. of Evans, J., *post*, at pp. 7–8.) No such conclusion can be reached on this record, so the penalty verdict must be reversed.

**LIU, J.**

3

PEOPLE v. DEMOLLE

S159120


Concurring and Dissenting Opinion by Justice Evans


In the course of arguing that defendant Alex Demolle, a Black man, should be put to death, the prosecutor encouraged the jury to view Demolle as a dangerous, predatory animal. Given the history of dehumanizing comparisons of Black men to animals in the criminal justice system, this constituted an appeal to racial bias in violation of the Racial Justice Act (Pen. Code, § 745; RJA or Act). In a companion case, this court has declared that allowing prosecutors to appeal to racial bias in this manner "undermine[s] the very foundation of a system of equal justice" by unfairly discouraging the jury "from according [a defendant] the full measure of individual worth and mercy that the law allows." (*People v. Bankston* (June 1, 2026, S044739) ___ Cal.5th ___, ___ [pp. 105, 125] (*Bankston*).)

I agree, yet this type of injustice turns out to be something the majority is willing to tolerate here. I am not. This is because "[a]n appeal to racial bias is at its most pernicious when the decision to be made is one that rests on individual moral and normative considerations." (*Bankston*, *supra*, ___ Cal.5th at p. ___ [p. 28] (conc. opn. of Evans, J.).) Since the RJA requires death sentences tainted by racist appeals to be reversed (Pen. Code, § 745, subd. (*l*)), I respectfully dissent.

**I.**

Demolle raped and murdered an 11-year-old girl. No one disputes his guilt or that this was a heinous crime. The jury

1

found true two special circumstances, which rendered him eligible for the death penalty: murder during the commission of a rape and murder during the commission of a lewd act on a child under the age of 14.

At the penalty trial to determine whether Demolle would be sentenced to death or to life without the possibility of parole, the prosecutor likened Demolle to a predatory wolf in sheep's clothing because he had used his PlayStation to entice the child into his apartment, where he raped and killed her. Animal comparisons of this sort raise concerns under the RJA. As the Legislature explained in uncodified findings and declarations accompanying the RJA's enactment, "use of animal imagery is historically associated with racism" and "should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e).) The RJA itself lists "language that compares the defendant to an animal" as " '[r]acially discriminatory language,' " which "means language that, to an objective observer, explicitly or implicitly appeals to racial bias." (Pen. Code, § 745, subd. (h)(4).)

We have explained that while the RJA prohibits "some" comparisons between a defendant and an animal, "we are unpersuaded that the RJA categorically forbids *all* such language," given that "not all uses of animal imagery raise concerns about explicit or implicit appeals to racial bias." (*Bankston, supra,* ___ Cal.5th at p. ___ [pp. 101–102].) To determine whether the challenged language violates the Act, " 'we must carefully consider context.' " (Maj. opn., *ante*, at p. 112.)

Context does matter. It is true, as the majority opinion points out, that "[t]he term 'wolf in sheep's clothing' is a common, facially neutral saying that has long been used in

2

myriad circumstances in which someone or something poses or has been presented as something it is not,' " dating back at least as far as Aesop's Fables. (Maj. opn., *ante*, at p. 115.) The problem, though, is that in context, "the prosecutor did not tell the story as though []he were merely pulling a page from Aesop's Fables." (*Bankston, supra*, ___ Cal.5th at p. ___ [p. 106].) He instead repeatedly described Demolle as a "predator" — a wolf being an apex predator — and the victim as "easy prey," "a wounded lamb that has been separated from the flock." The scene he painted for the jurors was that once the victim came inside and Demolle shut the door, the sheep's clothing came off "and he *is* a wolf." (Italics added.) After Demolle pushed her down, "then he's on her like the wolf." To isolate particular comments — first, " 'predator' and variants of the term" (maj. opn., *ante*, at p. 113; see *id.* at p. 114); next, " 'wolf in sheep's clothing' " (*id.* at p. 115); and only then "the word 'wolf' " (*id.* at p. 116) — fails to apprehend that the prosecutor's characterization of Demolle's behavior was overlaid with unnecessary animal metaphors that were likely to trigger the jurors' implicit biases. Parsing the language in this fashion also mischaracterizes Demolle's RJA claim, which is based on the prosecutor's animal imagery considered as a whole.

Given the ease with which prosecutors can "conjure up stereotypes of Black people as having animalistic tendencies" just by "using similes" (Prasad, *Implicit Racial Biases in Prosecutorial Summations* (2018) 86 Fordham L.Rev. 3091, 3105–3106), portraying the defendant as a predatory animal who preyed sexually on a young and helpless victim bore a substantial risk of appealing to the jury's racial biases. (Stats. 2020, ch. 317, § 2, subd. (e) ["Because use of animal imagery is historically associated with racism, use of animal imagery in

reference to a defendant is racially discriminatory and should not be permitted in our court system"].) This is far from the first time a Black man (or even a child or teenager) has been described as a "wolf" as a means of dehumanizing them. For example, newspapers in New York and around the country, and even elected officials, called the ultimately exonerated Black and Latino teenagers known as the Central Park Five a " 'wolf pack' " (Duru, *The Central Park Five, the Scottsboro Boys, and the Myth of the Bestial Black Man* (2004) 25 Cardozo L.Rev. 1315, 1349); one outlet went so far as to "argue[] that perhaps referring to the youths as wolves defamed wolves, because not even wolves attack for the thrill." (*Id.* at p. 1348; see also Center for Death Penalty Litigation, *"A Worthless, Good-for-Nothing Mammal": Painting Black Defendants As Animals* (2006) <https://racistroots.org/section-4/a-worthless-good-for-nothing-mammal-painting-black-defendants-as-animals/> [as of June 1, 2026] [prosecutor described the defendants as " 'a pack of humans acting as wolves' " when arguing to juries why the Black defendants "should be executed"].)[1] The imagery of a wolf and a predator in this case, which dehumanized Demolle in the eyes of the jury, was not remotely like the innocuous metaphors of "an 'eager beaver,' 'happy as a clam,' 'free as a bird,' or 'quiet as a mouse.' " (*Bankston, supra*, ___ Cal.5th at p. ___ [p. 101].)

The majority opinion deems it significant that "the challenged remarks were consistent with the theme — unrelated to race — which the prosecutor developed early in his argument," namely that Demolle "behaved differently in front of

---

[1] All internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/opinions/cited-supreme-court-opinions>.

family and friends than 'when no one is watching.' " (Maj. opn., *ante*, at p. 115.) I do not quarrel with the propriety of the prosecutor's theme, nor with the fact that this theme could have been presented to the jury without making an appeal to racial bias. What caused the argument to run afoul of the RJA was that the prosecutor laced it with the racial trope of the Black male defendant as an apex predator — a wolf — so as to render him more dangerous and less human in the eyes of the jury.

Consider the Bengal tiger story in *Bankston*. The court there recognized it can be legitimate for a prosecutor to point out that a defendant's calm and docile demeanor in the courtroom was not necessarily inconsistent with " 'his violent conduct in less controlled circumstances.' " (*Bankston, supra,* ___ Cal.5th at p. ___ [p. 103.].) That theme, too, was unrelated to race. It is nonetheless a violation of the RJA, however, to illustrate that theme with the use of animal comparisons that "run[] the risk of appealing to biases that undermine the very foundation of a system of equal justice." (*Bankston*, at p. ___ [p. 105.) The same is true here. The prosecutor's "manner of telling left no doubt about the connection [the prosecutor] wished the jurors to draw, between this image of a vicious predator and the defendant standing before them." (*Bankston, supra,* ___ Cal.5th at p. ___ [p. 106.)[2]

---

[2] The majority opinion further contends that "[t]he fact that the challenged language 'fell within the prosecutor's broader [legitimate] argument' supports the conclusion that it does not reflect bias or animus toward defendant because of his race." (Maj. opn., *ante*, at p. 116.) But Demolle's claim is not that the challenged language reflected bias or animus toward him because of his race, but that it explicitly or implicitly appealed

I therefore conclude that the prosecutor's wolf/predator metaphor more likely than not appealed to racial bias.

## II.

The RJA provides that if the prosecutor made an appeal to racial bias, "the court *shall* impose a remedy," as specified. (Pen. Code, § 745, subd. (e), italics added.)  If the violation affected only the sentence, "the court shall vacate the sentence, find that it is legally invalid, and impose a new sentence." (*Id.*, subd. (e)(2)(B).)  In the specific circumstance where a violation has been proven in a capital case, "the defendant shall not be eligible for the death penalty." (*Id.*, subd. (*l*).)

Accordingly, in this case, the prosecutor's appeal to racial bias requires us to reverse the death judgment.  There is no additional requirement that the court conduct a separate inquiry into whether the activation of jurors' racial biases was prejudicial.  (See *Bankston, supra*, ___ Cal.5th at p. ___ [pp. 7–26] (conc. opn. of Evans, J.).)  "An appeal to racial bias is at its most pernicious when the decision to be made is one that rests on individual moral and normative considerations." (*Id.* at p. ___ [p. 28] (conc. opn. of Evans, J.).)  Appealing to such biases can never be harmless because it "undermine[s] the very foundation of a system of equal justice." (*Id.* at p. ___ [p. 105].)  "Surely the Legislature did not intend to create a statute that would encourage defendants in nonfinal cases to identify and present bona fide claims of racism in the system, only for courts

---

to racial bias (Pen. Code, § 745, subd. (h)(4)), "whether or not purposeful" (*id*, subd. (a)(2)).

to discount them by deeming them 'harmless.' " (*Id.* at p. ___ [p. 10] (conc. opn. of Evans, J.).)

## III.

Even if the RJA could be construed to deem some errors harmless, Demolle would still be entitled to relief. "Unlike a sufficiency of the evidence claim, where we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence," a reviewing court's task in analyzing prejudice in this circumstance is markedly different: " 'whether any rational fact finder could have come to the opposite conclusion.' " (*People v. Hin* (2025) 17 Cal.5th 401, 462, quoting *People v. Mil* (2012) 53 Cal.4th 400, 418; see *People v. Lamb* (2024) 16 Cal.5th 400, 452.) The burden is even higher at a capital penalty trial, when the jury's "role is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448.)

To determine whether an error was prejudicial or harmless, a court must "consider all the ways that error can infect the course of a trial." (*Brecht v. Abrahamson* (1993) 507 U.S. 619, 642 (conc. opn. of Stevens, J.).) It is not enough to analyze the aggravating and mitigating evidence. When we are considering the effect of an appeal to racial bias at a penalty trial in a capital case, we must *also* consider the fact that dehumanization of the defendant by use of animal comparisons can make the trier of fact "less likely to properly weigh the evidence of Black defendants' guilt" (Prasad, *supra*, 86 Fordham L.Rev. at p. 3107), more likely to view the defendant as " 'outside

the boundary in which moral values, rules, and considerations of fairness apply' " (Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences* (2008) 94 J. Personality and Social Psychology 292, 293), less likely to extend sympathy (Prasad, at p. 3107), and more likely to impose harsher punishment (*id.* at p. 3105). In short, implicit biases cause jurors to "value [Black capital defendants] less as humans than they value their White American counterparts." (Levinson et. al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States* (2014) 89 N.Y.U. L.Rev. 513, 564; see Prasad, at p. 3105 [dehumanization "reduces white persons' empathy for Black people"].)

With these effects in mind, I examine whether the Attorney General has carried his burden to demonstrate beyond a reasonable doubt that the prosecutor's appeal to racial bias "did not contribute to the judgment" (Pen. Code, § 745, subd. (k)) in this case.

## A.

The majority opinion uses the wrong frame to examine the question of prejudice. It emphasizes that the prosecutor's challenged comments were "only a brief portion of a lengthy closing summation" — which, in its view, "as a whole was extensive and fair" — and were offered "only in describing defendant's 'egregious harmful behavior' in raping and killing a child." (Maj. opn., *ante*, at p. 120.) Neither circumstance ameliorates an appeal to racial bias.

The majority opinion does not explain how the prosecutor's weaving together his comparison of Demolle to an apex predator with his description of Demolle's conduct eliminated any

reasonable possibility that the prosecutor thereby dehumanized Demolle in the eyes of the jury. To the contrary, this form of argument exemplifies the evil the RJA was designed to address: "[c]ourts often argue that subtle references are '*merely descriptive*' and are unwilling to recognize the impact the references could have on jurors' implicit biases" and therefore "do not fully appreciate the unfair impact . . . the references could have on jurors' implicit biases." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3115, italics added; see *id*. at p. 3118 ["The fact that some courts find subtle racial arguments plausible suggests that the jurors might find them persuasive"].)

I fear this point cannot be emphasized enough: An appeal to racial bias is *not* excused or mitigated merely because it is " 'part of an evident effort to comment on matters fairly presented to the jury for its consideration.' " (Maj. opn., *ante*, at pp. 120–121.) The RJA, after all, is not limited to gratuitously tossed-off epithets that are not a fair comment on the evidence; that type of language was already misconduct before the RJA was enacted. The RJA *also* applies when legitimate argument is enhanced or bolstered by a coded appeal to racial bias. (*People v. Barrera* (June 1, 2026, S103358) \_\_\_ Cal.5th \_\_\_, \_\_\_ [p. 85, fn. 11] ["language can appeal to implicit racial bias even when the prosecutor purports to be giving a factual description of a brutal crime"].) As the Legislature explained in its findings and declarations, "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats. 2020, ch. 317, § 2, subd. (i); see Pen. Code, § 745, subd. (h)(4).)

The Legislature's finding on this point is well supported in academic literature and the case law. "Coded language is particularly powerful in triggering stereotypes precisely *because*

*it does not reference race explicitly*, and thereby does not violate our current egalitarian norms.  Explicit references to race allow low-prejudice individuals to evaluate and reject stereotypical appeals.  Coded language, on the other hand, allows our minds to quickly grasp complex concepts and the associated cultural values, while obscuring the racial stereotypes underlying these cultural values." (Bowman, *Seeking Justice:  Prosecution Strategies for Avoiding Racially Biased Convictions* (2023) 32 So.Cal. Interdisciplinary L.J. 515, 527, italics added & fn. omitted.)  Because " 'subtle references to racial bias are 'just as insidious' and '[p]erhaps more effective' " (*State v. Zamora* (2022) 199 Wn.2d 698, 715), I frankly do not understand the basis for the majority's belief that the prosecutor's subtle approach negated any reasonable possibility of prejudice.

The majority likewise errs in relying on the alleged brevity of the prosecutor's challenged language.  " 'Like wolves in sheep's clothing, a careful word here and there can trigger racial bias.' " (*State v. Zamora, supra*, 199 Wn.2d at p. 715.)  As the Legislature's explicit findings explain, racial bias is "[l]ike a metastatic cancer" that "in all its forms or degrees, is never minor or harmless." (Stats. 2025, ch. 721, § 1, subd. (e).)  Nor can the appeal to racial bias be cured by pointing to other portions of the prosecutor's argument where he did *not* compare the defendant to a predatory animal. (See maj. opn., *ante*, at pp. 120–121.)  Besides, the prosecutor's problematic language can be deemed "brief" only by failing to appreciate that the characterization of Demolle as a predator, a wolf in sheep's clothing, and a wolf reinforced each other so as to portray Demolle as more dangerous than a human.

Finally, the majority opinion errs in according weight to an assumption that the prosecutor made " 'an evident effort' "

(maj. opn., *ante*, at p. 121) to comment on legitimate matters. The RJA bars an appeal to racial bias, "whether or not purposeful." (Pen. Code, § 745, subd. (a)(2).) Our task is to analyze the effect of the prosecutor's appeal to racial bias, not the prosecutor's intent.

## B.

The majority opinion provides its own assessment of the aggravating and mitigating evidence, concluding that the prosecutor's appeal to racial bias at trial must have been harmless because the crimes were " 'shocking and callous' " and the mitigating evidence "offered no justification — legal, moral, or anything approaching understandable — for his behavior." (Maj. opn., *ante*, at pp. 121, 124.) This analysis is incomplete. Although evidence that tends to extenuate the gravity of or diminish defendants' responsibility for their crimes can be *a* reason to mitigate punishment, it is not the only possible justification for a life sentence. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1192 [the death penalty statute "allows the jury to consider a virtually unlimited range of mitigating circumstances"]; see *Marshall v. Hendricks* (3d Cir. 2002) 307 F.3d 36, 103 (*Marshall*) ["The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life"]; Crocker, *Concepts of Culpability and Deathworthiness: Differentiating Between Guilt and Punishment in Death Penalty Cases* (1997) 66 Fordham L.Rev. 21, 82, fn. 341 [" 'To say that evidence mitigates a defendant's culpability is not to say that he is any less guilty or deserving of blame, but that he is less deserving of death' "].)

Consider the defendant in *Bankston*, *supra*, ___ Cal.5th ___. He committed *two* murders, not just one, and his crimes were likewise "callous[]." (*Bankston*, at p. ___ [p. 124].) His mitigation case, by contrast to Demolle's, "was virtually nonexistent." (*Id.* at p. ___ [p. 28] (conc. opn. of Evans, J.).) Nonetheless, the court unanimously reversed his penalty judgment because the prosecutor's argument "appeal[ed] to implicit racial bias" (*id.* at p. ___ [p. 125]) and thereby posed an intolerable risk of "undermin[ing] the very foundation of a system of equal justice" (*id.* at p. ___ [p. 105]).

Notably, Demolle's case in mitigation was much more robust than Bankston's. Through the testimony of 31 witnesses, the defense established that Demolle was a friendly and helpful person, often watching the children of family, friends, and fellow church members. Demolle's nephew described him as " 'brave' " and " 'courageous' " because Demolle once had saved him from being kidnapped by drunk men with crowbars. Demolle was devoted to his daughter and, prior to his arrest, had served as her primary caregiver. She said she missed him, loved him, and wished he could come home. Demolle's wife testified that he helped out when "somebody needed to move," "fix things," or even string Christmas lights and decorations. Demolle had expressed remorse in letters of apology he wrote to the victim's family, his wife, and his friend. In addition, Demolle's aunt testified about how Demolle's mother would react if Demolle were executed: "I think it's going to kill her if Alex gets the death penalty. It's going to really kill her, going to tear her apart."

The evidence further showed that Demolle had no other felony convictions, behaved well in custody, and, in the opinion of a former prison warden, would not pose a threat of violence in

prison because when Demolle had been threatened in jail, "he walked away from it." A sheriff's deputy confirmed that Demolle always "did whatever we told him" to do and was "[n]ever a problem."

All this matters "[b]ecause one of the most important functions of the capital sentencing process is the opportunity to humanize the defendant." (*Lawhorn v. Allen* (11th Cir. 2008) 519 F.3d 1272, 1296.) Evidence offered in mitigation sheds light on " '[a] central issue' " at the penalty trial, namely, " 'the meaning and value of the defendant's life' " so that the jury can determine " 'the convicted defendant's worthiness to live.' " (*Marshall, supra*, 307 F.3d at p. 99.) But the activation of racial bias can make jurors more likely to view the defendant as " 'outside the boundary in which moral values, rules, and considerations of fairness apply' " (Goff, *supra*, 94 J. Personality and Social Psychology at p. 293), less likely to extend sympathy (Prasad, *supra*, 86 Fordham L.Rev. at p. 3107), and more likely to impose harsher punishment (*id.* at p. 3105).[3] These effects uniquely damage the jurors' ability to understand and evaluate the evidence. (Cf. *People v. Hamilton* (1989) 48 Cal.3d 1142, 1184 [despite the prosecutor's mischaracterization of the absence of mitigating factors as "aggravating," "we have assumed reasonable jurors would understand how to evaluate the absence of particular mitigating factors"].) Accordingly, had the prosecutor not tainted the jurors' assessment of the evidence by appealing to racial bias, there is a reasonable possibility the

---

[3] That "the facts surrounding the *capital crimes* were uncontroverted" (maj. opn., *ante*, at p. 124, italics added) is thus irrelevant to how the jury assessed Demolle's mitigating evidence.

extensive evidence offered in mitigation in this case could have convinced at least one juror to spare Demolle's life. (See *People v. Easley* (1983) 34 Cal.3d 858, 879–880 (*Easley*) [evidence that defendant "was a loving and devoted son" who assisted "with household repairs and in many other ways," had "loving relationships with his own as well as with his friends' children," and was described as "nonviolent" by "correctional officials" established a " 'reasonable possibility' that the jury would not have returned a death penalty sentence," despite the "brutal" and "unusually cold-blooded" nature of the murders].)

The majority opinion discounts the possibility of prejudice because, in its view, "there is no indication on this record" that the prosecutor's racialized rhetoric affected the jury "so as to lead it to impose the death penalty." (Maj. opn., *ante*, at p. 124.) But this places the burden on the wrong party. Under *Bankston*, *supra*, ___ Cal.5th at page ___ [p. 109], the burden is on *the prosecution* to demonstrate beyond a reasonable doubt that the appeal to racial bias did *not* contribute to the verdict. Neither the Attorney General nor the majority opinion has discharged that burden.

In any event, objective indicators in the record corroborate the possibility that the RJA violation could have affected the verdict. The jury deliberations were nearly as long as the presentation of evidence at the penalty phase: five days. "Of course, the length of deliberations may also indicate that 'the question of penalty [was] a close and difficult one.' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1029, fn. 11; cf. *People v. Avena* (1996) 13 Cal.4th 394, 436 [finding no " 'difficulty' with the penalty decision" when the jury deliberations were less than half as long].) The majority opinion's reliance on *People v. Brown* (1985) 40 Cal.3d 512, which analyzed *guilt* phase

deliberations under a considerably more forgiving standard of prejudice (*id.* at p. 535), is quite misplaced.

The record also reveals that the jury requested Demolle's letters of apology as well as readbacks of defense mitigation witnesses during deliberations. These, too, are indications the case was close. (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295; accord, *Thomas v. Chappell* (9th Cir. 2012) 678 F.3d 1086, 1103 [listing the length of deliberations and requests for readback as "objective clues" that " '[t]he jury was clearly struggling to reach a verdict' "].) The majority opinion, by contrast, offers nothing but speculation for its assertion that the lengthy deliberations and requests to review the evidence showed "that the jury conscientiously examined the mitigating evidence." (Maj. opn., *ante*, at p. 123.) Even if that were a possible inference from the record, it is not the *only* possible one — and therefore fails to dispel any reasonable possibility of prejudice. However conscientiously some jurors may have examined the mitigating evidence, the prosecution has not refuted the possibility that at least one juror's evaluation of that evidence may have been tainted by an unlawful appeal to racial bias.

## IV.

Death penalty cases present courts with terrible and senseless crimes that from time to time tax even the ability of judges to set aside the horror and apply the law faithfully and fairly. Demolle was fairly convicted of raping and murdering an 11-year-old girl, and I concur in the court's opinion affirming his guilt. But the trial to determine whether he should live or die was infected with racialized imagery and metaphor that bore a reasonable possibility of diverting jurors from fully and fairly

evaluating the case he presented for a sentence of life in prison without the possibility of parole.

The defense offered evidence to show that, despite these crimes, Demolle's life had value.  He was remorseful.  He loved and was loved, especially by his daughter, for whom he had been the primary caregiver.  He had been helpful to family and friends.  He had behaved well in jail, and a former warden believed he would not pose a danger in prison.

Did these facts "extenuate" or "justif[y]" his crimes?  (Maj. opn., *ante*, at pp. 122, 124.)  No.  But they did illuminate, as the jury was instructed, a "sympathetic or other aspect of the defendant's character or record . . . whether or not related to the offense for which he [was] on trial," which was a " '*necessary*' " part of the penalty calculus.  (*Easley*, *supra*, 34 Cal.3d at p. 880.)  These facts in mitigation offered a reasonable basis for a juror who was weighing Demolle's life in the balance to conclude that the risk of future harm was low, that his life still had some value, and that the appropriate sentence was not death but life without the possibility of parole.  (See Stetler, *The Past, Present, and Future of the Mitigation Profession:  Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases* (2018) 46 Hofstra L.Rev. 1161, 1186 & fn. 142 [noting that death judgments are becoming "[v]anishingly [r]are," even in cases involving child victims].)  Indeed, the record, including the length of deliberations and the jury's request for readbacks, strongly suggests that the penalty determination was a close call.

For all these reasons, I cannot say beyond a reasonable doubt that the injection of racial bias into the penalty trial was

harmless.  I would reverse the death judgment and remand for further proceedings.  I therefore respectfully dissent.

**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Demolle

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S159120
**Date Filed:** June 1, 2026

_____

**Court:**  Superior
**County:**  Alameda
**Judge:**  Larry J. Goodman

_____

**Counsel:**

Mary K. McComb and Galit Lipa, State Public Defenders, Jolie Lipsig, Bethany L. O'Neill and Erik Levin, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Ronald S. Matthias and James William Bilderback II, Assistant Attorneys General, Glenn R. Pruden, Sarah J. Farhat, Alice B. Lustre and Lisa Ashley Ott, Deputy Attorneys General, and Joshua A. Klein, Deputy State Solicitor General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Erik Levin
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 20000
Oakland, CA 94612
(510) 879-0756